# 14-2437-cr

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

—against—

ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, RAYMOND CRAIG BRUBAKER, BDO USA, LLP, DAVID PARSE,

*Defendants,*

PAUL M. DAUGERDAS,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

HENRY E. MAZUREK
BRIAN D. LINDER
CLAYMAN & ROSENBERG LLP
305 Madison Avenue, Suite 1301
New York, New York 10165
(212) 922-1080

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Page

**INTRODUCTION AND SUMMARY OF ARGUMENT**....................1

**JURISDICTIONAL STATEMENT**...............................6

**ISSUES PRESENTED**........................................6

**STATEMENT OF THE CASE** ...................................8

**STATEMENT OF FACTS**............................................10

**ARGUMENT**................................................27

I.  PAUL DAUGERDAS'S CONVICTIONS FOR TAX EVASION,
    OBSTRUCTION OF THE IRS, AND MAIL FRAUD MUST BE
    REVERSED BECAUSE (A) THE EVIDENCE FAILED TO
    DISPROVE HIS GOOD FAITH DEFENSE AND (B) THE
    EVIDENCE FAILED TO PROVE THAT THE RELEVANT
    TRANSACTIONS LACKED ECONOMIC
    SUBSTANCE........................................................27

    A. The Court's Jury Instructions..............................31

    B. Daugerdas's Good Faith As to the Objective Prong of Economic
    Substance.......................................................33

    C. Daugerdas's Good Faith as to the Subjective Prong of Economic
    Substance.......................................................46

    D. The Evidence With Respect to Counts Five and Six Was Legally
    Insufficient....................................................49

        1.  There was Insufficient Evidence That Blair and Coleman
        Lacked A Business Purpose In Executing the Swaps
        Trades Or That Daugerdas Knew They Had No Non-Tax
        Purpose.....................................................49

2.     There Was Insufficient Evidence To Prove That Daugerdas Knew Blair and Coleman Lacked A Reasonable Possibility of A Profit....................................51

E. The Evidence With Respect to Counts Seven and Eleven Was Legally Insufficient.........................................................52

F. The Evidence With Respect to Counts Thirteen and Seventeen Was Legally Insufficient........................................................53

II.    PAUL DAUGERDAS'S CONVICTION FOR CONSPIRACY AND MAIL FRAUD MUST BE REVERSED BECAUSE (A) THE EVIDENCE WAS INSUFFICIENT TO PROVE (i) DAUGERDAS'S PARTICIPATION IN ILLEGAL BACKDATING OR (ii) THAT THE TRANSACTIONS INVOLVING "AS OF" TRADE DATES "AFFECTED A FINANCIAL INSTITUTION" AND (B) THE INDICTMENT FAILED TO ALLEGE AN EFFECT ON A FINANCIAL INSTITUTION......................................................56

A. Daugerdas Did Not Participate in a Criminal Backdating Scheme.......................................................................57

B. The Evidence Was Insufficient to Prove That the Backdated Transactions Affected Deutsche Bank.................................62

C. Count Seventeen Failed to Allege An Essential Element of the Crime.........................................................................65

III.   THE DISTRICT COURT'S ERRONEOUS SUPPLEMENTAL INSTRUCTIONS ON THE "ANNUAL ACCOUNTING RULE" WARRANT A NEW TRIAL FOR MR. DAUGERDAS ON ALL COUNTS...................................................................66

A. The Standard of Review...................................................67

ii

B. The District Court's Supplemental Instructions Deprived
Mr. Daugerdas of a Fair Trial…………………………………………70

    1.    The District Court Misstated Federal Tax Law by
Instructing the Jury on an Absolute Annual Accounting
Rule……......................................................………...…74

    2.    The District Court's Supplemental AAR Instructions
Failed to Refer to the *Klein* Conspiracy Charge and Left
the Jury Confused as to Their Applicability to All
Counts as Urged by the Prosecutor in Rebuttal
Summation……………………………….……………………...83

    3.    The Supplemental AAR Instructions Impermissibly
Reduced the Scienter Requirement on All Counts and
Deprived Mr. Daugerdas of His Good Faith
Defense…………………………………………………………90

IV.    DAUGERDAS IS ENTITLED TO A NEW TRIAL BECAUSE
THE GOVERNMENT CONSTRUCTIVELY AMENDED
THE INDICTMENT TO CREATE AN ALTERNATIVE
THEORY OF ANNUAL ACCOUNTING FRAUD………………...94

A. The Government's Summation and the Court's Supplemental
Instructions Permitted the Jury to Convict of Uncharged
Crimes………......................................................……...96

    1.    The Government's Rebuttal Summation……………..……....96

    2.    The District Court's Supplemental Instructions…..………..99

B. Because the S-6 Indictment Failed to Allege Violations of
the Annual Accounting Rule as a Separate or Alternative
Tax Evasion and Mail Fraud Scheme, the Government's
Reliance on This Theory Violated the Grand Jury Clause
and the Sixth Amendment Right to Notice…………..……………101

V.   DAUGERDAS'S CONVICTIONS MUST BE  VACATED
     BECAUSE THE GOVERNMENT'S IMPROPER
     SUMMATION ARGUMENTS, COMBINED WITH THE
     OTHER TRIAL ERRORS, VIOLATED DUE PROCESS….........105

     A. The Court Committed Reversible Error by Permitting the
        Government to Admit Irrelevant, Highly Prejudicial
        Evidence of a Third Party's Guilty Plea to Tax Evasion in
        an Unrelated Matter and Argue Guilt by Association….….......106

     B. The Government's Burden-Shifting and Improper
        Bolstering in Summation Diverted the Jury from
        Consideration of the Evidence……………………………………111

     C. The Prosecution's Improper Summation Theory and
        Inconsistent Position at Sentencing Violated Due Process….….116

     D. The Cumulative Prejudice Resulting from the Uncured
        Trial Errors is Substantial and Facilitated Otherwise
        Tenuous Convictions………………………………………………119


VI.  PAUL DAUGERDAS'S CONVICTION FOR OBSTRUCTION
     OF THE IRS MUST BE REVERSED BECAUSE COUNT
     THIRTEEN OF THE INDICTMENT WAS DUPLICITOUS…….120


VII. AT A MINIMUM, DAUGERDAS SHOULD BE
     RESENTENCED BECAUSE THE SENTENCE IMPOSED
     WAS PROCEDURALLY AND SUBSTANTIVELY
     UNREASONABLE……………………………………………………123

     A. Daugerdas's Sentencing Proceedings Were Procedurally
        Flawed…………………………………………………………………124

     B. Daugerdas's Sentence was Substantively
        Unreasonable……………………………………………………………128

iv

VIII. THE PRELIMINARY ORDER OF FORFEITURE MUST BE
VACATED BECAUSE THE GOVERNMENT DID NOT
ESTABLISH THE REQUISITE NEXUS BETWEEN THE
FORFEITED PROPERTY AND THE OFFENSE CONDUCT
GIVING RISE TO THE FORFEITURE……..………………………134

**CONCLUSION**......................................................................... 138

# TABLE OF AUTHORITIES

## Cases

*ACM Pshp. v. Commissioner,*
   157 F.3d 231 (3d Cir. 1998) ...................................................... 41, 42

*Begner v. United States,*
   2004 U.S. Dist. LEXIS 8134 (N.D. Ga. Apr. 15, 2004) .................... 79

*Blakely v. Washington,*
   542 U.S. 296 (2004) ...................................................................... 133

*Bollenbach v. United States,*
   326 U.S. 607 (1946) ................................................................. 89, 93

*Bradshaw v. Stumpf,*
   545 U.S. 175 (2005) .............................................................. 117, 118

*Cavazos v. Smith,*
   132 S. Ct. 2 (2011) ....................................................................... 124

*Cheek v. United States,*
   498 U.S. 192 (1991) .......................................................... 34, 73, 103

*Crawford v. Washington,*
   541 U.S. 36 (2004) ....................................................................... 108

*Cunningham v. California,*
   549 U.S. 270 (2007) ..................................................................... 132

*Dodge v. Commissioner,*
   27 T.C.M. (CCH) 1170 (Oct. 15, 1968) .......................................... 77

*Gall v. United States,*
   552 U.S. 38 (2007) ............................................................... 123, 125

*Goldstein v. Commissioner,*
   364 F.2d 734 (2d Cir. 1966) ................................................ 13, 17, 43

*Gonzalez v. Sullivan,*
   934 F.2d 419 (2d Cir. 1991) ......................................................... 116

*Hillsboro Nat'l Bank v. Commissioner,*
  460 U.S. 370 (1983) ................................................... 75, 76

*Hudson v. N.Y. City,*
  271 F.3d 62 (2d Cir. 2001) ....................................... 67, 68

*Kimbrough v. United States,*
  128 S. Ct. 558 (2007) ................................................... 126

*McMillan v. Pennsylvania,*
  477 U.S. 79 (1986) ...................................................... 131

*Miller v. United States,*
  949 F. Supp. 544 (N.D. Ohio 1995) ................................ 79

*Nat'l R. Passenger Corp. v. One 25,900 Square Foot,*
  766 F.2d 685 (2d Cir. 1985) ........................................... 68

*Neder v. United States,*
  527 U.S. 1 (1999) ............................................... 70, 71, 93

*Pettibone Corp. v. United States,*
  34 F.3d 536 (7th Cir. 1994) ........................................... 80

*Real Estate Equity Strategies, L.L.C. v. IRS,*
  2007 U.S. Dist. LEXIS 16720 (D. Minn. Mar. 8, 2007) .................. 79

*Rita v. United States,*
  551 U.S. 338 (2007) ...................................................... 131

*Schering Corp. v. Pfizer Inc.,*
  189 F.3d 218 (2d Cir. 1999) ......................................... 109

*Smith v. Commissioner,*
  331 F.2d 298 (7th Cir. 1964) ......................................... 80

*Tart v. McGann,*
  697 F.2d 75 (2d Cir. 1982) ............................................ 69

*United States v. Agne,*
  214 F.3d 47 (1st Cir. 2000) ........................................... 63

*United States v. Alfonso-Perez,*
  535 F.2d 1362 (2d Cir. 1976) ....................................... 113

*United States v. Aracri,*
968 F.2d 1512 (2d Cir. 1992) ......................................... 121

*United States v. Berlin,*
472 F.2d 1002 (2d Cir. 1973) ......................................... 104

*United States v. Booker,*
543 U.S. 220 (2005) ............................................ 125, 133

*United States v. Broxmeyer,*
699 F.3d 265 (2d Cir. 2012) ......................................... 132

*United States v. Bubar,*
567 F.2d 192 (2d Cir. 1977) ......................................... 113

*United States v. Certified Envtl. Servs.,*
753 F.3d 72 (2d Cir. 2014) ......................................... 119

*United States v. Clemente,*
22 F.3d 477 (2d Cir. 1994) ......................................... 101

*United States v. Contorinis,*
692 F.3d 136 (2d Cir. 2012) ......................................... 137

*United States v. Coplan,*
703 F.3d 46 (2d Cir. 2012) ................................... 11, 35, 54

*United States v. Coppola,*
671 F.3d 220 (2d Cir. 2012) ........................................... 67

*United States v. D'Amelio,*
683 F.3d 412 (2d Cir. 2012) ......................................... 100

*United States v. Danielson,*
199 F.3d 666 (2d Cir. 1999) ........................................... 98

*United States v. Daugerdas,*
867 F. Supp. 2d 445 (S.D.N.Y. 2012) ................................. 8

*United States v. Daugerdas,*
2011 U.S. Dist. LEXIS 14912, 2011 WL 666170 (S.D.N.Y. Feb. 7, 2011) ........................................................... 122

*United States v. Dyer*,
   922 F.2d 105 (2d Cir. 1990) ........................................................... 82

*United States v. Ferrarini*,
   219 F.3d 145 (2d Cir. 2000) ........................................................... 93

*United States v. Friedman*,
   909 F.2d 705 (2d Cir. 1990) ......................................................... 115

*United States v. Gallo*,
   668 F. Supp. 736 (E.D.N.Y. 1987) ............................................... 111

*United States v. Gonzalez*,
   686 F.3d 122 (2d Cir. 2012) ....................................... 65, 94, 102, 104

*United States v. Grant*,
   2008 U.S. Dist. LEXIS 73479 (S.D.N.Y. Sept. 25, 2008) .............. 137

*United States v. Hassan*,
   578 F.3d 108 (2d Cir. 2008) ................................................. 74, 75, 91

*United States v. Hastings*,
   918 F.2d 369 (2d Cir. 1990) ................................................. 68, 87, 90

*United States v. Kopstein*,
   759 F.3d 168 (2d Cir. 2014) ....................................................... 68, 69

*United States v. Lefkowitz*,
   284 F.2d 310 (2d Cir. 1960) ............................................................ 69

*United States v. Milstein*,
   401 F.3d 53 (2d Cir. 2005) ........................................................... 101

*United States v. Mollica*,
   849 F.2d 723 (2d Cir. 1988) ................................................... 95, 100

*United States v. Morales*,
   577 F.2d 769 (2d Cir. 1978) ............................................... 82, 85, 92

*United States v. Murray*,
   618 F.2d 892 (2d Cir. 1980) ................................................. 121, 122

*United States v. Nusraty*,
   867 F.2d 759 (2d Cir. 1989) ......................................................... 110

*United States v. Parker,*
 903 F.2d 91 (2d Cir. 1990) ..................................... 111, 112

*United States v. Patino,*
 962 F.2d 263 (2d Cir. 1992) ........................................ 98

*United States v. Pelullo,*
 964 F.2d 193 (3d Cir. 1992) ........................................ 63

*United States v. Pfaff,*
 407 F. App'x 506 (2d Cir. 2010) .................................... 39

*United States v. Pirro,*
 212 F.3d 86 (2d Cir. 2000) ......................................... 74

*United States v. Quattrone,*
 441 F.3d 153 (2d Cir. 2006) ........................................ 75

*United States v. Regan,*
 937 F.2d 823 (2d Cir. 1991) ................................. 35, 36, 37

*United States v. Roshko,*
 969 F.2d 1 (2d Cir. 1992) .............................. 96, 97, 100

*United States v. Rossomando,*
 144 F.3d 197 (2d Cir. 1998) ........................................ 69

*United States v. Rothstein, Rosenfeldt, Adler, P.A. (In re Rothstein, Rosenfeldt, Adler, P.A.),*
 717 F.3d 1205 (11th Cir. 2013) ............................... 136, 137

*United States v. Stringer,*
 730 F.3d 120 (2d Cir. 2013) ........................................ 65

*United States v. Terry,*
 702 F.2d 299 (2d Cir. 1983) ....................................... 115

*United States v. Thomas,*
 274 F.3d 655 (2d Cir. 2001) .................................. 96, 105

*United States v. Ubakanma,*
 215 F.3d 421 (4th Cir. 2000) ....................................... 62

*United States v. Velez,*
  652 F.2d 258 (2d Cir. 1981) ...................................................... 69, 91

*United States v. White,*
  551 F.3d 381 (6th Cir. 2008) ........................................................ 127

*United States v. Zingaro,*
  858 F.2d 94 (2d Cir. 1988) ........................................................... 101

*Woods v. Commissioner,*
  92 T.C. 776 (1989) ...................................................................... 79

*Yates v. United States,*
  354 U.S. 298 (1957) ..................................................................... 74

**Statutes**

18 U.S.C. § 145 (2006) ................................................................. 137

18 U.S.C. § 371 (2006) ................................................................. 10

18 U.S.C. § 1341 (2006) ................................................ 29, 57, 60, 62, 64

18 U.S.C. § 3231 (2006) ................................................................ 6

18 U.S.C. § 3293 (2006) ............................................................ 62, 64

18 U.S.C. § 3661 (2006) ........................................................ 7, 123, 126

18 U.S.C. § 3553(a) (2006) ................................................. 126, 127, 128

18 U.S.C. § 981(a)(1)(B) (2006) ...................................................... 137

18 U.S.C. §§ 981(a)(1)(c), 982(a)(2)(A) (2006) ...................................... 134

21 U.S.C. § 853(p) (2006) ............................................................. 136

26 U.S.C. § 7212 (2006) ..................................................... 29, 53, 120

26 U.S.C. § 761(c) (2006) ............................................................. 80

28 U.S.C. § 1291 (2006) ................................................................. 6

I.R.C. § 163 (2006) ................................................................... 43

I.R.C. § 172 (2006) ................................................................... 76

I.R.C. § 666 (2006) ................................................................... 76

I.R.C. § 810 (2006) ................................................................... 77

I.R.C. § 855 (2006) ................................................................... 77

xi

I.R.C. § 1212 (2006) ........................................................ 77

I.R.C. § 165(i) (2006) ...................................................... 76

I.R.C. § 401(b) (2006) ...................................................... 77

I.R.C. § 441(a) (2006) ...................................................... 75

I.R.C. § 663(b) (2006) ...................................................... 76

I.R.C. § 761(c) (2006) ...................................................... 76

I.R.C. § 1311-14 (2006) .................................................... 77

I.R.C. § 401(a)(2) (2006) .................................................. 77

I.R.C. § 404(a)(6) (2006) .................................................. 76

I.R.C. § 402(g)(2)(A) (2006) ............................................. 76

I.R.C. §§ 441, 451 (2006) ................................................. 99

U.S.S.G. § 2T4.1 ........................................................... 132

## Other

Douglas Berman & Stephanos Bibas, *Making Sentencing Sensible*,
 4 Ohio St. J. Crim. L. 37, 56 & n.76 (2006) .................................... 132

Fed. R. Evid. 403 .......................................................... 109

Fed. R. Evid. 806 ..................................................... 107, 108

Fed. R. Evid. 606(b) ....................................................... 125

Fed. R. Evid. 801(a) ....................................................... 108

# INTRODUCTION AND SUMMARY OF ARGUMENT

Paul Daugerdas stood trial twice. In neither of these trials did the government, or its 67-page Indictment, present a theory that he orchestrated a fraudulent tax scheme to violate the "annual accounting rule" of federal tax law. Despite this fact, Mr. Daugerdas is now serving a 15 year sentence for precisely this crime. Mr. Daugerdas's re-trial ended in such gross error that he was convicted of violating a tax law that was not even mentioned in an eight-week long re-trial.

These errors were the result of an outrageous "bait-and-switch" by the prosecutor during the panic of a rebuttal summation made in the hopes of changing the fate of a case not proven. This argument set off a series of events, including a set of six jury questions during deliberations, and increasingly misleading, disconnected and over-emphasized responses from the court about a tax law that was not the focus of the trial evidence. The unjust result was that the government accomplished its goal of changing the outcome, but not before Mr. Daugerdas was deprived a fair trial.

Paul Daugerdas is a 64-year-old tax lawyer from Chicago. He was the head of the tax department at the Chicago firm of Altheimer &

Gray, and later became the founding partner of the Chicago office of Jenkens & Gilchrist. Mr. Daugerdas became known at both firms as an aggressive tax lawyer who developed complex financial tax shelters that could be utilized by individuals rather than corporate taxpayers. The trial evidence showed that Paul Daugerdas believed in his legal arguments and crafted tax shelters by utilizing the interplay of byzantine federal tax law – not by violating it. As one taxpayer testified at trial, Paul Daugerdas would "go to his grave" defending the lawfulness of his shelters. Paul Daugerdas never doubted his legal positions and backed up his advocacy with action – he reported the same shelters in his own personal tax returns, year after year, for the Internal Revenue Service to plainly see and challenge. Indeed, the jury acquitted Mr. Daugerdas of all three personal tax evasion counts in this Indictment.

Paul Daugerdas was acquitted of nine felony tax evasion counts. He was convicted of four others, and flowing from these convictions, the jury also returned guilty verdicts on the more general conspiracy, IRS obstruction, and mail fraud counts. These convictions were not based on the economic substance tax shelter fraud that was the scheme

2

charged in the S-6 Indictment, but rather on an isolated paragraph in the 67-page indictment that referred to "backdating" by other lawyers in Mr. Daugerdas's law firm on a handful of client returns. This happened because the prosecutor stood at rebuttal summation and told the jury that it could ignore eight weeks of economic substance law and convict based on a single client taxpayer's return, Michael Toporek's return, which reported "as of" dated currency transactions on Deutsche Bank brokerage statements. The government argued in summation that these "as of" dates were "backdated" into a prior tax year, but actually occurred in the subsequent year. From this alone, the government claimed that the jury – ignoring the tax shelter theory charged in the indictment – could convict Mr. Daugerdas on all counts.

The government did not argue that the dates were falsified on these brokerage statements. Instead, it argued that reporting these "as of" dates violated the Internal Revenue Code's "annual accounting rule," even though this rule was not articulated in the trial court's final jury charge.

The district court overruled defense counsel's objections, and left the prosecutor's rewriting of the jury charge uncorrected. Predictably,

3

the jury started asking questions about the "annual accounting system," which was part of the charge.  Eventually, the district court produced six additional supplemental instructions on what became known as the "annual accounting rule," which consumed jury deliberations.  The jury ultimately convicted only on those substantive tax evasion charges in which the government produced evidence and argument about "backdated" trade dates on brokerage statements.

The government took away Mr. Daugerdas's right to present a defense by introducing its separate "annual accounting rule" theory of tax evasion and fraud only during summations, and the district court took away his good faith defense in its supplemental instructions.  Mr. Daugerdas spent eight weeks confronting witnesses about the ambiguities in the common law "economic substance" doctrine, which exposed the government's flaws in its criminal theories.  Mr. Daugerdas never had the chance to show those same flaws in the government's theory relating to the "annual accounting rule," because he did not know that he was on trial under this alternative theory until summations.  He would have spent eight more weeks confronting witnesses to show the flaws in the government's "other" theory of tax

4

fraud if he had the chance.

In this appeal, Mr. Daugerdas seeks a judgment of acquittal for legal insufficiency of the government's evidence, or reversal of his convictions for violations of due process and legal errors made by the government in its summation argument and in the trial court's supplemental instructions. Mr. Daugerdas also seeks reversal of his convictions because the government constructively amended the indictment, charged him in a duplicitous obstruction count, and prejudiced him with the erroneous admission of an alleged co-conspirator's guilty plea to tax evasion. While this case is truly about Paul Daugerdas's wrongful conviction, he also seeks to vacate his sentence for procedural and substantive error and to vacate a defective order of forfeiture.

Mr. Daugerdas was acquitted of the charges on which he stood trial twice. Those crimes that were added by the prosecutor after the defense rested are unjust grounds for conviction. Justice demands reversal of all Paul Daugerdas's convictions.

# JURISDICTIONAL STATEMENT

The District Court's jurisdiction is based on 18 U.S.C. § 3231. This Court's jurisdiction is based on 28 U.S.C. § 1291. Daugerdas's sentence was imposed on June 25, 2014, and entered on June 27, 2014. His Notice of Appeal was filed on July 3, 2014. This appeal is from a final judgment of conviction.

# ISSUES PRESENTED

1. Whether Daugerdas is entitled to a judgment of acquittal on the tax evasion (Counts Five, Six, Seven, and Eleven), IRS obstruction (Count Thirteen), and mail fraud (Count Seventeen) charges because the evidence was insufficient to prove that Daugerdas willfully violated the tax laws or that the relevant transactions lacked economic substance.

2. Whether Daugerdas is entitled to a judgment of acquittal on the *Klein* conspiracy (Count One) and mail fraud charges (Count Seventeen), because (a) the evidence was insufficient to prove (i) that Daugerdas participated in a scheme to defraud involving the use of "as of" dated trades on clients' tax returns or (ii) that the transactions

6

involving "as of" dated trades "affected a financial institution," and (b) the indictment failed to allege an effect on a financial institution.

3.     Whether Daugerdas is entitled to a new trial because of the district court's erroneous supplemental jury instructions.

4.     Whether Daugerdas is entitled to a new trial because the government constructively amended the indictment in violation of the Grand Jury Clause of the Fifth Amendment and the notice provision of the Sixth Amendment.

5.     Whether Daugerdas is entitled to a new trial because of the cumulative prejudicial effect from prosecutorial misconduct.

6.     Whether the conviction on Count Thirteen must be reversed because the charge was duplicitous in that it alleged two separate obstructions in the same count.

7.     Whether the district court erred in sentencing Daugerdas to a near-life term of 15 years imprisonment, by (a) refusing to consider post-verdict juror statements in support of sentencing under 18 U.S.C. § 3661, and (b) imposing the sentence based largely on acquitted conduct.

8.     Whether the district court's forfeiture order must be vacated because the forfeited property was not traceable to the offense conduct underlying the convictions.

## STATEMENT OF THE CASE

On June 9, 2009, Paul Daugerdas was indicted with six others on charges of conspiracy to commit tax fraud, tax evasion and obstruction of the IRS.  A third superseding indictment in 2010 added a charge of mail fraud.  Daugerdas and four defendants proceeded to trial in 2011. The trial was conducted in the Southern District of New York, the Hon. William H. Pauley III presiding.  Defendants were convicted of all counts in May 2011.[1]  In 2012, the district court vacated the convictions because of gross misconduct and perjury by one juror during the jury selection process.[2]  *See United States v. Daugerdas,* 867 F.Supp.2d 445 (S.D.N.Y. 2012).  Daugerdas and one co-defendant, Denis Field, proceeded to trial again in September 2013 on a seventeen count indictment alleging conspiracy (Count One), tax evasion (Counts Two

---

[1] One defendant, Craig Brubaker, was acquitted.

[2] The district court declined to vacate the convictions of one defendant, David Parse.  Parse's appeal is currently pending before this Court.   Docket No. 13-1399-cr.

8

through Eleven and Fourteen through Sixteen), obstruction of the IRS (Count Thirteen), and mail fraud (Count Seventeen). On October 31, 2013, the jury acquitted Field on all counts and acquitted Daugerdas of nine of sixteen counts. Specifically, the jury acquitted Daugerdas of three counts of personal tax evasion and six counts of tax evasion relating to clients of Daugerdas's law firm, Jenkens & Gilchrist ("J&G"). The jury returned verdicts of guilty on the conspiracy (Count One), IRS obstruction (Count Thirteen), and mail fraud charges (Count Seventeen). The jury also convicted Daugerdas on four counts of tax evasion relating to three J&G clients (Counts Five, Six, Seven and Eleven).

On June 25, 2014, Judge Pauley sentenced Daugerdas principally to 180 months' imprisonment. The court also ordered Daugerdas to pay restitution in the amount of $371 million. (SPA-43-49). Separately, the court entered a preliminary order of forfeiture against Daugerdas consisting of a money judgment of $164 million and forfeiture of specified property. (SPA-31-42).

Daugerdas is currently serving his sentence at a designated institution of the Federal Bureau of Prisons. His expected release date is October 24, 2027.

## STATEMENT OF FACTS

Count One of the S-6 Indictment[3], upon which the defendants proceeded to trial, alleged a violation of 18 U.S.C. § 371. In 42 pages, Count One charged a wide-ranging tax shelter fraud conspiracy involving Daugerdas and other lawyers at Altheimer & Gray ("A&G") and J&G, investment professionals at financial institutions such as Deutsche Bank ("DB") and Bank One, and accountants at BDO Seidman ("BDO"). The objects of the conspiracy were to impede the lawful functions of the IRS, to evade taxes owed by tax shelter clients, and to commit mail fraud by evading federal taxes. (A-213-215, ¶¶ 60-62).

The Indictment charged tax fraud through four tax shelter strategies designed by lawyers at A&G and later J&G: the short sale, SOS, Swaps and Homer. The government's theory was that the investment components of the tax shelter strategies lacked economic

---

[3] References to "the Indictment" are to the S-6 Indictment.

10

substance, resulting in fraudulent tax losses being reported on the clients' tax returns. (A-212-213, ¶¶ 53-57).

Guided by this Court's approval of the instruction on economic substance in an earlier tax shelter prosecution, *see United States v. Coplan*, 703 F.3d 46, 92 (2d Cir. 2012), the government undertook to prove that the clients who entered into the tax shelter transactions had no non-tax motive for engaging in the investments (the subjective prong of the economic substance doctrine) and that the investments had no reasonable possibility of a profit (the objective prong of the economic substance doctrine). Further, the government sought to establish that Daugerdas acted with the requisite criminal intent: that he knew that the clients who reported the tax shelter losses on their tax returns were not entitled to the losses because the transactions lacked economic substance.

Two issues that lay at the heart of this case were never in dispute. First, there was never any question that clients were motivated by tax considerations in seeking advice from A&G and later J&G. Tax planning is inherently tax motivated. Clients testified, however, either that they also wanted to make money in connection with the tax shelter

11

investments (A-290; A-305; A-358; A-409), or that they understood profit motive in a real investment was a necessary prerequisite to obtaining the tax benefit from the transaction. (A-291-292; A-299-301; A-308; A-311; A-325-326; A-401; A-410; A-419). Indeed, when presenting the strategy to clients, it was standard practice for the J&G attorneys to explain that a secondary profit motive was essential. (A-360; A-363). The record showed that no clients ever told Daugerdas that they acted without any profit motive. Moreover, Daugerdas believed that clients had a secondary non-tax motive because J&G had required DB to structure investments so that clients had approximately a 33% chance of profiting on their investment. (A-349-350; A-375-376; A-378). Many clients did, in fact, profit on their investments in the short sale of treasury securities and in the digital options. A-398; A-644; A-978-989; A-430).

The second issue undisputed at trial was that the expected profits on tax shelter investments could not have covered the professional fees to BDO or J&G. At the time the strategies were implemented, however, the state of tax law was uncertain as to whether tax opinion fees or fees relating to tax advice were transaction costs that needed to be

12

accounted for in the economic substance profitability assessment. Professional tax advisers testifying for the government, who discussed this issue with Daugerdas, conceded that they had researched the transaction cost issue and found conflicting authorities (A-393; A-396), or were unable to definitively resolve the issue (A-337; A-339). Robert Greisman and Charles Bee, who had examined the question on behalf of the BDO tax opinion committee, testified that, in general, tax opinion fees were not considered transaction costs. (A-331; A-340; A-393).

Erwin Mayer, Daugerdas's partner at both law firms (and the government's chief cooperating witness), claimed that he questioned Daugerdas's reasoning on the transaction cost issue. Mayer cited *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), in support of his argument that tax opinion fees were transaction costs. (A-359). Mayer conceded, however, that the Court's discussion of transaction costs in *Goldstein* was *dicta*. (A-371-374). Moreover, there was no evidence that this 1966 case had ever been cited as authority on the question of whether tax opinion fees were transaction costs.

Daugerdas maintained his position throughout. His rationale, consistently stated, was that the fees to J&G were not costs that the

13

client was required to pay in order to enter into the investment component of the tax strategies. (A-344; A-346; A-905). Indeed, the J&G fee was structured so that the client never had to pay the fee unless and until the client received the tax opinion the year following the investment. (A-346). J&G did not charge a client if the client did not receive a tax opinion, even if legal work had been done in connection with the client's tax strategy. (A-321-322; A-341-342; A-368-369; A-397; A-976-977).

The prosecution sought to portray the tax opinions as strong evidence of Daugerdas's tax fraud scheme. Each tax opinion was approved by Michael Cook, a highly respected tax attorney who headed the firm's tax department. (A-310; A-317-318). Moreover, the model tax opinions were always reviewed at the highest levels of the firm. (A-319-320). The government's theory was that the tax opinions were fraudulent because the factual representations upon which they were based were never made by the clients and because they were false. In particular, the government focused on the fact that each opinion letter recited a client's factual representation that they had entered into the

14

investment component of the transaction for substantial non-tax reasons.

Although the clients did not provide to J&G a signed document embodying the representations, it was standard practice for J&G to prepare documents that required clients to swear under oath that the entities that were being formed to implement the tax strategy were formed for investment purposes. *E.g.* A-309; A-653; A-669; A-678; A-327-330; A-399).

J&G attorneys were trained to advise clients that a profit motive was essential to the transaction. (A-361-363). J&G provided the clients with the tax opinion in advance of filing the client's tax return. (A-400; A-415; A-736-897). The representations were not buried within a dense lengthy tax opinion. Rather, they prominently appeared in a letter at the front of the opinion which explained that the opinion was not valid if the representations were wrong. (*E.g.* A-745-746; A-416-417). Though, amazingly, some clients testified that they never looked at their tax opinions, (A-312; A-402; A-407; A-418), Daugerdas could hardly be condemned for assuming that a client would at least read the cover letter of a document of this importance.

15

The government also sought to establish Daugerdas's participation in the alleged conspiracy by eliciting evidence that a handful of tax shelter transactions were implemented incorrectly, thus preventing the clients from obtaining the tax benefit that J&G and the clients expected. The government focused the "as of" dating allegations primarily on two sets of transactions that were the subject of four tax evasion counts: clients Matthew Coleman/Robert Blair (Counts Five and Six) and Michael Toporek (Counts Seven and Eleven).[4]

Donna Guerin, Daugerdas's partner at both A&G and J&G, was primarily responsible for attending to the details of implementing the transactions. (A-323). Upon discovering the errors in the year following the tax shelter investments, attorneys at J&G requested that DB correct the mistakes by buying and selling the correct type and amount of securities in accordance with the client's prior year's tax plan. Significantly, the government presented no evidence that Daugerdas requested the incorrect trades, requested the corrected trades, or was even aware that incorrect trades had been made.

---

[4] The government introduced evidence of a third instance of "as of" dating involving Daniel Aronoff. There was no evidence linking Daugerdas to this transaction.

16

DB employees acceded to J&G's requests and issued monthly statements indicating that the investment trades as originally intended were effectuated "as of" the date of the original incorrect trade. This error correction process was not unusual or improper and was utilized by DB for its non-J&G clients as well. (A-383-384.1).

The "as of" dating evidence was presented to the jury from the outset of trial as evidence that the investments were unimportant to the clients, (A-287), and not genuine attempts to make money. (A-288). The government argued, as alleged in the Indictment, that the "as of" dating allowed the affected clients to claim "phantom losses" generated by the tax shelters that lacked economic substance. *Id.* (A-216, ¶63(i)) (backdated financial transactions were implemented "in order to provide the clients with the tax losses they had purchased.").

The trial court's instructions to the jury on the "as of" dating issue were brief and in line with the theory set out in the Indictment and in the government's opening statement that the "as of" dating evidence was relevant only to the jury's consideration of the conspiracy charged in Count One:

17

> A conspiracy to impede the functions of the IRS by fraud or dishonest means may ... include falsifying the date of a transaction for tax purposes. **In this regard, I instruct you that the income tax laws are administered on the basis of an annual accounting system which prohibits the reopening of a prior year's tax return to take account of events occurring in later years**.

(A-519-520)(emphasis added).[5]

In its instructions, the court also established the legal framework of the tax shelter fraud theory, which exclusively relied upon findings that the shelters failed both the subjective and objective prongs of the economic substance doctrine. (A-534-535). The mail fraud scheme also hinged on this theory of tax evasion. (A-542).

Despite these instructions, in rebuttal summation, the government argued, for the first time, that the backdating or "as of" dating evidence should be considered by the jury as an independent basis of criminal tax fraud and not just as evidence of the economic substance fraud charged in the Indictment:

---

[5] The court gave this instruction in the first trial. Defense counsels' objections to that instruction were overruled. The court also declined to give the expansive separate instruction on the AAR requested by the government. (A-281-283; A-258-260).

18

Now, let me just point out one thing with respect to this backdating. There are a whole series of charges to consider. There **is a conspiracy charge, there is a mail fraud charge, there is a tax obstruction charge, and there are substantive tax evasion counts.**

The economic substance test applies only to the substantive tax evasion charges. What that means is, ladies and gentlemen, **you can find Paul Daugerdas guilty based solely on his involvement in the backdating of that transaction** [referring to Michael Toporek's tax return], because it doesn't revolve around Michael Toporek's subjective business purpose for engaging in the transaction.

If you find, as you should, that [he] engaged with John Beery in backdating of that transaction, **that they agreed to prepare false tax returns that falsely reported as 2001 losses really things that were changed in 2002, that's it.**

**That's conspiracy to defraud the Internal Revenue Service. It's also a conspiracy to commit mail fraud,** because Michael Toporek's tax return was mailed by Paul Daugerdas or sent by Federal Express by Paul Daugerdas from Chicago in 2002 after it's over.

**It also constitutes an obstruction of the IRS,** because he's engaging in this corrupt tax reporting that has no basis in the law. So keep that in mind, the different sets of trials, because if you – different sets of charges, **because if you find even a subset of the criminal activity that they are involved in, it can constitute mail fraud violation or a conspiracy violation or an obstruction.**

19

 (A-460-461). (emphasis added).

The government's new allegation was that, even absent evidence that the tax shelters were fraudulent at all, the jury should convict Daugerdas on all counts even if they only found that he agreed to the backdating of a single transaction.

Suddenly, the prosecutor claimed this new theory even applied to the mail fraud charge, notwithstanding the fact that this count was based on tax evasion property loss to the IRS. Daugerdas's counsel objected because the prosecutor's argument, that the jury could convict him of mail fraud based on the "as of" dating evidence without any finding of tax shelter fraud, constructively amended the indictment. (A-496). Counsel requested that the court modify the mail fraud instructions to make it clear to the jury that the mail fraud scheme to defraud was the design, marketing, and implementation of the four tax shelters identified in the Indictment. (A-494-497). Daugerdas's objections to the government's summation argument and request to modify the court's instructions were denied. (A-509).

Over the course of two days of deliberations, the jury sent the court four notes, with six questions, seeking additional instructions relating to the small section of the court's charge relating to the AAR. (A-990-991; A-562/SPA-51; A-993). These notes demonstrated that the jury was attempting to understand if the AAR had any exceptions or ambiguities that could cause the defendant to believe he was permitted to use "as of" trade dates for tax return reporting purposes. The jury's notes also made clear that they were reviewing the Michael Toporek transactions, the very tax returns referred to by the government in rebuttal summation. (A-554). This was the one tax client about which the government told the jury it could convict Daugerdas on all counts based solely on a finding of reporting "as of" trade dates. Notably, the jury only sought supplemental instructions regarding the AAR.

The full set of jury questions and the district court's responses are reproduced here as a composite of two days of inquiries. The jury's questions reflected basic confusion about the applicability of the AAR and how it related to the evidence of tax reporting using "as of" dates in DB brokerage statements:

21

Q: Please provide further instruction or clarification to page 36 of the jury charge, lines 17 and 18 [discussing the "annual accounting system"]. Our question: What is defined as a "prior year's tax return"? Does this specifically mean a tax return that has already been filed? (A-990; A-545-546).

A: Members of the jury, in singling out lines 17 and 18 with your question, you're focusing on the annual accounting rule. The annual accounting rule prohibits, in connection with the preparation of a tax return for a particular year, consideration of transactions that occur in a subsequent year. Therefore, the answer to that question is, no. (A-561/SPA-50).

Q: Can you legally claim an "as-of" dated transaction on your tax return in a given year if that "as-of" transaction had a "settlement date" in the following calendar year? (A-991; A-548-549).

A: Members of the jury, I cannot answer that question yes or no. It all depends on when the transaction actually occurred. (A-561/SPA-50).

Q: Judge Pauley, please provide us a copy of the passage from the annual accounting rule that you read to us. (A-562/SPA-51).

[The district court produced a typewritten statement of the above-mentioned supplemental instruction defining the "annual accounting rule."] (A-992; A-562-563/SPA-51-52).

Q: Is the annual accounting rule cited a part of the Internal Revenue Laws? (A-993; A-565).

A: Yes. (A-994; A-587-588/SPA-53-54).

Q: Are the "Internal Revenue Laws" in fact "laws," or are they simply a "position" taken by the IRS? (A-993; A-565).

A:  The "Internal Revenue Laws" are in fact laws.  The "Internal Revenue Laws" include the Internal Revenue Code, regulations issued by the Department of Treasury implementing the Internal Revenue Code and Court decisions interpreting these various statutes and regulations.  You have also heard testimony in this case about IRS notices.  These are positions taken by the IRS that do not have the effect of law.  IRS notices are not included in the "Internal Revenue Laws."  (A-994; A-588/SPA-54).

Q:  Is there a law, or rule, within the Internal Revenue Laws that can be considered contradictory to the annual accounting rule cited in the Supplemental Charge to Page 36?  (A-993; A-565).

A:  The law that I gave you concerning the annual accounting rule at Page 36 and in any Supplemental Instruction is the law that should govern your deliberations.  The application of this rule depends on the particular facts of each case.  In some instances you have heard about as-of reporting and it may be proper under the Internal Revenue Laws if the transaction reported on the as-of date actually occurred on that date.  On the other hand, it would violate the Internal Revenue Laws to report a transaction that occurred in a subsequent year as occurring during the prior year.  You are to apply the facts of this case to the law as I have provided it to you on page 36, lines 16 through 18, and as added to in the supplemental charge.  Of course, you should not consider any charge alone or give this charge undue weight, but must consider my charge as a whole in your deliberations.  (A-994; A-588-589/SPA-54-55).

Defense counsel objected to these supplemental instructions on several grounds.   First, counsel objected because the cumulative effect of the instructions was to confuse the jury by adding new law that

23

created a tax crime – violation of the AAR – that was not separately identified apart from the tax shelter fraud in the Indictment. (A-557). Counsel also objected because the court's instructions created the misimpression that the AAR was without exception and prohibited the tax reporting of "as of" trade dates on financial statements. (A-572). The court declined to tell the jury that the AAR was not found in the IRC, (A-581), or that it was broadly based on the principle of a regular reporting period. The court misled the jury into believing that this "law" was absolute and without exception. (A-584-585).

Daugerdas' counsel objected to the court's introduction of new tax law during deliberations. Counsel argued that the court's new charges infringed the province of the jury by resolving factual disputes. For example, by giving the jury an absolute rule that only the actual date of the transaction mattered under the AAR, the court removed from the jury's consideration the reasonableness of witnesses' testimony, including a certified public accountant (Quedenfeld) and another tax return preparer (Bencik), who testified that they believed it was proper to report DB's "as of" trade dates on tax returns. (A-551; A-554; A-571). Finally, counsel objected because the court refused to remind the jury

24

that it could only convict Daugerdas if it found that he knowingly violated this law and did not act in good faith. (A-585).

After the jury received the trial court's several answers about the AAR, it returned its verdict. This verdict was decidedly mixed. The jury acquitted co-defendant Field on all counts (the government presented no issues of backdating as to Field). The jury acquitted Daugerdas on six counts of client tax evasion and three counts of personal tax evasion (none of these counts included allegations of backdating).

The jury convicted Daugerdas of four tax evasion counts relating to three clients: Coleman/Blair and Michael Toporek. These counts were the ***only*** tax evasion counts in which the government presented evidence of backdating. Consistent with the government's summation argument, the jury also found Daugerdas guilty of conspiracy, obstruction of the IRS, and mail fraud. (A-596-598).

At Daugerdas's sentencing hearing, the government returned to its original claim of a billion dollar tax shelter fraud. Despite having beseeched the jury to convict Daugerdas on all counts based upon a

single instance of backdating, the government urged the court to sentence Daugerdas to at least twenty years' imprisonment based on the total economic substance tax shelter fraud that it earlier told the jury it could ignore. (A-1117, A-1120; A-1131/SPA-27). Daugerdas's counsel objected to the "bait and switch" approach of the government and urged the court to credit the jury's acquittals. Daugerdas's counsel asked the court to acknowledge that the economic substance fraud had not been proven. Counsel argued that the court should sentence Daugerdas based upon the crime on which the government last asked the jury to convict: participation in the tax reporting of "as of" trade dates on a handful of client transactions. (A-1121-1124).

Daugerdas' argument was buttressed by two declarations from defense counsel describing post-verdict interviews (after obtaining permission of the court) with two jurors. Both jurors reported their opinion that the jury acquitted the defendant of the tax evasion charges because it accepted his good faith defense and rejected the government's economic substance fraud theory. The jurors also indicated that they convicted Daugerdas on the remaining charges based on the

26

government's argument about the backdating evidence. (A-1008-1011; A-1059-1060).

Ultimately, the court sentenced Daugerdas principally to fifteen years in prison, giving lip service to the several counts of acquittal. Following sentencing, the court entered a preliminary order of forfeiture against Daugerdas consisting of a money judgment of $164 million and forfeiture of specified property derived from proceeds traceable to the commission of the convicted crimes. (SPA-31-42). The court rejected defense counsel's argument that the government had failed to establish the required nexus between the property sought to be forfeited and the fraudulent tax shelter fees earned by J&G. (SPA-13-15).

## ARGUMENT

### POINT I

**PAUL DAUGERDAS'S CONVICTIONS FOR TAX EVASION, OBSTRUCTION OF THE IRS, AND MAIL FRAUD MUST BE REVERSED BECAUSE (A) THE EVIDENCE FAILED TO DISPROVE HIS GOOD FAITH DEFENSE AND (B) THE EVIDENCE FAILED TO PROVE THAT THE RELEVANT TRANSACTIONS LACKED ECONOMIC SUBSTANCE.**

In this tax shelter criminal prosecution, the government alleged

27

that Paul Daugerdas authored fraudulent tax opinion letters for clients of two of his law firms, Altheimer & Gray ("A&G") and Jenkens & Gilchrist ("J&G") as part of a scheme to defraud the IRS of taxes due and owing from the firms' clients. The tax shelter opinions related to four different transactions: the short sale, the short options strategy ("SOS"), Swaps, and HOMER. The latter three tax shelters were implemented solely by clients of J&G between 1999 and 2002. Each tax shelter was designed around a financial investment: the short sale involved an investment in treasury securities, SOS and HOMER involved an investment in foreign currency digital options, and Swaps similarly involved an investment in foreign currency.

The central allegations in the indictment were that (a) each of the tax shelters lacked economic substance and that (b) Daugerdas knew that these transactions lacked economic substance but nevertheless issued opinion letters to clients to facilitate the reporting of fraudulent tax losses for the client taxpayers. More specifically, the government alleged that the taxpayer-clients had **no** non-tax purpose for entering into the transactions - the so-called subjective prong of the economic substance doctrine, and that Daugerdas knew that the taxpayers were

28

solely motivated by tax considerations when making the investments.
Further, the government alleged that there was no possibility for the
taxpayers to earn a profit – the objective prong of the economic
substance doctrine, because the fees to J&G far exceeded any potential
gain on the investment.

Cross-examination exposed three deficiencies in the government's
proof. First, the evidence failed to prove beyond a reasonable doubt
that Daugerdas willfully violated the tax laws.[6] Specifically, the
evidence demonstrated that Daugerdas believed that tax advisory fees
incurred by clients, such as the law firm's fee for issuing the tax
opinion, were not transaction costs because payment was not required
to make the financial investment. J&G did not charge a fee to tax
shelter clients if the clients did not receive a tax opinion. Therefore,
Daugerdas believed that the investments satisfied the objective prong of
the economic substance doctrine because the taxpayers had a
reasonable possibility of earning a profit. Furthermore, the evidence
contradicted the government's theory on the subjective prong of

---

[6] As set forth below, Daugerdas's good faith was a complete
defense to the obstruction charge under 26 U.S.C. §7212 and the mail
fraud charge pursuant to 18 U.S.C. §1341 (SPA-64).

economic substance by (1) confirming that the relevant taxpayers in fact had a secondary profit motive in entering into the tax shelter investments, and (2) Daugerdas believed that these taxpayers had a genuine secondary profit motive.

Daugerdas was charged with 13 counts of tax evasion. Three counts (14, 15, and 16) related to Daugerdas's personal reporting of the tax shelter strategies on his own tax returns in 1999, 2000 and 2001. The jury acquitted him of each of these charges. Daugerdas also faced ten counts of aiding and abetting tax evasion by J&G clients who participated in tax shelter transactions. The jury acquitted Daugerdas of six of these charges (Counts Two-Four, Eight-Ten). The counts of conviction (Five-Seven and Eleven) related to three J&G clients. Matthew Coleman and Robert Blair were business partners who jointly retained J&G in connection with a Swaps tax shelter for the 2001 tax year. Michael Toporek, the subject of Counts Seven and Eleven, engaged J&G in connection with Swaps transactions in 2001 and 2002. The Coleman/Blair and Toporek tax shelters were the only tax evasion counts including evidence of what the government termed "backdating": that Deutsche Bank ("DB") made corrections to trades for these

30

individuals in the year following implementation of their tax shelters.

By its verdict, acquitting Daugerdas on all counts of personal tax evasion, and also acquitting him on six counts of client tax evasion, the jury necessarily rejected the heart of the government's case—that the tax shelters lacked economic substance and that Daugerdas knew it. Thus, it is clear that the jury's verdict rested solely upon the so-called backdating evidence.

This was an impermissible, legally insufficient basis of convicting Daugerdas of tax evasion because the Court's instructions expressly relied on the economic substance fraud theory. Moreover, since the government failed to disprove Daugerdas's good faith defense with respect to the economic substance of the transactions, the evidence was insufficient to sustain his convictions for obstruction and mail fraud.[7]

## A. The Court's Jury Instructions

As instructed by the district court, the government was required to prove three elements of tax evasion beyond a reasonable doubt: a

---

[7] Thus, the evidence was also insufficient to sustain the jury's finding with respect to the tax evasion and mail fraud objects of the conspiracy alleged in Count One.

31

substantial tax was due and owing by the relevant taxpayer, an affirmative act of evasion was committed or caused to be committed by the defendant, and that the defendant acted knowingly and willfully. (A-530). With respect to the tax due and owing element, the court instructed the jury that the government was required to prove that the losses claimed by taxpayers on tax returns resulted from transactions that lacked economic substance. (A-531-535). The Court further instructed the jury to acquit the defendant of tax evasion if the government failed to prove beyond a reasonable doubt either the objective or subjective prong of the economic substance doctrine with respect to the tax shelter transactions in question. (A-534-535). The Court instructed that to prove that the defendant acted willfully, the government had to establish that the defendant knew that the transaction lacked economic substance. (A-538).

With respect to the objective prong of economic substance, Judge Pauley amplified the good faith instruction, informing the jury that if the defendant had a good faith belief that the fees charged to the clients by J&G and BDO Seidman ("BDO") were not required to be included in the evaluation of the tax shelter's profit potential, and if inclusion of

32

these fees was the only reason why the transaction lacked profit potential, then the defendant has not acted willfully. (A-540).

As set forth below, the evidence was legally insufficient to establish that Daugerdas acted willfully because of his genuine good faith belief that the transactions complied with the subjective and objective prongs of the economic substance doctrine, and because the evidence failed to establish that the relevant taxpayers lacked the requisite non-tax motive in entering into the transactions.[8]

## B. Daugerdas's Good Faith As to the Objective Prong of Economic Substance

As the district court instructed the jury, Daugerdas could not have been convicted of tax evasion unless the government disproved his good faith defense beyond a reasonable doubt. With respect to the objective

---

[8] Judge Pauley's instructions on the obstruction and mail fraud charges essentially incorporated the concepts contained in the instructions on tax evasion. The Court explained that the money or property that was the object of the alleged mail fraud scheme was the income tax due and owing to the IRS, thus incorporating the economic substance concepts of tax evasion. (A-542). The Court's instructions on obstruction conveyed that the government had to prove that the defendants acted corruptly, which required a finding that they acted with consciousness of unlawfulness. (A-541). Judge Pauley also instructed the jury generally that Daugerdas's good faith was a complete defense to all charges in the indictment. (A-544).

prong of the test, this meant that Daugerdas knew there was no reasonable basis for the taxpayer to take the tax position on their income tax returns because there was no reasonable possibility of a profit on the transaction.

The Court's instructions reflected the willfulness requirement for tax evasion, as enunciated by the Supreme Court in *Cheek v. United States*, 498 U.S. 192 (1991).  In *Cheek*, the Supreme Court held that a defendant on trial for tax evasion must be acquitted if the government fails to disprove beyond a reasonable doubt that the defendant sincerely believed he was not violating the law, even if the defendant's belief was "objectively unreasonable." *Id.*  The defendant's claim in *Cheek*  was that he believed he was not obligated to file a tax return because his wages were not income, the most "elementary and basic" aspect of the tax law.  *Id.* at 209 (Blackmun, J. dissenting).  This was an issue upon which there was no ambiguity or dispute in the legal community.  In contrast, here the critical issue was far more nuanced and technical: whether tax advisory fees were transaction costs that needed to be accounted for in determining whether the investments underlying the tax shelters had a reasonable possibility of a profit.  Daugerdas's view

34

was that these fees should **not** be part of the equation.[9]

The critical question for the jury in this case was not whether Daugerdas's "construction of [transaction costs] was correct or even objectively reasonable but whether it was made in good faith." *United States v. Regan,* 937 F.2d 823, 826 (2d Cir. 1991). As the trial evidence demonstrated, this was an issue upon which there was little guidance in the case law or Internal Revenue Code. Witnesses who were tax-law educated professionals testified that they had personally examined the question, discussed it with Daugerdas, and acknowledged it was difficult to resolve. This was an issue upon which Daugerdas had frequently and openly expressed his views. Indeed, Daugerdas structured the law firms' fees for the tax shelters to comply with his understanding of the law on transaction costs. Simply put, the evidence was overwhelming that Daugerdas held a sincere belief that tax advisory fees did not count in the analysis of whether the tax shelter investments could result in a reasonable possibility of a profit.

---

[9] This Court previously noted that the law of economic substance, at least prior to its codification in 2010, was not a "model of clarity." *United States v. Coplan,* 703 F.3d 46, 92 (2d Cir. 2012), *cert. denied* 2013 U.S. LEXIS 5486 (2013).

In 1998 and early 1999, BDO evaluated economic substance issues relating to the short sale tax shelter to determine whether they should recommend it to clients. Testimony concerning this review process was offered primarily by two cooperating witnesses, former BDO senior executives Robert Greisman and Charles Bee. Greisman and Bee both testified that they had independently researched the issue of whether the J&G tax opinion fee was a transaction cost and discussed it with Daugerdas.

Greisman testified that in or around March 1999 he spoke with Daugerdas as part of a review being conducted by the BDO tax opinion committee. (A-332-333). In part, the committee was examining the question of whether the tax opinion fee could be recharacterized by the IRS as a transaction cost of the short sale because of the size of the fee. (A-340). Critically, Greisman conceded that "in general, legal advice, including tax opinions on a transaction, are not a transaction cost." *Id.*, (A-331). He further testified that absent such a recharacterization, it would not be considered a transaction cost. *Id.* In a four-page memo memorializing the internal discussion within BDO on this issue, Greisman indicated, in reference to the short sale: "it is not entirely

36

clear whether or not the IRS could or would re-characterize a portion of a fee paid for a tax opinion as a 'transaction cost' in a transaction that essentially has no costs." (A-905). Following up on this comment, Greisman agreed that the only cost associated with executing the short sale was the margin cost assessed by DB which was actually built into the investment itself. (A-343).

According to Greisman's memorandum, Daugerdas spoke with Greisman and echoed the position stated taken in the memorandum: that the tax opinion fee would not be recharacterized as a transaction cost in a transaction that essentially has no costs. (A-344; A-905). According to Greisman, Daugerdas added that where there is much at stake, a tax opinion fee could be greater than when there is less at stake and that his entire fee "comes off the table" when determining profit potential. *Id.* Greisman did not reject this reasoning and, indeed, reiterated it to a client some years later. (A-345).

Bee testified that he too was aware of Daugerdas's position on transaction costs based, in part, upon Greisman's memorandum. (A-392). He also testified about a conversation that he and Greisman had with Daugerdas about transaction costs in late 1999 in the context of

37

BDO's review of the SOS tax shelter. Bee recalled generally that Daugerdas presented a number of arguments in favor of his position that the tax opinion fee was not a transaction cost. (A-394). Daugerdas candidly shared his views on why the legal fees were not transaction costs and neither Greisman nor Bee ever communicated to Daugerdas that they disagreed with his analysis. (A-336; A-395-396).[10]

Greisman and Bee's testimony provided additional support for Daugerdas's good faith defense on the transaction cost issue. They each testified that they researched the question of whether the tax opinion fee was a transaction cost. According to Greisman, this was a "fuzzy" issue; there was no definition in a book, and no court case that clearly resolved the question. (A-337; A-339). Bee indicated that he too had researched the issue and he agreed that this was a tough question and certainly a debatable point, although typically tax opinion fees were not transaction costs. (A-393; A-396). The lack of clarity and formal

---

[10] Bee recalled that the BDO tax opinion committee concluded that the tax opinion fee should be viewed as a transaction cost in early 1999. However, if true, Bee acknowledged, this was never communicated to Daugerdas. (A-395-396). What was communicated to Daugerdas was that BDO agreed to recommend the short sale and SOS tax shelters to its clients following its review of the transaction cost issue.

guidance on the question was compelling support for Daugerdas's
defense; as the evidence demonstrated that the law was far from clear,
Daugerdas could not have known that his view of the law was wrong.
*See United States v. Pfaff,* 407 Fed. Appx. 506, 509 (vagueness of the
law does not negate a finding of willfulness though it may be probative
of a defendant's subjective belief in the lawfulness of his conduct).

The government relied primarily on Erwin Mayer in an attempt to
refute Daugerdas's good faith defense. Mayer testified that he had
conversations with Daugerdas and others at J&G in which Mayer
questioned the firm's position on transaction costs. Yet, at no time did
Mayer, or anyone else, ever testify that Daugerdas expressed or
demonstrated doubt about the correctness of his position. While
Daugerdas was made aware of potentially conflicting views, such
evidence is a far cry from proving that Daugerdas secretly agreed with
them.

Mayer claimed that he suppressed the depths of his concerns
regarding the economic substance of the tax shelters that he presented
to many hundreds of clients, upon which he issued hundreds of tax
opinion letters, and that he subsequently defended before the IRS.

39

However, he testified that he had discussions with Daugerdas at times concerning the propriety of not including the tax opinion fee in their economic substance analysis.

In January 2000, an individual at Ernst & Young ("E&Y"), Jerred Blanchard, wrote a memorandum that purported to be a critical preliminary analysis of E&Y's version of the SOS tax shelter. The Memorandum, (A-946-954), was emailed to Daugerdas. As Mayer testified, Blanchard analyzed the economics of the SOS-type shelter and included in his profitability analysis "tax structuring" and "investment banking" fees payable to J&G and E&Y. (A-351). Notably, the memorandum assumed without discussion that these fees had to be included in the profitability analysis. There was no case law cited in support of the proposition that the tax opinion fees to counsel had to be included in the profitability analysis. According to Mayer, the memorandum also expressed concerns about the deductibility of noneconomic losses. Mayer testified that he discussed the memorandum with Daugerdas. Daugerdas was surprised that E&Y would send him a critical analysis of a transaction that they had just implemented and upon which J&G was about to issue tax opinions. (A-

40

352-353).  Mayer conceded, though, that Daugerdas disagreed with its conclusions.  (A-354).

Mayer testified that he and Daugerdas first discussed the question of transaction costs shortly after the Third Circuit issued its October 1998 decision in *ACM v. Commissioner*, 157 F.3d 231 (3d Cir. 1998).  (A-346).  Mayer claimed that he began internally to question their rationale because J&G was providing more services to clients than simply an opinion letter.  (A-347).  J&G had relationships with banks that facilitated the clients' investments.  J&G also handled the legal work for setting up the various entities needed to implement the transaction.  *Id.*  Daugerdas rejected Mayer's reading of *ACM*  as not applicable to the reasonable possibility of profit calculus under the objective prong of the test.

During cross-examination, Mayer essentially confirmed Daugerdas's position on this issue.  Mayer acknowledged that *ACM*'s discussion of fees and the economic substance of the transaction was limited to the subjective prong of economic substance – whether the taxpayer had a non-tax motive in entering into the transaction. (A-367).  In other words, the Third Circuit had explained that tax legal fees were

41

relevant to the subjective prong of the economic substance doctrine, but did not attach any significance to these costs with respect to the objective prong and the issue of transaction costs  *Id.*  .

Furthermore, Mayer agreed that transaction costs were costs that the client necessarily incurred in order to execute the transaction.  (A-365-366).  Yet, J&G structured its fee so that it was clear that the client was not paying for those services that could be classified as fees necessary to enter into the investment transactions.  Rather, as Mayer conceded, clients had no obligation to pay the J&G fee, regardless of any other services that J&G provided, unless they accepted the tax opinion letter.  Indeed, during the criminal investigation, Mayer created a list of over 150 J&G clients who consulted with him about various tax shelters and were not charged because they did not receive a tax opinion.  (A-368-369).

Similarly, Sandra Burnside, Daugerdas's administrative assistant, testified that if the client did not want the opinion letter, she would not send out an invoice.  (A-321).  Indeed, the client could obtain his transaction binder, which summarized the already completed investment transactions, even if they had not yet received and paid for

42

the tax opinion. (A-322). BDO was aware of this J&G policy; Bee testified that the fee to J&G was only paid if the client received the tax opinion. (A-397). In a memorandum faxed to Daugerdas in January 1999 by BDO partner Michael Kerekes, Kerekes confirmed that he had advised a client that the J&G fee would be due only at such time as the client calls upon J&G to issue a tax opinion. (A-341-342; A-976-977). The Kerekes memorandum also confirmed that the BDO fee was for assisting in the preparation of the tax opinion and would be payable only if J&G rendered an opinion.

During his cross examination, Mayer also cited this Court's 1966 decision in *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), as another case that he supposedly discussed with Daugerdas relating to the transaction cost issue. (A-359). On cross-examination, Mayer again conceded that there was no indication in the Court's opinion that the legal services in that case related to tax opinions regarding how to report transactions. (A-370). Moreover, Mayer agreed that the discussion of transaction costs fell outside the holding of the case, which dealt with an interpretation of Internal Revenue Code § 163. (A-372). There was no testimony that *Goldstein* had ever been cited by any court

43

for the proposition that tax advisory fees had to be included in the objective prong profitability analysis.

The jury also heard from numerous witnesses about Daugerdas's statements concerning his genuine belief in the legitimacy of the transactions. For example, Greisman indicated that when he first spoke with Daugerdas about the short sale tax shelter, there was no hint that Daugerdas believed that the transaction was illegal or even that it wouldn't be upheld by the courts. Daugerdas expressed confidence in the legal merits of the transaction. (A-338). Clients also testified that Daugerdas was adamant about the legality of the strategy. (A-403; A-413-414).

The trial evidence also clearly established that Daugerdas believed that clients had a reasonable possibility of a profit given his understanding of transaction costs. In order to ensure that clients could, in fact, return a profit, J&G relied upon DB to design digital option investments in such a way that the clients had an approximately 33% chance of doubling their money. (A-350; A-375-376; A-378).[11]

---

[11] In March 2002, Daugerdas learned that in fact the expected probability of a payout for one J&G client, Brian Allen, was actually

44

According to Mayer, J&G's profitability criteria for the later-developed swaps investments were the same as they had been for the digital options. (A-379-380).[12] Mayer conceded that Daugerdas provided these criteria to DB in order to comply with the economic substance doctrine. (A-378). J&G also communicated to DB that the possibility of profit for HOMER should also be about 35%. (A-975).[13] Thus, Daugerdas believed that the clients had a substantial possibility of making money on the investments.

---

41%. (A-973-974).

[12] The government's expert witness, David DeRosa, testified that the possibility of profit on the various swaps trades he analyzed was between 1% and 12% excluding the J&G fees. (A-422-427). However, there was no evidence that Daugerdas was aware that the possibility of profit for the swaps transactions was any different than what it had been for the digital options.

[13] DeRosa testified that there was virtually no chance of making a trading profit on the HOMER options. Again, however, there was no evidence that Daugerdas or anyone at J&G was ever told of this diminished profit potential.

45

## C. Daugerdas's Good Faith as to the Subjective Prong of Economic Substance

Judge Pauley instructed the jury that the government also had to prove beyond a reasonable doubt that Daugerdas knew that the taxpayers had no non-tax reason for entering into the transaction. (A-538). Here too, the evidence demonstrated quite the opposite— Daugerdas had every reason to, and did, believe that taxpayers had a secondary motive to make a profit from the investments in the tax shelters. First, the profit potential of the investment was something that Daugerdas stressed, and counseled others at his firms to stress, in every presentation to clients. (A-360; A-363; A-899-902). Second, as noted above, Daugerdas and J&G requested that DB ensure that clients had approximately a 33% chance of making a profit on the digital options, swaps, and HOMER trades. Third, from 1998 through 2000, many clients in fact profited from the short sale of treasury securities[14] and from the digital options excluding the tax advisory fees. Thus, actual investment results would not have caused Daugerdas any concern about profit potential.

---

[14] The government did not argue that the clients could not make money on the short sale transaction, simply that profits could not exceed the tax legal fees.

Mayer testified that profit potential was a component of every presentation to a client, (A-363), and was highlighted in executive summaries of the transactions. (A-360). The first point of the J&G summaries indicated that a business or investment reason for the transaction had to exist for the tax shelter to satisfy the law. (A-899-902). As Mayer noted, if the client did not express an interest in making money in connection with the investment, if they did not develop a secondary non-tax motive, then it was "game over." (A-361-362).

As noted above, in order to ensure that clients could have a significant non-tax reason for entering into the investments, J&G relied upon DB to design the digital options, swaps, and HOMER trades in such a way that the clients had approximately a 33% chance of doubling their money. Thus, Daugerdas believed that the clients had every reason to want to earn money in addition to reducing taxes because he believed that the investments were designed for the client to have a substantial possibility of making money on the investments.

Finally, as also stated in the section above, Daugerdas believed that clients subjectively wanted to make money because investment

47

results showed that a substantial number of them, in fact, did. First, with respect to the short sale of treasury securities, a client profited even on a short-term investment if the price of the treasury note declined even slightly. According to a chart introduced by the government summarizing the gains and losses for approximately 80 clients who implemented short sale transactions in 1998, 29 of the trades were profitable. (A-644-647).[15] With respect to the SOS trades, the trial evidence established that in 1999 and 2000, 109 partnerships invested in digital options where the payout on at least one option exceeded the net premium. These 109 partnerships had a total of 160 profitable digital option trades. (A-430; A-978-989).

The evidence at trial was clear that Daugerdas took steps to advise clients as to the importance of a profit motive and to ensure that there was a reasonable possibility of a profit from the trades. Moreover, he also knew that profits had been attained. Without question, the

---

[15] None of the trades yielded a profit large enough to cover the J&G fees. Again, this was irrelevant in Daugerdas's view because the J&G fees were not transaction costs. Therefore, the relevant question for Daugerdas was whether the client had a secondary profit motive for engaging in the short sale trade. Since there was no question that these trades could be profitable, Daugerdas had every reason to believe that clients wanted to make money from them.

48

government failed to prove beyond a reasonable doubt that Daugerdas knew J&G clients lacked any nontax motive for engaging in the transactions.

## D. The Evidence With Respect to Counts Five and Six Was Legally Insufficient

Daugerdas was charged in Counts Five and Six with tax evasion in connection with losses reported by Matthew Coleman and Robert Blair on their 200l federal income tax returns. The losses were the result of their investments in swaps transactions in 2001. The evidence at trial was legally insufficient to establish (i) that the Coleman/Blair transactions failed the subjective prong of economic substance, and that Daugerdas knew this, or that (ii) the Coleman/Blair transactions failed the objective prong of economic substance, and that Daugerdas also knew this.

### 1. There Was Insufficient Evidence That Blair and Coleman Lacked a Business Purpose In Executing the Swaps Trades Or That Daugerdas Knew They Had No Non-Tax Purpose

Pursuant to the Court's jury instructions, the subjective prong of the economic substance doctrine required the government to prove that Coleman and Blair had no genuine business purpose or non-tax reason

49

for entering into the transaction. (A-531-533). Furthermore, to satisfy the willfulness element of tax evasion, the government was also required to prove that Daugerdas knew that Coleman and Blair had no non-tax reason for entering into the investments.

With respect to Count Five, Coleman testified that he did not expect to make money on his swap investment. (A-404). However, Coleman also testified that he understood from Daugerdas that the investments had to have a possibility of financial gain in order for the transaction to be lawful, (A-409-410), and that he believed that the transaction was lawful. (A-412). Coleman also testified that Daugerdas appeared to him to firmly believe that the transaction was lawful based on these principles. (A-411). Moreover, Coleman never told Daugerdas that he could not develop a profit motive for entering into the transaction. This testimony failed to prove that Daugerdas acted in bad faith when he advised Coleman on the law and these investments.

With respect to Count Six (Blair), there is no evidence of Blair's reasons for entering into the transaction, or Daugerdas's belief about these reasons, because Blair never testified. Thus, the government utterly failed to prove that Blair entered into these investments only for

50

tax losses and that Daugerdas knew this.

## 2. There Was Insufficient Evidence To Prove That Daugerdas Knew Blair and Coleman Lacked A Reasonable Possibility Of A Profit

Pursuant to the Court's instructions, the objective prong of economic substance required the government to prove that Coleman and Blair had no reasonable possibility of earning a profit. The government relied on the testimony of Dr. David DeRosa to establish the profit potential of the tax shelter investments. With respect to the Coleman and Blair swaps, DeRosa concluded that there was a 1% chance that they would earn a profit net of DB fees although no chance that the swaps would have generated sufficient profit to cover the fees to J&G. (A-425-426). However, as noted above, there was absolutely no evidence that Daugerdas or anyone at J&G was aware that the profit potential for the swaps transactions was any different from the profit potential on the digital options or SOS transactions. Indeed, the only evidence on this issue came from Erwin Mayer, who testified that J&G's profit criteria for the swaps were the same as the criteria for the options. (A-379-380). The perception at J&G that the swap criteria were the same as the digital option transaction was quite logical. As

51

DeRosa testified, the swap was in effect a digital option carrying case. (A-421). Furthermore, Mayer testified that J&G's understanding was that there was approximately a 33% chance that the digital options would terminate in the money. (A-350; A-377-378).[16]

Thus, because there was no evidence that Daugerdas was aware that the profit potential for the swaps was markedly reduced from the profit potential for the digital options, the jury could not have properly found the willfulness element of tax evasion.

## E. The Evidence With Respect to Counts Seven and Eleven Was Legally Insufficient

Daugerdas was charged in Counts Seven and Eleven with tax evasion in connection with losses reported by Michael Toporek on his 2001 and 2002 tax returns. According to IRS agent Valerie Catanzaro, the losses were the result of separate swaps transactions by Toporek in 2001 and 2002. (A-428-429). Toporek did not testify and the government did not offer any evidence about what was presented to him and what he communicated to J&G before he engaged in these

---

[16] By acquitting Daugerdas on six client tax evasion counts, the jury clearly demonstrated that they rejected the government's theory that Daugerdas knew that the J&G and BDO fees had to be included in the transaction cost analysis.

transactions.    Thus, there is absolutely no evidence from which the jury could have concluded that the government met its burden of proof with respect to the subjective prong of economic substance, i.e. that Toporek lacked a business purpose for entering into the transactions.

With respect to the objective prong of economic substance, DeRosa testified concerning a swaps transaction for Toporek in 2001 relating to Count Seven.  DeRosa testified that the probability of profit was 3%.  As stated above, however, there was absolutely no evidence that Daugerdas was aware of the more limited possibility of profit for the swaps than existed for the digital options.   No testimony was offered by DeRosa concerning the second swaps transaction, in 2002, identified by Agent Catanzaro in her testimony.  Thus, there is no evidence in the record from which the jury could have concluded that the government met its burden with respect to the objective prong of economic substance for Count Eleven.

## F. The Evidence With Respect to Counts Thirteen and Seventeen Was Legally Insufficient

Count Thirteen charged Daugerdas with obstruction of the IRS pursuant to 26 U.S.C. §7212.  It alleged that Daugerdas obstructed the

53

IRS in connection with his personal income tax returns for the years 1994 through 2002. This charge also incorporated by reference an entirely separate set of conduct taken from the conspiracy allegations of Count One.[17] The court instructed here that the government had to prove beyond a reasonable doubt that Daugerdas acted corruptly, with "consciousness of unlawfulness." (A-541). Thus, in essence, this charge required the government to prove that Daugerdas acted willfully in seeking to violate the tax laws. *See United States v. Coplan*, 703 F.3d 46, 73 (2d Cir. 2012). As the above discussion demonstrates, Daugerdas acted in good faith with respect to the tax shelters because he believed that the transactions complied with the economic substance doctrine.

Finally, Count Seventeen charged Daugerdas with mail fraud in connection with the same four tax shelters. This count was a mirror image of the tax evasion charges on a general (versus individual taxpayer) level. As set forth above, the evidence failed to establish that Daugerdas believed that the tax shelters deprived the IRS of taxes due and owing because, in his view, the transactions had economic substance.

---

[17] For the reasons set forth in Point VI, this charge was duplicitous and, accordingly, the conviction must be reversed.

.....

The government was required to prove beyond a reasonable doubt not only that the tax shelters lacked economic substance, but also that Daugerdas **knew** that the tax shelters lacked economic substance. The proof at trial convincingly established, however, that Daugerdas believed that the investments satisfied the objective prong of the economic substance doctrine because, based upon his good faith understanding of the law concerning transaction costs, he believed that the clients had an approximately 33% chance of making a profit on their investments. Further, the evidence established that Daugerdas believed that the J&G clients had a secondary non-tax motive in executing the trades that sheltered their income. Accordingly, Daugerdas's convictions on those counts of the indictment that required proof that Daugerdas knew the tax shelters lacked economic substance - tax evasion, obstruction, and mail fraud - should be reversed and the counts dismissed.

# POINT II

## PAUL DAUGERDAS'S CONVICTION FOR CONSPIRACY AND MAIL FRAUD MUST BE REVERSED BECAUSE (A) THE EVIDENCE WAS INSUFFICIENT TO PROVE (i) DAUGERDAS'S PARTICIPATION IN ILLEGAL BACKDATING OR (ii) THAT THE TRANSACTIONS INVOLVING "AS OF" TRADE DATES "AFFECTED A FINANCIAL INSTITUTION" AND (B) THE INDICTMENT FAILED TO ALLEGE AN EFFECT ON A FINANCIAL INSTITUTION.

As demonstrated in Point I, Daugerdas's conviction for mail fraud must be reversed because the evidence was insufficient to prove that he willfully violated the tax laws. Thus, there was a failure of proof with respect to the object of the alleged mail fraud scheme: tax due and owing to the IRS. As demonstrated in Point IV, *infra*, the government's attempt to address its failure of proof with respect to the economic substance doctrine by urging the jury to convict based on the "as of" dated trades constituted a constructive amendment of the indictment. Nevertheless, even if properly considered as a basis to support the mail fraud charge, the evidence at trial was plainly insufficient to prove that Daugerdas willfully violated the AAR or knowingly participated in a scheme to backdate trades so that clients could obtain tax benefits to

56

which they otherwise would not have been entitled.  Therefore, the proof with respect to mail fraud and the *Klein* conspiracy was legally insufficient.[18]  Furthermore, there was no evidence that the "as of" dated transactions "affected" Deutsche Bank ("DB") within the meaning of 18 U.S.C. §§ 1341, 3293(2).  Finally, as Daugerdas argued in his post-trial motions, Count Seventeen failed to allege the requisite effect on a financial institution.  Accordingly, his conviction for mail fraud should be reversed.

## A. Daugerdas Did Not Participate In A Criminal Backdating Scheme

The government offered evidence with respect to three sets of transactions involving the use of backdated or "as of" trade dates: Aronoff, Blair/Coleman, and Toporek.  The evidence was clear that J&G lawyers requested DB to correct errors in trade orders.  The government failed to show, however, that Daugerdas was aware of

---

[18] The court's original instructions on the AAR correctly limited its applicability to the *Klein* conspiracy alleged in Count One.  As set forth in Point III, *infra*, the court's supplemental instructions constituted reversible error, *inter alia*, because they failed to limit the AAR's application to Count One.  As set forth in Point IV, the government's rebuttal summation, combined with the Court's supplemental instructions, constructively amended the conspiracy and mail fraud counts by eliminating the core allegation, economic substance tax shelter fraud, from the charges.

these trading errors, or that he knew that the "as of" reported dates meant that the trades had not occurred on those dates.

In December 2001, two clients, Coleman and Blair, purchased and subsequently sold shares of Cisco stock as part of their tax shelter transaction. In February 2002, J&G advised DB that Coleman and Blair should have purchased and sold Canadian dollars and requested the mistake be corrected. Carrie Yackee from DB testified concerning the correction. She received from J&G new letters of authorization signed by Coleman authorizing the purchase (A-640-641) and sale (A-642-643) of Canadian dollars on or about February 11, 2002. On August 29, 2002, Yackee faxed to John Beery, a lawyer at J&G, a revised statement showing the reversal of the Cisco transaction and the purchase of Canadian dollars "as of" December 2001. (A-599-639). There is not a scintilla of evidence linking Daugerdas to either the initial instructions to DB concerning the Cisco transaction or to the request to change the transaction to one involving the purchase and sale of Canadian dollars. Yackee repeatedly referred to her communications with J&G generally. (A-380.1-380.5). Further, the only individual at J&G identified in the various communications

58

between J&G and DB concerning the change was Beery. (A-380.7-380.8). Moreover, Coleman testified that he received documents and instructions from Donna Guerin concerning the implementation of his transaction. (A-405-406).

Beery was also at the center of the Toporek transaction. The evidence showed that Beery retrieved via fax, from tax preparer Judith Quedenfeld, Toporek's 2001 tax return. Beery emailed Guerin to inquire about an apparent discrepancy that he had discovered concerning the percentage of Lucent stock and Canadian dollars that had been purchased and sold in Toporek's accounts. (A-898). Although the fax had been addressed to Daugerdas, it was clear that Daugerdas did not retrieve it. Nor was Daugerdas involved in the J&G effort to effectuate a change in the transaction.

First, Sandra Burnside testified that she recalled advising the government that Daugerdas was out when the fax arrived and he was not handling the matter. (A-324). Second, Beery sent his email to Guerin, without copying Daugerdas, shortly after J&G received the fax from Quedenfeld. Third, Quedenfeld faxed the revised tax returns to Beery, not to Daugerdas. (A-955-970). Fourth, Quedenfeld testified

that she never discussed the substance of the transactions with Daugerdas. (A-385). Fifth, Quedenfeld testified that she guessed that someone from J&G asked her to modify the original tax returns and she guessed that it was Beery with whom she was communicating. (A-386). Sixth, Quedenfeld testified that she prepared the revised tax returns based upon revised DB statements that she received from Carrie Yackee. (A-387-388). Seventh, Yackee emailed Beery concerning the Toporek transaction, not Daugerdas, to inquire whether DB was going to be "correcting the sale of FX or stock." (A-907). Yackee also indicated that she was aware that it was Beery who had spoken with her boss, David Parse, about this matter. *Id.* (A-382). Finally, Guerin transmitted the opinion letter to Toporek. (A-385.1).

Both Nicole Bencik of BDO and Yackee of DB testified concerning the Aronoff transaction. Bencik prepared the tax returns based upon the "as of" statements transmitted to her by Yackee. (A-914-944). In this transaction, an error in the distribution of assets upon liquidation of the Aronoff partnership was corrected. (A-390.1-390.2). Neither Bencik nor Yackee ever communicated with Daugerdas about this

transaction; the documentary evidence was clear that it was Guerin who communicated with DB. (A-313-316; A-381; A-911-913; A-945).

There was no evidence that Daugerdas knew of the trading errors or the corrections. However, even had he been aware of the "as of" dates on the DB monthly statements, there was no evidence that Daugerdas knew that the dates did not reflect the actual trade dates or that it would be a crime to report the "as of" trade date on a tax return. Indeed, Quedenfeld, an experienced tax preparer, was clearly aware that DB was making corrections to the trades at the request of J&G. Yet even she was not concerned about the propriety of using "as of" dates on the returns. She utilized the "as of" date for tax reporting purposes because she understood that the "as of" date was the date that DB reported the trade occurred and because she considered the "as of" date to be the trade date. (A-390). Indeed, Carrie Yackee of DB held the same view; the "as of" date meant the date of the trade. (A-384.2). Similarly, Nicole Bencik, another tax preparer, testified that she believed that there was nothing wrong with using the "as of" date on tax returns because she viewed it as the date the transaction actually occurred. (A-391).

61

## B. The Evidence Was Insufficient to Prove That the Backdated Transactions Affected Deutsche Bank

To avoid a five-year statute of limitations in the mail fraud count, the government invoked the provisions of 18 U.S.C. §§ 1341, 3293(2), which provide a ten-year limitations period and a maximum of 30 years imprisonment for "a violation of, or a conspiracy to violate" the mail fraud statute "if the offense affects a financial institution."[19] Accordingly, the court charged the jury with the additional element "that the scheme to defraud affected one or more financial institutions, as that term is used in the mail fraud statute." (A-542).

To invoke the provisions of section 3293, any alleged harm to the financial institution must be "tangible." *United States v. Agne*, 214 F.3d 47, 52-53 (1st Cir. 2001) (rejecting the government's argument that "reputational" damage to the financial institution would bring a charge

---

[19] Daugerdas maintains his position that the language of "affect[ing] a financial institution," for purposes of both the statutory language at 18 U.S.C. §§ 1341 and 3293, only applies to cases where a financial institution is an alleged *victim* of the charged scheme and not an alleged participant. *See United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000) (in interpreting the same language under the federal wire fraud statute, holding that "a wire fraud offense under Section 1343 'affected' a financial institution only if the institution itself were victimized by the fraud . . .").

within the ten-year statute of limitations).  Moreover, the ten-year

statute of limitations and increased maximum penalty only apply where

the damage to the financial institution was a direct and immediate,

rather than a "remote" product of the alleged fraud. *Id.*, 214 F.3d at 51-

52; *United States v. Pellulo*, 964 F.2d 193 (3d Cir. 1992).

The government's evidence at trial failed to make the requisite

showing of "tangible" and non-"remote" harm to DB resulting from any

alleged misreporting of dates in the Aronoff, Coleman/Blair or Toporek

tax returns.  The fact that these taxpayers might have paid fewer taxes

to the IRS as a result solely of the use of "as of" dates for certain of their

financial transactions did not have any impact on DB.  In other words,

the government's argument at summation – that  the jury could convict

Daugerdas of mail fraud, based only on the misuse of "as of" reporting

on these few individuals' tax returns – was legally wrong. (A-460-461).

This was error because DB was only "affected" by its alleged wholesale

agreement to work with A&G and J&G to assist these firms in its

clients' use of the various charged tax shelters – not by the use of "as of"

reporting on a single, or even two or three, J&G clients' returns.  The

government presented absolutely no evidence that DB was somehow

"affected" within the meaning of the mail fraud statute (18 U.S.C. § 1341) by the reporting of "as of" dates in these clients' respective tax returns in alleged contravention of the AAR.

During trial, Daugerdas entered into a stipulation that DB "was 'affected' within the meaning of 18 U.S.C. § 3293(2) by the Short Sale, Short Options, Swaps, and HOMER tax strategies ...." (A-972). This stipulation lends no support to the government's attempt to save the mail fraud conviction based upon the backdating allegations. The parties clearly only stipulated that DB was "affected" by its participation in the overall implementation of the four tax shelters themselves, not by the use of "as of" reporting in violation of the AAR in a few tax returns.[20]

Accordingly, Daugerdas is entitled to a judgment of acquittal because the "as of" dating evidence is insufficient to sustain the mail fraud conviction.

---

[20] Indeed, the language of the stipulation demonstrates quite clearly that the tax shelter scheme set forth in the indictment was the economic substance fraud involving the four tax strategies, not a backdating scheme involving three clients' transactions. (A-971-972).

## C. Count Seventeen Failed to Allege An Essential Element of the Crime

Daugerdas's mail fraud conviction must also be reversed because Count Seventeen failed to allege a necessary element of the crime charged to the jury, and upon which it convicted, in violation of the Grand Jury Clause of the Fifth Amendment. The court instructed the jury that the fourth element of mail fraud required the jury to determine whether the crime "affected a financial institution." Judge Pauley also advised the jury that the parties had stipulated that Bank One and Deutsche Bank were financial institutions, that Bank One was "affected" by the HOMER tax shelter in this case, and that Deutsche Bank was "affected" by the Short Sale, Short Options, Swaps, and HOMER tax shelters. (A-544). However, Count Seventeen failed to include the language necessary to charge the separate offense of mail fraud "affecting a financial institution."

To be sufficient, an indictment must allege facts essential to establish each and every element of the offense charged. *E.g. United States v. Stringer*, 730 F.3d 120, 124 (2nd Cir. 2013); *United States v. Gonzalez*, 686 F.3d 122, 127 (2nd Cir. 2012). The instant indictment

fails to allege that a financial institution was "affected" by the mail fraud scheme. As this was an essential element, the conviction for Count Seventeen must be reversed.

## POINT III

### THE DISTRICT COURT'S ERRONEOUS SUPPLEMENTAL INSTRUCTIONS ON THE "ANNUAL ACCOUNTING RULE," WARRANT A NEW TRIAL FOR MR. DAUGERDAS ON ALL COUNTS

The district court, spurred by the government's rebuttal summation, committed instructional error in response to jury questions during deliberations. In doing so, the Court permitted the government to amend its theory of tax evasion, mail fraud, and obstruction after the close of evidence and after the defendant's summation.

The Court's misleading and confusing supplemental instructions on the so-called "annual accounting rule," a general principle of federal tax law, were tainted by a number of errors, including: (1) misstating the AAR by presenting it as an absolute rule; (2) reducing the scienter requirement by informing the jury that a tax return preparer could not consider an "as of" date reported in a financial statement, but only the date on which a transaction actually occurred; (3) refusing to inform the

66

jury of the source of the AAR and whether it had any exceptions; (4) failing to limit the new AAR instruction to the applicable element of the Count One conspiracy; and, (5) refusing to expressly instruct the jury that Daugerdas's good faith defense applies to this new tax rule.

Each error plainly changed the results of the trial, permitting the jury to convict on all counts solely on the basis of backdating evidence and an erroneous instruction on the law. Accordingly, Daugerdas's convictions on all counts should be vacated and, at the very least, remanded for a new trial.

## A. The Standard of Review

This Court reviews *de novo* a claim of error in jury instructions, reversing "where the charge, viewed as a whole, demonstrates prejudicial error." *United States v. Coppola*, 671 F.3d 220, 247 (2012). "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001) (internal quotation marks omitted). "Objectionable instructions are considered in the context of the entire jury charge, and reversal is required where, based on a review of the record as a whole, the error was prejudicial or the

67

charge was highly confusing." *Id.* at 67-68 (internal quotation marks omitted). *See also Nat'l R.R. Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land,* 766 F.2d 685, 688 (2d Cir. 1985) ("A charge that appears likely to have left the jury 'highly confused' may, on that ground alone, be reversed.").

Errors in supplemental instructions alone may warrant reversal. *See United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014) ("Even if an initial instruction is not itself erroneous or highly confusing, a supplemental instruction prompted by a jury question may be so muddled as to warrant vacatur."). This Court has explained:

> If the court's instruction . . . had been confined to those contained in its original charge to the jury, a reversal would not be required. . . . However, in its supplemental instructions to the jury after deliberations had begun, the district court left the issue . . . in further confusion and thereby inadvertently undermined its earlier correct instructions. . . . In short, the court's supplemental instructions to the jury were sufficiently incomplete and misleading so as to make the charge, viewed as a whole, inadequate. . . .

*United States v. Hastings,* 918 F.2d 369, 371-73 (2d Cir. 1990) (citations omitted).

"A supplemental instruction can be a potent influence" on a jury. *Kopstein*, 759 F.3d at 172. A jury's interruption of its deliberations "to seek further explanation of the law" is a "critical moment in a criminal trial," and this Court has ascribed "crucial importance" to a "completely accurate statement by the judge" at that moment. *United States v. Lefkowitz*, 284 F.2d 310, 314 (2d Cir. 1960). "[T]he district court must exercise special care to see that inaccuracy or imbalance in supplemental instructions do not poison an otherwise healthy trial. This is especially true since the judge's last word is apt to be the decisive word." *Tart v. Michigan*, 697 F.2d 75, 77 (2d Cir. 1982) (internal quotation marks and citations omitted).

Unaddressed or aggravated jury confusion is almost certainly not harmless if it pertains to a defendant's "only" or "primary" defense. *See United States v. Velez*, 652 F.2d 258, 262 (2d Cir. 1981); *United States v. Rossomando*, 144 F.3d 197, 198 (2d Cir. 1998) (finding plain error because the jury's questions during deliberations suggested that the charge could have "utterly vitiated" defendant's defense and the supplemental instructions failed to cure the error).

69

## B.   The District Court's Supplemental Instructions Deprived Mr. Daugerdas of a Fair Trial

The district court's instructional errors alone entitle Daugerdas to a new trial. *See Neder v. United States*, 527 U.S. 1, 18 (1999) (instructional error is harmless only if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error").  The district court erroneously instructed the jury that it was a *per se* violation of the I.R.C. [21] for a tax return preparer to consider "in connection with the preparation of a tax return for a particular year . . . transactions that occur in a subsequent year." (A-561 / SPA-50: 9-11)  Thus, the district court directed the jury to convict if it found that Daugerdas relied on an "as of" trade date for tax purposes, regardless of what he believed those dates to mean or the tax law to require, if the jury found that the transaction actually occurred in the subsequent year.  This instruction not only misstated tax law,

---

[21]    Citations to "I.R.C." are to Title 26 of the United States Code.

but also vitiated Daugerdas's good faith defense.[22]

---

[22]    The jury's confusion on this issue was evident by its questions during deliberations.  For example, it asked at one point: "Can you legally claim an as-of dated transaction on your tax return in a given year if that as-of transaction had a settlement date in the following calendar year?" (A-991).  The court declined to answer, telling the jury instead "[i]t all depends when the transaction actually occurred." (A-561 / SPA-50.)  The court should have responded that it depended on the intent of the return preparer.  Instead, the court's answer left the jury to ponder the confused state of the trial record regarding the meaning of the terms "trade date," "as of trade date," and "settlement date."  Carrie Yackee, an assistant vice president in private wealth management at Deutsche Bank, testified that the term "trade date" on Deutsche Bank statements meant "when the trade occurs." (A-380.6).  She also testified that the term "settlement date" is "the time by which the trade must be paid for." (*Id.*)  Another witness, Judith Quedenfeld, a certified public accountant at American Express Tax and Business Services, testified that the term "settlement date" on brokerage statements generally means "[t]he date the transaction basically occurred." (A-388).  Outside the presence of the jury the district court disputed Ms. Quedenfeld's testimony and asked the government to correct it. (A-388.1-388.2). On the next day of her testimony, Ms. Quedenfeld offered this equivocal response:  "Usually the settlement date is within three days of the date the trade is put in to be traded." (A-388.3-388.4).  Then, when asked on cross-examination about how she reported a certain transaction on a client's tax return, Ms. Quedenfeld said she thought it was correct to report the "as of 12/28/01" trade date reported by Deutsche Bank rather than the settlement date of April 5, 2002. (A-389-3900; A-908-910).  Ms. Quedenfeld testified that she "understood that the as-of date was the trade date," (A-390), despite the fact that the settlement date was dated a few months – rather than days – later.  The court's supplemental instruction on the AAR left the jury to untangle this mess.

Under applicable law, Daugerdas was entitled to an instruction that the jury could not convict him for defrauding the IRS if he believed that there was a lawful tax basis for relying on "as of" dates used in brokerage statements—*even if the underlying transaction was not executed until the subsequent year.  See* A-556-557 (Daugerdas's objections that the AAR is not a *per se* rule without exception, and that he is entitled to a good faith defense to each charge).

The district court should have accepted defendants' proposed charge on Count One from Daugerdas's first trial, or simply should have limited its instruction to the single line that defrauding the IRS "can include falsifying the date of a transaction for tax purposes."  Final Retrial Charge (A-520); *see also* Defense Request to Charge (A-262): First Object of Conspiracy: Defrauding the United States and the IRS: "Only conduct that is both intended to impede the lawful functions of the IRS and is fraudulent, deceitful, or dishonest will support a charge of conspiracy to defraud the IRS.  It is critical for you to recognize that not all conduct that impedes the lawful functions of a government agency is illegal. To be unlawful, the conduct must entail fraud, deceit, or other dishonest means.")

72

Eventually, the district court had to respond to six additional jury questions about this new AAR charge. These responses only added to jury confusion.

The court compounded its error by disconnecting this series of supplemental instructions from Count One in the Indictment— permitting the jury to carry out the result urged by the government during summation and convict Daugerdas on all counts solely for violations of the AAR.

Most damaging, though, the court's AAR instructions lacked any reference to intent. The court should have directly linked its expansive AAR charge to the heightened intent requirements in criminal tax law, *see Cheek,* 498 U.S. at 200-01, and specifically to Daugerdas's good faith defense. A properly instructed jury likely would not have convicted Daugerdas for relying on "as of" trade dates in Deutsche Bank brokerage statements because the government failed to introduce any evidence indicating that Daugerdas agreed to his legal staff's reporting of Michael Toporek's tax return with an intent to violate a known duty under the tax law. *See United States v. Pirro,* 212 F.3d 86, 90-91 (2d Cir. 2000) (dismissing indictment for lack of allegation of violation of

73

"known legal duty" where government failed to point to any statute or regulation that stated that S corporations were required to report "ownership interests" on their corporate tax returns, nor was there specific Second Circuit or Supreme Court authority that made this requirement clear).

In fact, the government introduced evidence that the mere use of "as of" dates was not a signal to tax return preparers that the date reflected something other than when the transaction occurred. (A-389-391).

These substantial errors require the Court to vacate all of Daugerdas's convictions and remand for a new trial.[23]

## 1. The District Court Misstated Federal Tax Law by Instructing the Jury on an Absolute Annual Accounting Rule

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Hassan*, 578 F.3d 108, 129 (2d Cir. 2008); *see also*

---

[23]     Under the rule of *Yates v. United States*, 354 U.S. 298, 312 (1957), the impossibility of determining which object of the conspiracy is the basis for Daugerdas's conviction necessitates a new trial on that Count as well.

*United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (same). "An erroneous instruction, unless harmless, requires a new trial." *Hassan*, 578 F.3d at 129.

Here, the district court's rendition of an absolute AAR—which "prohibits, in connection with the preparation of a tax return for a particular year, consideration of transactions that occur in a subsequent year"—simply does not exist in the federal tax code. (A-992.) The district court acknowledged as much when it refused to give this same instruction at Daugerdas's first trial. (*See* A-281-282; A-258-260).

Although the I.R.C. is based on an annual system of accounting, it is not, by any means, an absolute rule. The primary reference in the Code to a specific time period that governs the reporting of income and expenses is I.R.C. § 441(a), which states that: "Taxable income shall be computed on the basis of the taxpayer's taxable year." As a general matter, this principle reflects the fact that the annual accounting *system* was devised "to produce [income tax] revenue ascertainable and payable at regular intervals." *Hillsboro Nat'l Bank v. Comm'r*, 460 U.S. 370, 377 (1983). However, the Supreme Court has acknowledged that "strict adherence to an annual accounting system would create

75

transactional inequities," and therefore is not required by the law. *Id.*
The tax law thus frequently permits deviations to "approximate the
results produced by a tax system based on transactional rather than
annual accounting." *Id.* at 381.

Contrary to the district court's instructions, the I.R.C. is riddled
with exceptions that ***authorize*** tax professionals, "in connection with
the preparation of a tax return for a particular year, [to] consider [ ]
transactions that occur in a subsequent year." (*Cf.* A-922.) *See, e.g.,*
I.R.C. § 165(i) (disaster loss may be taken into account for prior tax
year); I.R.C. § 172 (net operating loss carrybacks to prior years); I.R.C. §
402(g)(2)(A) (retroactive allocation of excess deferrals until March or
April of following year); I.R.C. § 404(a)(6) (contributions to employee
plans deemed made after close of preceding tax year "considered as paid
during such taxable year"); I.R.C. § 663(b) (payment or credit to estate
or trust within first 65 days of a new year considered to be made on the
last day of the preceding year); I.R.C. § 666 (allocation of accumulation
distribution of certain trusts to preceding tax years); I.R.C. § 761(c)
(modifications to partnership agreements permitted at or before filing of
tax year's return in subsequent year); I.R.C. § 810 (operating loss

76

carrybacks for insurance companies); I.R.C. § 855 (permitting regulated investment companies to consider certain dividends paid in previous tax year); I.R.C. § 1212 (capital loss carrybacks).

Indeed, authority exists in the tax law to permit prior year reporting of transactions that occur after year-end for the very purpose undertaken by J&G lawyers in this case, that is, to retroactively correct an error. *See* I.R.C. § 1311-14 (permitting corrections of certain errors in prior returns barred by statute of limitations or otherwise); I.R.C. § 401(a)(2) (permitting return of contribution to certain qualified employer plan trusts within six months, if "made by a mistake of fact or law"); I.R.C. § 401(b) (permitting retroactive changes in plans up to time of filing); and *Dodge v. Comm'r,* 27 T.C.M. (CCH) 1170 (1968) (tax court gave retroactive effect to estate transactional error, where taxpayer intended property interest to be transferred in 1960, and the mistake was only discovered in the subsequent year).

These legal authorities confirm the district court's error here. In a criminal case, the district court's failure to instruct the jury that the AAR and interpreting case law acknowledged exceptions to annual accounting, especially after the jury expressly asked this question,

77

created clear prejudicial error.

At trial, the government's chief cooperating witness, Erwin Mayer, Daugerdas's former tax partner at A&G and J&G, recalled prior conversations with Daugerdas, in which he referred to similar tax authority that allowed reporting of transactions after year-end. Mayer testified to Daugerdas's good faith belief that the tax law in some cases permitted the correction of transactions in a subsequent tax year to give effect to taxpayer intent from the prior year when an error represented mutual mistake of the parties. Mayer testified: "Generally, [Mr. Daugerdas and I] would talk about trying to effectuate the client's intent, that it wasn't the client's fault that a mistake had been made in the implementation of the transaction." (A-348).

Correcting a mutual mistake or "scrivener's error" is just one area in the federal tax law – and the most relevant here – that gave J&G lawyers reason to believe they could lawfully report the "as of" trade dates on Deutsche Bank statements despite the annual accounting principle. *See e.g., Miller v. United States,* 949 F. Supp. 544, 548 (N.D. Ohio 1995) (authorizing retroactive tax reporting of marital trust transactions to effectuate client intent where "scrivener's errors were

78

inadvertent in that they were intended by neither" of the parties); *Real Estate Equity Strategies, LLC v. IRS*, Civil No. 05-1008 (JNE/SRN), 2007 U.S. Dist. LEXIS 16720, at *1, n. 1, 2007-1 U.S. Tax Cas. (CCH) P50,413 (D. Minn. March 8, 2007) (IRS agreed to give legal effect to wrong party's filing of Notices of Intention to Redeem property "due to scrivener's error"); *Begner v. United States*, Civil No. 1:02-cv-1702-GET, 2004 U.S. Dist. LEXIS 8134, *12, 2004-1 U.S. Tax Cas. (CCH) P50,269 (N.D. Ga. April 15, 2004) (holding that "a scrivener's error should not be permitted to defeat the clear intention of the parties," giving effect to parties' intent despite differences in written agreements stemming from IRS's use of outdated tax form); *Woods v. Comm'r*, 92 T.C. 776, 781-82 (1989) (finding in favor of IRS that statute of limitations was extended for filing of notice of deficiency, and conforming written consent to the actual agreement contemplated by the parties where writing contained scrivener's error).

The government did not even dispute that the "as-of" dates reported on Deutsche Bank statements were implemented solely to correct "errors" and effectuate the parties' prior year's tax plan. In fact, this was the government's primary argument at trial to show that they

these investment transactions lacked economic substance. (A-287-288). Only in summation did the government change course. There, for the first time, instead of focusing on the errors as evidence of lack of business or investment purpose, the government claimed an entirely separate fraud. In rebuttal summation, the government cited to these same errors, not as retroactive fixes to give effect to a prior plan, but as an independent AAR tax fraud. (A-460-461). In other words, the government wanted to have its proverbial cake and eat it too.

In any case, because a bright line "annual accounting rule" does not exist in the federal tax law, the jury should not have been misled to believe it did. *See Pettibone Corp. v. United States*, 34 F.3d 536, 539 (7th Cir. 1994) (Easterbrook, J.) (finding that claims of absolute system of "annual accounting" does not exist in federal tax reporting and any attempt to claim that it does is "deceiving"); *see also Smith v. Comm'r*, 331 F.2d 298 (7th Cir. 1964) (holding that retroactive application of partnership income was proper in a subsequent year for a prior year's tax reporting).[24]

---

[24]     The Code provision cited to in *Smith* was actually implicated in the trial testimony. (A-390.1-390.2; A-911-913). Because of an error

The district court's supplemental instructions also misstated the law by placing a burden on Daugerdas that simply does not exist in the criminal law.  By telling the jury that the AAR "prohibits . . . *consideration*[25] of transactions that occur in a subsequent year," the Court essentially imposed a duty on Daugerdas to determine if the transactions actually occurred on the "as of" trade dates before reporting them on tax returns. (A-992) (emphasis added).  This is anathema to principles of criminal intent.  The criminal tax law does not punish tax reporting violations based on the failure to check if the reported trade dates were correct. *United States v. Dyer,* 922 F.2d 105, 108 (2d Cir. 1990) (willfulness requirement mandates proof of

---

in the distribution of assets upon dissolution of one of the tax shelter partnerships, relating to client Aronoff, the partners had to modify its prior liquidation agreement, which is expressly permitted under the I.R.C. ***even after year-end***. *See* 26 U.S.C. § 761(c) (permitting modifications to partnership agreement after year-end but prior to filing of tax return).  Thus, the district court erroneously told the jury that these transactions were also prohibited, even though a specific provision in the I.R.C. existed that authorized retroactive reallocation of partnership assets.  Indeed, counsel for Daugerdas cited to the *Smith* decision and this Code provision in his objection to the supplemental AAR instruction that did not allow for ***any*** exceptions. (A-558; A-571-572).

[25]     The verb "to consider," is defined as:  "to think about (something or someone) carefully especially in order to make a choice or decision." http://www.merriam-webster.com/dictionary/consider.

intentional violation of a known legal; "gross carelessness or negligence is not sufficient").

The government did not prove deceitful intent, and the district court's supplemental instructions did not require the jury to find that Daugerdas had such intent when he reviewed Michael Toporek's or Coleman and Blair's returns.

This error was not harmless. In fact, based on the split tax evasion verdicts rendered, it is reasonable to conclude that Daugerdas was convicted on these misstatements of tax law—law that was neither charged in the Indictment as an alternative theory of criminal tax liability nor included as a separate basis of tax evasion in the final jury charge. The AAR's late entry into this case and undue emphasis as an absolute tax reporting obligation created reversible error. *See United States v. Morales*, 577 F.2d 769, 777 (2d Cir. 1978) (improper emphasis on one part of jury charge had "cumulative effect" of confusing the jury and depriving defendant of a fair trial).

**2. The District Court's Supplemental AAR Instructions Failed to Refer to the *Klein* Conspiracy Charge and Left the Jury Confused as to Their Applicability to All Counts as Urged by the Prosecutor in Rebuttal Summation**

In addition to misstating federal tax law, the Court erred by failing to limit its AAR supplemental instructions to Count One's *Klein* conspiracy. Instead, in the wake of the government's improper summation argument urging the jury to convict on all counts for a single "backdated" transaction, the court, in response to jury questions, gave several new tax law instructions that were unconnected to any specific counts. (A-460-461).

Initially, the district court erred by refusing to correct the government's misstatement of the charges in the Indictment. It also rejected defense counsel's request to modify the jury charge to clarify that the tax evasion and mail fraud charges were based solely on the government's economic substance theory of tax shelter fraud. (A-494-503; A-509-512). The combination of the government's uncured rebuttal summation errors and the untethered supplemental instructions on the AAR created prejudicial error.

83

It is beyond dispute that the "backdating" allegations applied only to the first object of the Count One conspiracy—the so-called *Klein* conspiracy—to impede the functions of the IRS by fraud or dishonest means. (A-518-519). This fact is clear from both the language of the Indictment and the language and evolution of the Court's final jury charge.

The 67-page Indictment charged Daugerdas with committing tax fraud arising out of four investment tax shelters that the government claimed lacked economic substance. The isolated "backdating" conduct was alleged only as a means and method of the larger tax shelter fraud conspiracy—"to correct transactions that had been incorrectly implemented by J&G in order to provide the clients with the tax losses they had purchased." (A-216, ¶ 63(i)).

The court's final jury charge underscored the limited relevance of the backdating conduct in what was essentially an economic substance tax crime. Most notably, the court's charge on the tax evasion counts (2 through 11 and 14 through 16) was limited ***exclusively*** to the economic substance fraud theory. Specifically, the Court stated:

> The government claims that the reason the
> taxpayers or Mr. Daugerdas owed more taxes
> than they reported is that the losses they claimed
> on their tax returns as a result of the short sale,
> SOS, swap, or HOMER tax shelters were not
> allowable.  The government claims that these
> losses were not allowable because they stemmed
> from transactions that lacked economic
> substance.

(A-531).  The court further explained that: "[a] transaction that lacks

economic substance cannot enter into tax computations.  Any deduction

claimed for tax losses allegedly sustained in such a transaction is not

properly claimed on a tax return."  *Id.*  Thus, under the Indictment's

theory, the "backdated" transactions were fraudulent regardless of

when they were reported because the investments lacked economic

substance.

Furthermore, the court's final jury charge (at both the first trial

and re-trial) intentionally referred to the alleged "backdating" conduct

only in the context of Count One, the *Klein* object of the conspiracy.

This was no accident – it was the subject of argument at the charge

conference *before the first trial*.  At that time, the government sought a

more expansive, separate charge on the "annual accounting rule" to be

given as part of Count One's charges.  (A-258-259).   The government

suggested in this proposed charge that violations of this tax rule also be considered "for any substantive count to which the backdating of tax shelter transactions relates." The defendants strenuously objected. (A-269-280; A-263-265). And the district court ruled in defendants' favor.

Ultimately, the trial court settled upon the language and placement of its "annual accounting system" instruction within the *Klein* conspiracy in Count One. (A-281-283; A-519-520). The court refused to give the lengthy AAR instruction requested by the government. Instead, it gave the truncated charge about the "annual accounting system" within a list of examples of conduct that could constitute "fraud or dishonest means" to impede the functions of the IRS as the first object of the conspiracy. (A-519-520).

After the district court informed the parties at the first trial of its intent to limit the AAR charge to Count One, the government did not object or raise the issue for reconsideration before the district court gave the same charge at the re-trial. (A-283).

In this context, it was clear error—if not prosecutorial misconduct—for the government to tell the jury during rebuttal

summation to convict on all counts based on violations of the AAR in a single client's tax return. The district court should have addressed the prosecutor's misstatement of the charge, as demanded by defense counsel, by an emphatic curative instruction and a clarification in the charge to remove any confusion from the government's misstatement.

The Court declined to take any measure. (A-494-503; A-509-512). Instead, later during deliberations and in the face of the jury's obvious confusion about the government's rebuttal argument, the Court offered supplemental instructions that exacerbated the error by failing to expressly limit the applicability of the alleged backdating conduct and the AAR charge to Count One's *Klein* conspiracy. *See United States v. Hastings*, 918 F.2d 369, 372-73 (2d Cir. 1990) (reversing conviction due to errors in supplemental instructions which "were sufficiently incomplete and misleading so as to make the charge viewed as a whole, [ ] inadequate").

The jury's questions revealed that it tried to undertake the same careful review of the AAR as defense counsel had done with the government's witnesses insofar as testing the ambiguity, applicability and understanding of the economic substance doctrine as it applied to

87

the tax shelters. At various times, the jury asked for a copy of the actual AAR law, whether it was cited within the "Internal Revenue Laws," whether this rule was, in fact, law or otherwise just a position taken by the IRS, and whether there existed any exceptions or laws that "can be considered contradictory" to the AAR. Instead of telling the jury that the AAR was not the subject of the tax evasion or mail fraud scheme charged in the Indictment, the court told the jury it simply needed to follow the law as given and not consider anything else. (SPA-54-55). The jury should not have been the ones conducting a review of AAR law through jury questions, and it would not have been if this law were properly noticed in the Indictment. Defense counsel never questioned the trial witnesses about the AAR because it was not relevant to the jury's determination of any charge but the *Klein* conspiracy. And there, the only question should have been whether Daugerdas acted to knowingly deceive the IRS by falsifying dates on tax returns.

The Court's failure to cure the government's misstatement of the charge in summation and its incomplete and confusing supplemental instructions, left the jury with the erroneous impression that it could

88

apply the AAR to every count in the Indictment. This caused the jury to supplant the Court's original charge—expressly limiting the tax evasion counts to violations of economic substance law—and convict on four evasion counts where backdating evidence was presented at trial, while acquitting on all evasion counts where backdating was not alleged. Indeed, the jury convicted on the two tax evasion counts involving two years of returns of Michael Toporek – the same client whom the prosecutor pointed to in his rebuttal summation as having the one "backdated" transaction that allowed the jury to convict on all counts. (SPA-50-51).

The Supreme Court has emphasized the importance for district courts to make completely accurate statements at that critical moment in a criminal trial when the jury interrupts its deliberations to seek further explanation of the law. *See Bollenbach v. United States*, 326 U.S. 607, 611-14, 616-18 (1946). The district court failed in this instance. Instead, it injected more uncertainty and confusion into jury deliberations by ignoring its initial ruling, which limited the relevance of backdating to the *Klein* conspiracy.

89

Because the court's responses to jury questions only added to the confusion created by the government's summation argument, this Court can have no confidence that Daugerdas was convicted after appropriate findings on each element of each crime charged. *Hastings*, 918 F.2d at 373 (even though charge originally given was adequate, after supplemental instructions defined an element out of context from another element, charge found to be incomplete requiring reversal). These failings represent prejudicial error.

### 3. The Supplemental AAR Instructions Impermissibly Reduced the Scienter Requirement on All Counts and Deprived Mr. Daugerdas of His Good Faith Defense

The district court further erred by (1) failing to acknowledge any scienter requirement with respect to the AAR, and (2) refusing to provide an attendant good faith instruction. (A-585).

After eight weeks of trial testimony about the many ambiguities in the economic substance doctrine, the district court presented an absolute AAR. Then, in response to a question from the jury, the Court stated that there was no law or rule that provides a contradictory or different interpretation than the Court's instructions. (SPA-53-55). The express message to the jury was clear: Daugerdas's acquiescence to the

90

use of "as of" trade dates on Deutsche Bank statements was a strict liability tax crime. This instruction gutted Daugerdas's good faith defense. *See United States v. Velez*, 652 F.2d at 262 ("Although reluctant to upset a conviction because of an error in the supplemental charge, we are constrained to reverse here because the trial court's failure to recharge the jury on [an] element was both erroneous and highly prejudicial.")

This error was particularly prejudicial in light of the significant testimony supporting Daugerdas's good faith. The district court's instruction essentially told the jury to reject the testimony of the certified public accountant Quedenfeld and tax return preparer Bencik who both testified there was nothing wrong with reporting the "as of" trade dates. (A-389-390; A-391). It also told the jury to reject the testimony of assistant vice president Carrie Yackee from Deutsche Bank who testified about how she carefully obtained several levels of approval within the bank before she reported the trades with the designated "as of" dates. (A-383-384). *See Hassan*, 578 F.3d at 132-33 (reversing conviction because jury instruction permitted jury to convict even if government did not carry its burden to prove scienter).

91

The jury was never required to make a finding that Daugerdas intended to violate the AAR when he agreed to report "as of" dates on client tax returns. *See United States v. Morales,* 577 F.2d at 777 (jury charge misstatements had "cumulative effect" of confusing jury and depriving defendant of fair trial).

This error was extremely prejudicial because there was no evidence that Daugerdas knew that other lawyers at his firm were correcting trade orders they earlier had placed with Deutsche Bank on behalf of clients. The evidence only showed that Daugerdas received copies of Deutsche Bank statements that reported "as of" trade dates. Because the government did not prove that Daugerdas could not reasonably rely on these statements, its evidence was insufficient as a matter of law. (*See* Point II*, supra*.).

Lastly, the district court's supplemental instructions were not saved by the court's final general instruction to the jury to not consider the AAR charges on their own and to consider the charges as a whole. (SPA-55). This general admonition did not connect the AAR charges to other elements of the specific crimes charged. It also did not tell the jury that these instructions were applicable only to the *Klein* object of

the Count One conspiracy. And it did not tell the jury that Daugerdas's good faith defense applied to this other tax law. As the Supreme Court stated in *Bollenbach*, 326 U.S. at 612, "if [a supplemental instruction] is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge."

Given the dearth of scienter evidence of intentional "backdating" by Daugerdas, and the significant evidence of his good faith, the government cannot demonstrate that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder*, 527 U.S. at 18; *see United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) ("overwhelming evidence" required to show harmless error).

Daugerdas was not fairly tried on the issue of whether he intentionally violated the AAR in the handful of transactions at issue in this case. The prosecutor only introduced this alternative independent theory of tax fraud at summation and the district court compounded this late error by its confusing supplemental instructions. This Court can have no confidence that Daugerdas was properly convicted of the

93

crimes actually charged. Justice requires that his convictions be reversed.

## POINT IV

### DAUGERDAS IS ENTITLED TO A NEW TRIAL BECAUSE THE GOVERNMENT CONSTRUCTIVELY AMENDED THE INDICTMENT TO CREATE AN ALTERNATIVE THEORY OF ANNUAL ACCOUNTING FRAUD

Daugerdas is entitled to a new trial on all counts because the government's rebuttal summation and the Court's supplemental instructions constructively amended the Indictment.

The Fifth Amendment states that a defendant has a "substantial right to be tried only on charges presented in an indictment returned by the grand jury." *United States v. Gonzalez*, 686 F.3d at 127 (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). This constitutional right reflects the grand jury's role as "a substantial safeguard against oppressive and arbitrary proceedings." *Id.* (quoting *Smith v. United States*, 360 U.S. 1, 9 (1959)).

The Indictment was a lengthy, rambling document charging Daugerdas with a decade-long economic substance tax shelter fraud

94

involving four different tax shelters. Despite this dedication to economic substance doctrine, for the first time in summation, prosecutors urged the jury to convict Daugerdas of all counts based solely on evidence of a single "backdated" transaction among a thousand filed returns.

When it became evident during deliberations that the jury was confused by the government's new theory, the court responded by converting a background reference in the Indictment about "principles" of accounting into an "annual accounting rule," and erroneously implied that this was a strict liability tax crime under the I.R.C.

The government's theory and the Court's supplemental charge created "a substantial likelihood that the defendant may have been convicted of an offense other than the one charged" by the grand jury. *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988). Because violations of the AAR were not separately charged as an independent theory of criminal tax liability, and because the *sine qua non* of all of the charges was the design, marketing, and implementation of tax shelters that were fraudulent because they lacked economic substance, these convictions must now be vacated. *See United States v. Thomas,*

274 F.3d 655, 670 (2d Cir. 2001) (A "constructive amendment is a *per se* prejudicial violation of the Grand Jury Clause. . . .").

## A. The Government's Summation and the Court's Supplemental Instructions Permitted the Jury to Convict of Uncharged Crimes

### 1.    The Government's Rebuttal Summation

The Second Circuit clearly recognizes that introducing a new theory of criminality, even of the same conduct, is enough to violate the Grand Jury Clause. *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992). This Court has also "admonished prosecutors to be especially careful in drafting indictments" to avoid "confronting the defendant with its theory of criminality for the first time at trial." *Id.* at 4.

The government's theory, both in the Indictment and throughout trial, was that the A&G and J&G tax shelters were fraudulent because the underlying investments "lacked both economic substance and genuine business purpose." (A-194, ¶ 25; A-285-286). Based on this theory, the government charged Daugerdas with thirteen counts of tax evasion, mail fraud based on these evasions, obstruction of the IRS, and conspiracy.

96

Within the conspiracy charged in Count One, the government alleged that Daugerdas caused isolated financial transactions to be "backdated" to further the objective of implementing fraudulent tax shelters lacking in economic substance. (A-216, ¶ 63 (i)). Specifically, the Indictment alleged that these dates were reported "to correct transactions that had been incorrectly implemented by J&G in order to **_provide the clients with the tax losses they had purchased_**." *Id.* (emphasis added). This allegation presumes, and relies upon, the theory of economic substance fraud – the only "scheme" that pervades all of the tax shelters presented in the Indictment.

Up until summation, the government maintained this theory – presenting evidence of backdating solely in the context of showing that the tax shelters had no separate investment purpose and were solely executed to achieve tax losses high enough to negate a client's income. (*See* A-288: "This backdating showed that the investment parts of the shelters were not genuine attempts to make money; they were just part of the plan to create tax losses.").

The Government began rebuttal summation by reminding the jury of the scope of the fraud in this case: "**We're not talking about a**

**single transaction or a series of transactions** over a short time

period. We're talking about $7 billion –that's with a B – billion dollars of

fraudulent tax benefits that were created by the defense."

(A-434-435).

Then, quite shockingly, he changed course and told the jury

that they could ignore the economic substance tax shelter fraud and

convict Daugerdas of all counts based solely on the accounting

treatment of the isolated backdated transactions.  (A-460-461).   The

government's last gasp pursuit of an AAR criminal tax theory to apply

to the non-conspiracy counts constituted a clear constructive

amendment.  The government did not use the "backdating" evidence as

variance in proof to support its economic substance crime; it proposed a

completely separate crime of tax evasion and mail fraud. *Cf. United*

*States v. Danielson*, 199 F.3d 666 (2d Cir. 1999) (permitting proof that

shells, rather than entire rounds, had traveled in interstate commerce);

*United States v. Patino*, 962 F.2d 263 (2d Cir. 1992) (finding non-

prejudicial variance when three guns were presented at trial, instead of

the one gun charged in indictment).

At trial, the government presented the "backdating" evidence as a

means of furthering its economic substance fraud and waited until summation to offer a new theory of criminality in contravention of the Fifth Amendment.

## 2. The District Court's Supplemental Instructions

The series of events that followed the government's rebuttal summation only added to the indictment's amendment. The district court declined to give any curative instruction to correct the government's improper argument. Instead, the court's supplemental instructions introduced a new tax law – the annual accounting rule – as the basis for evasion and fraud. Thus, the district court gave teeth to the government's amendment and confused the jury to think it could convict Daugerdas on all substantive counts on an independent theory of AAR fraud. (A-992).

During jury deliberations, for the first time, government counsel presented new legal authority for violations of the AAR. The government raised sections of the I.R.C. and accounting rules that had never previously been mentioned. (A-566-567). Specifically, the government argued that two sections of the I.R.C. §§ 441, 451, were the authoritative source of this rule. *Id.* Defense counsel objected to the

99

government's interpretation of the Code, noting that it was disputed in the case law, and proposed an alternative instruction. (A-567-569). The district court refused to give Daugerdas's proposed responses to the jury's inquiries and instructed the jury that the AAR was a categorical rule found in the "Internal Revenue Laws." (SPA-50; SPA-54-55).

In doing so, the district court disregarded its "special responsibility" to enforce the Fifth Amendment Grand Jury Clause in fraud cases. *Roshko*, 969 F.2d at 3. Specifically, this Court has warned trial judges to be "especially alert to subtle attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions," while emphasizing the "critical" need to enforce the Fifth Amendment requirement "in light of the current broad range of conduct covered by federal fraud statutes." *Mollica*, 849 F.2d at 729.

The district court clearly failed to heed this Court's warnings. The government's new theory of criminality not only altered "the essence of the crime in general terms," but also modified essential elements of the charges. *United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) (defining the "core of criminality" as "the essence of the crime in general terms"); *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (an

100

indictment is constructively amended if "either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.").

By telling the jury in summation that it need not find an economic substance fraud to convict on all counts, the government re-wrote the Indictment. Because a constructive amendment is "*per se* violative of the Fifth Amendment that requires reversal even without a showing of prejudice to the defendant," the Court must vacate these convictions. *United States v. Clemente,* 22 F.3d 477, 482 (2d Cir. 1994); *Zingaro*, 858 F.2d at 98.

**B. Because the Indictment Failed to Allege Violations of the Annual Accounting Rule as a Separate or Alternative Tax Evasion and Mail Fraud Scheme, the Government's Reliance on This Theory Violated the Grand Jury Clause and the Sixth Amendment Right to Notice**

The government's reliance on a theory of criminal tax fraud based on the AAR violated Daugerdas's Fifth and Sixth Amendment rights because no such allegation was contained in the Indictment. *See Gonzalez,* 686 F.3d at 127 (holding that indictment was constructively

101

amended because it was "defective" and "[did] not set out all of the essential elements of the offense" presented to the jury).

The Fifth Amendment requires "presentment," the guarantee that a defendant will be tried only on charges presented in an indictment returned by the grand jury. *Id.* The Sixth Amendment requires "notice" and ensures that "the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." *Id.* (quoting U.S. Const. amend. VI). Both of these constitutional rights were violated by the government's eleventh-hour shift in theory to an uncharged AAR tax fraud.

There is nothing in the Indictment to suggest the grand jury indicted Daugerdas under a separate theory of criminal tax liability for knowing violations of the AAR. Rule 7(c) of the Federal Rules of Criminal Procedure states that an indictment must satisfy two requirements: (1) provide a "statement of the essential facts" and (2) refer to the "statute, rule, regulation, or other provision of the law that the defendant is alleged to have violated." *Gonzalez*, 686 F.3d at 127 (citing Fed. R. Crim. Proc. 7(c)). With respect to the government's

separate AAR fraud, the Indictment is deficient as to both requirements.

First, the Indictment failed to allege separate knowing violations of the AAR; there is only a background reference in Count One to general "principles of tax accounting." (A-208, ¶ 47). The Constitution requires that the indictment allege the tax laws that Daugerdas knowingly violated. This 67-page Indictment clearly identified the economic substance doctrine applicable to tax shelters – but not a categorical annual accounting rule.

Second, and equally significant, knowledge of the tax law is an essential element of a criminal tax fraud, *Cheek v. United States,* 498 U.S. at 1, and there is no specific allegation in the Indictment that Daugerdas ***knowingly*** violated the AAR. With respect to the backdating conduct, the Indictment merely alleges, in background, that defendants "caused" transactions to be treated in a way that violated accounting "principles." (A-208, ¶ 47). This Court has already invalidated indictments as defective on the basis of similar language. *See United States v. Berlin*, 472 F.2d 1002, 1008 (2d Cir. 1973) (indictment failed to allege knowledge of the falsity of a statement to

103

obtain mortgage insurance was defective even though the statutory
provision, 18 U.S.C. § 1010, was correctly cited).

Similarly here, allegations that Daugerdas caused transactions to
be reported to the IRS in a manner that violated "principles of tax
accounting" is insufficient to provide notice that he was being charged
with intentionally causing clients to commit tax evasion and mail fraud
in violation of known legal duties regarding the AAR.  As in *Berlin*, the
Indictment is deficient because it failed to allege that Daugerdas acted
knowingly and intentionally to violate the AAR when he caused clients
to submit tax returns that reported "as of" trade dates on brokerage
statements and that these violations deprived the IRS of a tax due and
owing.  *See also  Gonzalez*, 686 F.3d at 122 (highlighting similar
holdings in sister Circuits).

It is constitutional error for the government to rely upon a theory
of criminal tax evasion and mail fraud that was not properly alleged in
the indictment.  Because the indictment did not expressly allege that
Daugerdas intentionally violated a known legal duty imposed by the
AAR, his Sixth Amendment right to notice was violated.

104

Daugerdas's constitutional rights were violated because the government constructive amended the indictment by adding an AAR theory of tax evasion and mail fraud. This is *per se* prejudicial error and these convictions should be vacated. *Thomas*, 274 F.3d at 670.

## POINT V

### DAUGERDAS'S CONVICTIONS MUST BE VACATED BECAUSE THE GOVERNMENT'S IMPROPER SUMMATION ARGUMENTS, COMBINED WITH THE OTHER TRIAL ERRORS, VIOLATED DUE PROCESS

Daugerdas's trial was tainted by substantial error that violated his due process right to a fair trial.

First, the Court erred in permitting the government to admit irrelevant, highly prejudicial evidence of another tax lawyer's guilty plea to tax evasion in an unrelated matter, which the Government used to argue guilt by association. Then, in rebuttal summation, the Government blind-sided the defense with a new theory of criminal tax fraud, leaving no opportunity to defend against it at trial. The Government's summation also relied upon several prejudicial tactics: impermissible burden-shifting with respect to Daugerdas's good faith

105

and repeatedly borrowing the imprimatur of the Court to bolster its position with respect to a key issue in the case.

These improper arguments diverted the jury's attention from consideration of the evidence and amounted to nothing less than prosecutorial misconduct. They were extremely prejudicial, left uncured by the Court, and sealed otherwise tenuous convictions.

## A. The Court Committed Reversible Error by Permitting the Government to Admit Irrelevant, Highly Prejudicial Evidence of a Third Party's Guilty Plea to Tax Evasion in an Unrelated Matter and Argue Guilt by Association

The prejudice in this case began during the government's case in chief, when the court erred in admitting evidence of the guilty plea of John Ivsan, a tax lawyer, to conspiracy and tax evasion. The court's ruling was based on Daugerdas's cross-examination of Larry Morgan, a J&G client who participated in the short-sale tax strategy.

On direct examination, the Government elicited evidence about Morgan's meetings with his team of seven advisers who "pitch[ed]" him a tax strategy, including John Ivsan. (A-295). Morgan testified that during the second adviser meeting, Donna Guerin "walked [Morgan] through the similar steps that [ ] his [team of] advisers had presented a

106

few days before," and "said they had found . . . "[a] loophole" or "crack in the IRS code, that their strategy would be permissible" and allow Morgan to get the benefit of the tax strategy." (A-297).

Defense counsel addressed these statements on cross-examination, confirming that Morgan decided to enter into the strategy after consulting with his advisers. The court sustained a government objection to the generalized term "advisers." (A-298). Defense counsel only then elicited that "the information [Morgan] was receiving from all of these people was . . . that this was a strategy they believed was legally correct." The government had already elicited this information on direct. (A-298-299).

The government argued that defense counsel "opened the door" to impeachment of the hearsay declarant, John Ivsan, under FRE 806, by eliciting the fact that Ivsan "vouched for the validity of the short-sale transaction." (A-302). However, during continued cross-examination, Morgan clarified that he did not receive any advice directly from Ivsan. (A-304). Morgan said that although Ivsan was on the second call, he was "not someone [Morgan] confided in" when he was making his decision. *Id.* Rather, Morgan believed that Ivsan had shared his views

107

with others at his law firm. *Id.* (Q: "He was not someone that you confided in in Florida during your determination of whether this was an acceptable transaction to you, correct? A: "No: I think the Shumaker people valued his opinion, or the local people did."). On redirect examination, the government elicited yet again that Ivsan was part of the group from which Morgan received advice. (A-307).

After briefing by the parties, the court permitted the government to introduce evidence of Ivsan's guilty plea pursuant to FRE 806 and 609, but held that admission of the plea agreement itself would violate the Confrontation Clause pursuant to *Crawford v. Washington*, 541 U.S. 36, 68 (2004). (A-334-335). Admission of Ivsan's conviction was error because defense counsel did not elicit any statements by Ivsan, much less any hearsay statement.

A "statement" for hearsay purposes is defined as "a person's oral assertion, written assertion, or nonverbal conduct." FRE 801(a). The only response defense counsel elicited was the fact that the "information" Morgan received from the advisers, including Ivsan, reflected the consensus that the tax shelters were legally proper.

Indeed, Morgan confirmed during cross-examination that he did not receive advice specifically from Ivsan. (A-304).

Morgan's perception of the group's consensus does not equate to a hearsay declaration of one individual as to the legality of the tax strategy. "Information" gleaned generally from a group does not carry the risks that put any one declarant's credibility at issue (perception, recordation and recollection, narration, and sincerity (*i.e.* the possibility that the statement was fabricated)). *See* 8 *Weinstein's Evidence* 800[01], 800-9 to 800-10 (2008); *Schering Corp v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999) ("[T]here are four classes of risk peculiar to this kind of evidence . . . each of which decreases the reliability of the inference from the statement made to the conclusion for which it is offered.").

Even if Morgan's testimony revealed a hearsay statement by Ivsan, the district court still should have precluded the admission of Ivsan's guilty plea pursuant to FRE 403 because it was unduly prejudicial and had no probative value.

Ivsan's guilty plea to tax evasion and conspiracy in an unrelated matter had little or no probative value merely because Ivsan

was only one of seven advisers who met with Morgan. Thus, even had Ivsan made a statement that warranted impeachment, it was greatly diluted by the collective nature of the advice. Moreover, it was the government that initially elicited the fact that Ivsan was part of the group rendering the advice.

On the other hand, this evidence was extremely prejudicial to Daugerdas and created an unnecessary likelihood of jury confusion. The government was permitted to use Ivsan's guilty plea in an unrelated matter to impugn Daugerdas's credibility. They took unfair advantage of that opportunity in summation by emphasizing the association between Daugerdas and Ivsan, then suggesting to the jury that Ivsan had a propensity for tax evasion, the key allegation of this case, in advocating for Daugerdas's conviction. (A-431-432). This is a classic example of a prejudicial "guilt by association" argument. The idea that Daugerdas's tax advice was not credible because a third party is not credible is an inference that simply is not permissible. *United States v. Nusraty*, 867 F.2d 759, 763-64 (2d Cir. 1989) ("Mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement" in that criminal activity); *United*

110

*States v. Gallo*, 668 F. Supp. 736, 750 (E.D.N.Y. 1987) ("The courts must be scrupulous to avoid the spectre of guilt by association – or, more likely, guilt by confusion."). Because Ivsan's guilty plea in an unrelated matter lacked probative value and was highly prejudicial to Daugerdas, there was no basis for admitting it.

## B. The Government's Burden-Shifting and Improper Bolstering in Summation Diverted the Jury from Consideration of the Evidence

The prejudice at trial was exacerbated by the prosecutorial misconduct that was pervasive throughout the government's summation.

As this Court is well aware, the government cannot "suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990). Nevertheless, a central theme in the government's rebuttal summation was Daugerdas's failure to come forth with any evidence to prove his own good faith belief in the legality of the tax shelters. (A-439).

111

For example, the government emphasized Daugerdas's failure to show that other taxpayers successfully defended the tax shelters in civil proceedings against the IRS. (A-447-448). ("[O]ne of the most curious things that has occurred in this trial" is that "there is no proof in this record" that "anybody prevailed and succeeded in establishing the legitimacy of the transactions."). The court sustained defendant's objection that this was impermissible burden-shifting. (A-448). Nevertheless, the government continued, "[t]hey don't have to prove anything. They don't have to produce any witnesses. But you saw the defense did produce witnesses in this case. So don't you think you would have seen proof in connection with the transaction?" *Id.*

But the government did more than simply *shift* the burden—it actually conflated the civil and criminal standards, misleadingly suggesting that (1) transactions were rejected civilly by tax courts (a fact not in evidence), and (2) that the civil standard is a relevant basis for imposing criminal liability.

After the court sustained a second objection, the government continued along the same vein, emphasizing that nobody took the stand defending Daugerdas' view. (A-453-455). ("Ask yourself why it is that. . .

112

Paul Daugerdas standing alone is the only one . . . articulating that view?").

What the government's burden-shifting arguments were really pointing to was the lack of testimony directly defending Daugerdas's subjective good faith belief—and, in this context, the obvious "missing" evidence was his own testimony. For that reason, the government's burden-shifting was extremely prejudicial. *See Floyd v. Meachum*, 907 F.2d (2d Cir. 1990) (finding that prosecutor's statements about "facts left out of the case" could be interpreted by the jury as a comment on the defendant's failure to testify, which is prosecutorial misconduct); *United States v. Alfonso-Perez*, 535 F.2d 1362, 1366 (2d Cir. 1976) (prosecutor's insinuation that defendant could have, but did not, counter evidence regarding a government witness evokes an inference about defendant's failure to testify."). The trial court failed to see that Daugerdas "alone [had] the information to contradict the government's burden-shifting arguments" and that the effect of these arguments was to accentuate his failure to testify. *United States v. Bubar*, 567 F.2d 192, 198 (2d Cir. 1977).

The trial court had an obligation to give a curative instruction, but failed to do so.  The court also denied Daugerdas's motion for mistrial, although it did so with hesitance, noting:  "Mr. Okula's comments were within bounds, although this Court thought they were *very close to the line*."  (A-493) (emphasis added).

The government's rebuttal summation also attempted to use the court to bolster its position with respect to a key issue in the case: transaction costs and the definition of "profit" under the economic substance doctrine.  Despite the fact that this was a contentious issue for the jury alone to decide, the government attempted to circumvent the jury's decision by repeatedly (and impermissibly) borrowing the imprimatur of the court.  Specifically, the prosecutor said:  "I am going to show you what the legal instruction is that I expect Judge Pauley to give you.  This legal instruction basically means that Paul Daugerdas's view of the law is wrong."  (A-438).

Then again, with respect to transaction costs, the prosecutor stated: "Paul Daugerdas . . . claims that his belief was you don't count the opinion letter.  Now, you know, or *you are going to learn from*

114

***the judge's instruction*** that that was legally wrong." (A-450)
(emphasis added).

Defense counsel objected and proposed a curative instruction
that would explicitly inform the jury that the government's arguments
were improper and should not be considered. (*See* A-504). Instead, the
court gave only a bland instruction that did not even acknowledge,
much less correct any error—merely reminding the jury that "the court,
not counsel, is the source of the law in this case." (A-509). This
instruction was not direct enough to undo the resulting prejudice. *See
United States v. Friedman*, 909 F.2d 705, 710 (2d Cir. 1990) ("In [ ]
cases where a prosecutor's improper remarks have not been deemed
prejudicial, the record has disclosed ***emphatic curative instructions***
by the trial judge.") (emphasis added).

These summation errors functioned only to "divert the jury
from consideration of the evidence," in violation of due process. *United
States v. Terry*, 702 F.2d 299, 313 (2d Cir. 1983).

## C. The Prosecution's Improper Summation Theory and Inconsistent Position at Sentencing Violated Due Process

Perhaps the most egregious deprivation of due process was the government's last minute summation theory, the substantial prejudice that resulted, and the material impact it had on Daugerdas's sentence.

The government began its rebuttal summation by reminding the jury that this was a seven billion dollar tax shelter fraud (as alleged) and not about "a single transaction or series or transactions." (A-434-435). Then, as repeated above, the government contradicted itself and advocated for a conviction on all counts based solely on the backdating of a single transaction. (A-460-461). By raising a new theory of criminal tax fraud in rebuttal summation without giving the defense any chance to mount a defense at trial, the government "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also* Points III and IV, *supra* (discussing constructive amendment and instructional error).

116

This manifest injustice was only exacerbated at sentencing, when the Government pulled an egregious bait-and-switch—advocating for a more than twenty-year sentence on the basis of a tax shelter fraud that the jury summarily rejected. The government's advocacy at sentencing was wholly incompatible with its summation theory that all convictions could be based on a single backdated transaction. In fact, the only logical conclusion: from the jury's relentless focus in deliberations on backdating; Daugerdas's subsequent acquittal on all of the non-backdating related tax evasion counts; and from post-trial juror statements confirming as much, is that the jury rejected the government's tax shelter fraud theory, but followed the prosecution's summation argument to convict solely for backdating.

The Supreme Court has recognized "a prosecutor's use of allegedly inconsistent theories" can violate due process where it "was material to [the court's] sentencing determination." *Bradshaw v. Stumpf*, 545 U.S. 175, 187 (2005) (recognizing that although prosecutorial inconsistency did not have a material impact on defendant's conviction, it may have had a "material impact" on his sentence in violation of due process); 545 U.S. at 187-88 (Souter, J. and

Ginsberg, J. concurring) (acknowledging that "it violates the basic due process standard, barring fundamentally unfair procedure, to allow [defendant's sentence] to stand in the aftermath of [inconsistent] positions taken" by the government at trial and "at [defendant's] sentencing hearing").[26]

Here, the government's improper rebuttal summation both facilitated Daugerdas's conviction and had a material impact on his sentence in violation of due process. One need only look at the significant, disparate impact of the prosecution's bait-and-switch to see the resulting injustice. Whereas the $1.6 billion tax shelter fraud was accorded a total offense level of 44, the backdating conduct, on which Daugerdas's conviction was actually based, resulted in a base offense level of 22. (*See* A-996-997; A-1002-1003). The chasm between a Guidelines level of ***life imprisonment*** and 41-51 months is the government's unjust creation.

---

[26] Although *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), involved prosecutorial inconsistency in the context of proceedings against separate defendants for the same crime, the rationale is the same, and much stronger, when it applies to a single defendant.

118

**D. The Cumulative Prejudice Resulting from the Uncured Trial Errors is Substantial and Facilitated Otherwise Tenuous Convictions**

"In assessing whether prosecutorial misconduct caused 'substantial prejudice,' this Circuit has adopted a three part test, which considers 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.'" *United States v. Certified Envt'l. Servs.*, 753 F.3d 72, 95 (2d Cir. 2014) (internal citation omitted).

In this case, there can be no doubt that Daugerdas suffered substantial prejudice as a result of egregious errors that "permeated the proceedings." *Certified Envt'l Servs.*, 753 F.3d at 95. Not only were these errors left uncured by the court, but they were exacerbated by erroneous and improper supplemental jury instructions. The end result was a clear violation of due process.

Perhaps the most troubling aspect of the misconduct in this case is the uncertainty of the convictions in its absence. This was a close case, as evidenced by the nine acquittals on tax evasion counts that rejected the government's economic substance theory of tax shelter fraud. The jury rejected the central theory of criminality in this

119

indictment; it convicted only because as late as rebuttal summation the rules changed.  This was unjust; Daugerdas's convictions must be vacated.

## POINT VI

### PAUL DAUGERDAS'S CONVICTION FOR OBSTRUCTION OF THE IRS MUST BE REVERSED BECAUSE COUNT THIRTEEN OF THE INDICTMENT WAS DUPLICITOUS.

Count Thirteen alleged that Daugerdas obstructed the IRS in the administration of the tax laws, in violation of 26 U.S.C. § 7212, in connection with income he earned from his alleged participation in the conspiracy alleged in Count One.  In thirty-three paragraphs, this count traced Daugerdas's tax reporting history for the tax years 1994 through 2002.  In addition, in one introductory paragraph this charge incorporated by reference allegations of the Count One conspiracy, thus sweeping within its breadth the entire scope of the tax shelter fraud involving thousands of other taxpayers.  In essence, the jury was presented with two separate schemes upon which they would be called upon to render a verdict: a scheme involving hundreds of co-conspirators and thousands of tax returns relating to clients of the law firms, and a scheme involving Daugerdas alone and his individual tax

reporting for multiple years. Since this count incorporated two separate obstruction schemes, it was duplicitous.

The clearest indication that this count alleged two separate obstruction schemes is that, in fact, prior versions of the indictment did in fact allege two separate obstructions: one relating to the clients' participation in the tax shelters and one relating to Daugerdas's own tax returns. Count Twenty of the S3 indictment alleged that Daugerdas's co-defendants obstructed the IRS in connection with the tax shelter transactions that were the subject of the Count One conspiracy. In addition, Count 21 alleged that Daugerdas obstructed the IRS in connection with the same tax shelter transactions as well as in connection with his own tax reporting.

A duplicitous indictment is one in which two or more crimes are joined in a single count. *United States v. Aracri,* 968 F.2d 1512 (2d Cir. 1992). As this Court noted in *United States v. Murray,* a count is not duplicitous if it alleges that a single crime was committed by several means. 618 F.2d 892, 896 (2d Cir. 1980). In rejecting Daugerdas's duplicity claim with respect to this count, the trial court stated that "the distinction between two separate schemes and a single scheme

121

with two branches may well be a matter of degree." *United States v. Daugerdas*, 2011 U.S. Dist. LEXIS 14912, *5, 2011 WL 666170 (citing *United States v. Willner*, 2007 U.S. Dist. LEXIS 75597 (S.D.N.Y 2007)). Nevertheless, the distinction is real and of great significance. The instant indictment effectively created two separate obstruction offenses within Count Thirteen: one created by the incorporation of the allegations in Count One surrounding the conspiracy relating to the clients' tax returns, and one focusing on Daugerdas's own tax reporting.

One vice of a duplicitous indictment is that "a guilty verdict . . . does not indicate whether the jury found defendant guilty without having reached a unanimous verdict on the commission of a particular offense." *Murray,* 618 F.2d at 896. This is precisely the problem created by this duplicitous count. The general verdict does not indicate whether the jurors were unanimous as between the two sets of allegations. This is more than a hypothetical concern here. The jury acquitted Daugerdas of personal tax evasion for years 1999 through 2001, raising a serious question whether some jurors rejected these allegations as a basis to convict for obstruction.

Accordingly, Count Thirteen was duplicitous and Daugerdas's conviction should be reversed.

## POINT VII

### AT A MINIMUM, DAUGERDAS SHOULD BE RESENTENCED BECAUSE THE SENTENCE IMPOSED WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

Because of the trial errors described above, Daugerdas should not have been convicted, much less sentenced. Nevertheless, his sentencing was also flawed. The district court defied Congress's mandate at 18 U.S.C. § 3661 when it ignored relevant information pertaining to Daugerdas's offense conduct. Specifically, the court refused to consider post-verdict statements made by two jurors from this trial, regarding their views of the offense conduct. Because § 3661 does not include such a limitation, the district court erred, and Daugerdas's sentencing proceedings were procedurally unreasonable. The district court further erred by considering predominantly acquitted conduct in fashioning a reasonable sentence. In fact, Daugerdas's 15-year sentence could not be "upheld but for the existence of a fact found by the sentencing judge and not by the jury." *Gall v. United States,* 552 U.S. 38, 60 (2007) (Scalia, J., concurring). *See also Jones v. United States*, 132 S.Ct. 8 (2014) (Scalia,

123

J., dissenting from denial of *certiorari*).

## A. Daugerdas's Sentencing Proceedings Were Procedurally Flawed

Before sentencing, Daugerdas filed declarations by defense counsel which included a summary of interviews they conducted (with the district court's permission) with two jurors (Juror #1 and #7). (A. 1009-1011). The interviews revealed that these jurors believed that Daugerdas was not guilty of the massive tax shelter fraud charged in the indictment. Instead, the jurors believed he was guilty of an entirely different crime: the backdating of transactions in violation of the AAR. (*Id.*) As stated in sections above, the evidence of this conduct was limited to four tax returns, resulting in a maximum total tax loss of approximately $2.2 million—a mere fraction of the more than $400 million tax loss that the district court used to determine Daugerdas's Guidelines offense level. (*See* A-995-1004; A-1064 / SPA-7).

The two jurors who spoke to defense counsel volunteered this information to communicate their view of the conduct for which Daugerdas should be sentenced. This information was submitted to the sentencing court – not to impeach the verdict, which is precluded by

124

Federal Rule of Evidence 606(b), but to give the sentencing court relevant information about these fact-finders' opinions of the offense conduct for purposes of determining a fair sentence.

The district court, however, did not view the juror statements this way. Instead, the court concluded that because it ultimately had discretion to sentence based on acquitted conduct, the juror statements were irrelevant. (A-1068 / SPA-11).

The district court was wrong. Because the Supreme Court removed the artificial restrictions imposed by the formerly mandatory federal Sentencing Guidelines, juror sentiment cannot be rejected as irrelevant under Sections 3553(a) and 3661. *See United States v. Booker,* 543 U.S. 220 (2005).

The views of individual jurors about the offense conduct are absolutely relevant in fashioning a "substantively reasonable" sentence according to the mandates of *Gall* and *Kimbrough. Gall*, 128 S.Ct. at 596-97 (laying out the procedures to be taken by a federal district court in determining a reasonable sentence in light of *Booker*); *Kimbrough v. United States*, 128 S.Ct. 558, 564, 570 (2007) (the sentencing court "may

125

vary [from Guidelines ranges] based solely on policy considerations, including disagreement with the Guidelines") (quotation marks omitted).  Thus, a district court is no longer bound to impose a sentence enhanced by acquitted conduct if the court finds reason in the sentencing record to vary from the Guidelines in a particular case.

Post-*Booker*, sentencing courts are actually directed to follow Congress's true mandate to ensure that "**[n]o limitation** shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. §3661. (emphasis added).  Indeed, disregarding individual post-trial juror statements about relevant offense conduct would actually undermine three separate statutory factors that sentencing courts are mandated to consider at Section 3553(a).  Specifically, ignoring this information acts to:  (1) disrespect the law and the long and powerful historical, constitutional, empirical and policy justifications for a jury, and not judges, to determine what crimes the defendant committed; (2) obstruct the pursuit of a just punishment for the actual offense conduct upon which defendant was

126

convicted; and (3) impede the objective of general deterrence by giving citizens the impression that jury verdicts will be disregarded by sentencing courts and bear little correlation to punishment. *See* 18 U.S.C. § 3553(a).

Juror viewpoints, at least for those jurors who want to be heard, can provide a useful and relevant community perspective about the scope and extent of offense conduct that should form the basis of punishment. *See e.g.,* May 16, 2008 Letter from Juror #6 to the Honorable Richard W. Roberts, *reprinted in United States v. White*, 551 F.3d 381, 396-97 (6th Cir. 2008) (*en banc*) ("It appears to me that these defendants are being sentenced not on the charges for which they have been found guilty but on the charges for which the District Attorney's Office [*sic*] would have liked them to have been found guilty.").

The Supreme Court has infused district courts with the authority, and indeed the mandate, to interpret a jury's acquittals. Juror statements can aid a sentencing judge to assign value, not only to a defendant's convicted conduct, but also on the jury's decision to acquit on some charges.

In this case, the jury dutifully followed the government's summation arguments, which told them that they could ignore the more than $1 billion tax shelter fraud charged in the indictment and convict based on a single tax return that contained "backdated" information. The district court erred by then refusing to consider these jurors' revelation that that they did as the government requested.

The district court's failure to consider the jurors' opinions at sentencing, or to hold a hearing on the subject, was procedurally unreasonable. Such disregard for the opinions of diligent and responsible jurors detracts from federal sentencing purposes enumerated by Congress and codified at Sections 3553(a) and 3661 of Title 18.

## B. Daugerdas's Sentence Was Substantively Unreasonable

Paul Daugerdas was sentenced to 15 years of imprisonment for a crime that the jury acquitted him of. The jury convicted Daugerdas based on three clients' tax returns that reported "as of" trade dates of securities or currency transactions that referred to an earlier tax year. The total tax loss attributed to these three clients was approximately $2.2 million. (A-997; A-1002).

128

In contrast, the district court sentenced Daugerdas for the crime of scheming to defraud the IRS out of over $400 million related to four different investment tax shelters on behalf of over 900 clients. (A-1064 / SPA-7). The court independently found that these tax shelters lacked economic substance and Daugerdas knew that when he counseled clients. (A-1128 / SPA-24). These crimes are vastly different and warrant vastly different sentences. If the district court followed the jury's lead, a reasonable sentence would be far below 15 years of imprisonment.

The court did not actually need confirmation from the jury about its findings: it is apparent from the face of the verdicts. Daugerdas was convicted of only four out of 13 tax evasion counts. All four of these counts involved three clients' tax returns (Toporek (2001 and 2002), Coleman and Blair (2001)), in which the government's evidence showed that transactions were reported based on "as of" trade dates on Deutsche Bank brokerage statements. In the nine acquitted tax evasion counts, no allegations of "backdating" were presented by the government. The jury then convicted on the remaining counts of conspiracy, obstruction and mail fraud following the express instruction

in the prosecutor's rebuttal summation, which was left uncorrected by the court.  (A-460-461).

Consequently, the  court's sentence of 15 years was mostly based on acquitted conduct relating to economic substance fraud.  In addition to refusing to find that the jury acquitted Daugerdas of all economic substance fraud, it also announced that it was sentencing Daugerdas based on the nine acquitted counts of tax evasion. (A-1076 / SPA-19). The court sentenced Daugerdas on this conduct after making findings based on the lesser preponderance of evidence standard.  (A-1067-1068 / SPA-10-11).

Daugerdas recognizes that under the current state of Supreme Court and Second Circuit law, sentencing courts are permitted to sentence defendants based on findings by a preponderance of evidence, even after a jury acquits the defendant of that same conduct.

However, this case presents a unique set of facts that has gone untested in this Circuit.  Here, the district court's sentence was based almost entirely on acquitted conduct.  *See McMillan v. Pennsylvania,* 477 U.S. 79, 88 (1986) (rejecting sentence enhancements when they

130

become the "tail which wags the dog of the substantive offense"). In other words, but for the judge's findings of fact on acquitted conduct, Daugerdas's sentence of 15 years of imprisonment would be "substantively unreasonable" for his conviction on a $2.2 million "backdating" tax crime. *See Rita v. United States*, 551 U.S. 338, 369-70, 372 (2007) (Scalia, J., joined by Thomas, J., concurring in part and concurring in judgment) (Sixth Amendment issues will arise when a sentence is reasonable "only because [of] additional judge-found facts" – "aggravating facts, not found by the jury, that distinguish the case from the mine run [of cases]").

The *Rita* majority did not dispute this analysis but responded that this scenario was "not presented by [that particular] case." *Rita*, 551 U.S. at 353. But the majority was not all of one mind, for Justice Stevens, joined by Justice Ginsburg, wrote separately to state that a Sixth Amendment as-applied challenge should be "decided if and when [a non-hypothetical] case arises . . ." *Id.*, 551 U.S. at 365-66 (Stevens, J., joined by Ginsburg, J., concurring); *see also United States v. Broxmeyer*, 699 F.3d 265, 302 (2d Cir. 2011) (Jacobs, C.J., dissenting)

131

(writing that the hypothetical problem presented by the concurrence in *Rita* presents "vexing constitutional questions").

The Sixth Amendment imposes constraints on what it takes for a sentence to be reasonable.  In order to "give intelligible context to the right of jury trial," "juries must find all the facts of the *crime* the state *actually* seeks to punish." Douglas Berman & Stephanos Bibas, *Making Sentencing Sensible*, 4 OHIO ST. J. CRIM. LAW 37, 56 & n. 76 (2006) (quoting *Blakely v. Washington*, 542 U.S. 296, 305, 307) (emphasis added).  In this case, it is not difficult to prove that Daugerdas's sentence was tainted by Sixth Amendment error of the sort identified in the *Rita* concurrences.  *See also Cunningham v. California*, 549 U.S. 270, 309 n. 11 (Alito, J., joined by Kennedy & Breyer, JJ., dissenting) ("there inevitably will be *some* sentences that, absent any judge-found aggravating fact, will be unreasonable").

Daugerdas's extreme sentence, detached from the jury's fact-finding and many multiples of the norm for the actual offense of conviction – a $2.2 million "backdating" fraud[27] – subverts the

---

[27]    The appropriate Guidelines calculation of the offense level for the actual "backdating" conviction, without application of overlapping

Sentencing Reform Act's "basic aim of ensuring similar sentences for those who have committed similar acts in similar ways." *Booker*, 543 U.S. at 252. In constitutional terms, Daugerdas's outlier sentence is arguably even more problematic than the sentence in the *Rita* hypothetical because here the jury actually acquitted Daugerdas of conduct that led to almost four times the sentence than the Guidelines would have otherwise recommended. In any case, the Sixth Amendment violation is the same. The judge-made finding of Daugerdas's intentional participation in a more than $1 billion tax fraud was "essential to the punishment" that was imposed. *Blakely*, 542 U.S. at 301-02.

Because the district court's sentence of 15 years imprisonment was based on an as-applied violation of the Sixth Amendment, it is substantively unreasonable. This Court should vacate the sentence and

---

enhancements, is 22 (A-997; A-1002), according to the Tax Table at U.S.S.G. § 2T4.1 (loss of between $1 and $2.5 million) (2004 Guidelines Manual) (the Probation Department erroneously applied the 2013 Guidelines Manual, but the conduct alleged in the Indictment extends only to 2005, and before November 1, 2005, which means the 2004 Guidelines Manual applies). At Criminal History Category I, this offense level corresponds to a sentencing range of 41-51 months – not 180 months.

remand with instructions to the district court to impose a sentence consistent with the findings of the jury.

## POINT VIII

### THE PRELIMINARY ORDER OF FORFEITURE MUST BE VACATED BECAUSE THE GOVERNMENT DID NOT ESTABLISH THE REQUISITE NEXUS BETWEEN THE FORFEITED PROPERTY AND THE OFFENSE CONDUCT GIVING RISE TO THE FORFEITURE.

The instant indictment included a count seeking a forfeiture money judgment, as well as forfeiture of specified property and accounts that allegedly constituted or was derived from proceeds traceable to the commission of the mail fraud and conspiracy offenses. (A-249, ¶108). Following the jury verdict, the government sought a preliminary order of forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(c) and 982(a)(2)(A), ordering Daugerdas to forfeit his interest in one parcel of real estate and numerous accounts specified in the indictment. (A-1018-1030). The government claimed that the real estate and accounts could be traced to compensation Daugerdas received from J&G that was derived from the sale of tax shelters. (A-1027). The government's application failed, however, to establish the requisite nexus between the forfeited property

134

and the fees paid by tax shelter clients to J&G. Rule 32(b)(1), Fed. R. Crim. Proc.

Rule 32.2(b)(1), Fed.R.Crim.P. (SPA-74) requires the Court to determine whether the government has established the requisite nexus between the property sought to be forfeited and the offense of conviction. In support of its application for forfeiture, the government submitted the declaration of Special Agent Christine Mazzella of the IRS. The Mazzella Declaration established that J&G deposited Daugerdas's compensation into a professional corporation account controlled by Daugerdas. Mazzella also traced funds from these accounts to the accounts sought to be forfeited. Mazzella failed, however, to trace the funds from their source, the J&G clients, to the property, as required.

The evidence at trial clearly established that clients of J&G paid fees directly to J&G, not to PMD Chartered. Therefore, any tracing analysis must begin with the deposit of client funds into the J&G accounts. However, the Mazzella declaration does not analyze any of the deposits into the J&G account or disbursements from these accounts. This is not surprising because tracing these funds from their

135

source was impossible. The allegedly tainted legal fees from tax shelter transactions were commingled with fees generated by hundreds of lawyers providing services for thousands of untainted client transactions.

The issue of the forfeitability of commingled funds in a law firm bank account was addressed in *United States v. Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205 (11th Cir. 2013). In *Rothstein*, defendant Rothstein operated a Ponzi scheme and deposited the proceeds of the scheme in his law firm bank accounts. The Court noted that the firm's accounts also received legitimate income from seventy lawyers and these deposits were commingled with the tainted funds for the duration of the Ponzi scheme. *Id.* at 1213. The Court concluded that where the commingled funds could not be divided without difficulty, the government must proceed under the substitute property provisions of 21 U.S.C. §853(p). *Id.* at 1214. The Eleventh Circuit found that permitting the government to seize accounts equal to the amount of the tainted funds would negate the substitute asset provisions of 21 U.S.C. § 853(p) and 18 U.S.C. § 1963(m).

Relying on *United States v. Grant,* 2008 U.S. Dist. LEXIS 73479 (S.D.N.Y. 2008), the district court concluded that the property and accounts were subject to forfeiture because they were proceeds of the tax shelter fraud.  The Court reasoned that Daugerdas would not have received any funds but for the fraudulent scheme.  (A-1071).  However, taken to its logical conclusion, this "but for" test would obviate the need for tracing and "render the substitute asset provision a nullity." *Rothstein,* 717 F.3d at 1214.  More importantly, however, the decision in *Grant* preceded this Court's opinion in *United States v. Contorinis,* 692 F.3d 136 (2d Cir. 2012).  In *Contorinis*, the court concluded that in cases involving securities fraud (the crime at issue in *Grant*), the definition of proceeds is supplied by 18 U.S.C. § 981(a)(1)(B) (SPA-57) which applies to cases involving lawful services provided in an illegal manner.  *Id.* at 145 n.3.  Clearly, the sale of tax shelters or the rendering of tax shelter opinion is not an inherently unlawful activity like robbery.  *Id.*  Thus, the proceeds in this case were money "acquired through the illegal transactions resulting in the forfeiture...."  Clearly, that money was received by J&G from its  clients.  Since the government has failed to

137

trace the allegedly tainted legal fees deposited in the J&G accounts to the property sought to be forfeited, the forfeiture order must be vacated.

## **CONCLUSION**

This Court should vacate Daugerdas's convictions on all counts and remand for a judgment of acquittal. In the alternative, the Court should vacate his convictions on all counts because of instructional errors and because the rebuttal summation and supplemental instructions constructively amended the indictment. Separately, the Court should vacate his convictions and remand for a new trial because of an erroneous evidentiary ruling, prosecutorial misconduct, and because Count Thirteen was duplicitous. If the Court does not vacate Daugerdas's convictions, it should nonetheless vacate his sentence for procedural and substantive unreasonableness, and vacate the

preliminary order of forfeiture, and remand for further proceedings.

Dated: New York, New York
        January 30, 2015

Respectfully Submitted,

_____/S/_____

Henry E. Mazurek
Brian D. Linder
Christina M. Corcoran
Clayman & Rosenberg LLP
305 Madison Avenue, Suite 1301
New York, New York 10165
Phone: 212-922-1080

*Attorneys for Defendant-Appellant*
*Paul M. Daugerdas*

CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION,
TYPE-FACE REQUIREMENTS
AND TYPE-STYLE REQUIREMENTS

The undersigned counsel of record for Defendant-Appellant Paul M. Daugerdas certifies pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) that the foregoing brief contains 26,750 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the Word Count feature of Microsoft Word 2010; and that the brief has been prepared in 14-point Century Schoolbook font.

Dated: January 30, 2015

/s/ Henry E. Mazurek
Henry E. Mazurek, Esq.

# TABLE OF CONTENTS

PAGE

Court Order Regarding Defendant's PSR Objections,
    dated June 18, 2014............................................. SPA-1

Excerpts from Sentencing Transcript, dated June 25, 2014............. SPA-7

Preliminary Order of Forfeiture, dated June 26, 2014 ................ SPA-31

Judgment, dated June 27, 2014....................................... SPA-43

Excerpts of Supplemental Instructions, dated October 30, 2013....... SPA-50

Excerpts of Supplemental Instructions, dated October 31, 2013....... SPA-53

18 USCS § 981 ...................................................... SPA-57

18 USCS § 982 ...................................................... SPA-62

18 USCS §1341....................................................... SPA-64

18 USCS § 3553 ..................................................... SPA-65

18 USCS § 3661 ..................................................... SPA-66

21 USCS § 853 ...................................................... SPA-70

26 USCS § 441 ...................................................... SPA-73

USCS Fed Rules Criminal Procedure Rule 32.2 ........................ SPA-74

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/18/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                        :

UNITED STATES OF AMERICA,                  S6 09 Cr. 581 (WHP)

            - against -                  ORDER

PAUL M. DAUGERDAS,                :

           Defendant.         :

                        :
-----------------------------------------------------------------X

WILLIAM H. PAULEY III, United States District Judge:

        By letter dated May 5, 2014, Paul M. Daugerdas lodged numerous objections to
the initial Pre-Sentence Investigation Report ("PSR"). The Government responded to
Daugerdas's objections by letter dated May 23, 2014. While the party's submissions address the
February 14, 2014 version of the PSR, which was only available to counsel, this Court's rulings
relate to the March 28, 2014 version of the PSR (which was shared with this Court) and the
paragraphs as re-numbered therein. Having considering the party's submissions, this Court
resolves Daugerdas's objections to the PSR as follows:

        ¶ 20: Objection overruled, no change.

        ¶ 29: Objection resolved as follows: The penultimate sentence in paragraph 29
beginning "In return," should read as follows: "In return, J&G paid BDO a portion of the fees
J&G collected from clients as a result of the sale of tax shelters and for work performed by
BDO."

        ¶ 32: Objection overruled, no change.

        ¶ 35: Objection resolved as follows: replace the word "lies" to
"misrepresentations."

¶ 36: Objection overruled, no change.

¶ 37: Objection overruled, no change.

¶ 38: Objection overruled, no change.

¶ 39: Objection resolved as follows:  The first sentence is changed to read as follows: "J&G charged its tax shelter clients a percentage of the tax loss, which was based on the amount of income sought to be sheltered, generally ranging from 2 to 4%, as its fees."

¶ 40: Objection overruled, no change.

¶ 41: Objection overruled, no change.

¶ 42: Objection overruled, no change.

¶ 44: Objection overruled, no change.

¶ 45: Objection overruled, no change.

¶ 46: Objection overruled, no change.

¶ 47, Footnote 2:  Objection overruled, no change.

¶ 48: Objection overruled, no change.

¶ 49: Objection overruled, no change.

¶ 50: Objection overruled, no change.

¶ 51: Objection overruled, no change.

¶ 52: Objection overruled, no change.

¶ 53: Objection overruled, no change.

¶ 54: Objection overruled, no change.

¶ 55: Objection overruled, no change.

¶ 56: Objection resolved as follows:[1]  The parenthetical in paragraph 56 should be changed to read as follows: "Smith performed no services for Anderson or Flynn.  Rather, he agreed to DAUGERDAS's request to receive the $560,000 in Smith's entity bank account and then pass the money on to a DAUGERDAS-controlled entity."

¶ 57: Objection overruled, no change.

¶ 58: Objection overruled, no change.

¶ 59: Objection overruled, no change.

¶ 60: Objection overruled, no change.

¶ 61: Objection overruled, no change.

¶ 62-63: This Court resolves the party's divergent views of the total tax loss attributable to Daugerdas, as reported in paragraphs 62 and 63, by making the following finding: "Daugerdas is responsible for the total fraudulent tax loss of $1,630,166,343.00."  Paragraph 62 should be replaced with the finding that "Daugerdas is responsible for the total fraudulent tax loss of $1,630,166,343.00." and paragraph 63 should be eliminated and marked "[Intentionally Left Blank]."

¶ 64: Objection overruled, no change.

¶ 65: Objection overruled, no change.

¶ 69-70: Objection overruled.  However, the PSR should be changed to separate the base offense level and specific offense characteristics.  To that end, the PSR should be

---

[1] This Court conducted a Fatico hearing on the subject of Daugerdas's diversion of fees from Arthur Anderson and Altheimer & Gray.  This Court finds by a preponderance of evidence that Daugerdas's receipt of these payments was fraudulent and breached a fiduciary duty that he owed his partners and co-shareholders.  This Court will consider that fraudulent conduct in its analysis of the 3553(a) factors at sentencing.

changed as follows: The "Base Offense Level" paragraph will end after the sentence "A tax loss

of greater than $400,000,000 results in a base offense level of 36."

Paragraph 70 should incorporate two specific offense characteristics. First, the

specific offense characteristic previously incorporated as part of paragraph 69, namely, a two-

level enhancement pursuant to § 2T1.1(b)(2). To that end, paragraph 70 should include the

following language:

> "The defendant's involvement in the tax shelter activities involved
> sophisticated means, as the transactions created fraudulent tax
> losses via a complex series of transactions in the form of tax
> shelters that utilized custom partnerships, S corporations, and
> limited liability companies. Pursuant to 2T1.1(b)(2), the offense
> level is increased by two levels."

Second, paragraph 70 should continue to include a two-level enhancement pursuant to §

2T1.9(b)(2).

¶ 72: Objection overruled, no change.

¶ 74: Objection overruled, no change.

¶ 76: Objection overruled, no change.

¶ 77: Objection overruled, no change.

¶ 126: Objection resolved as follows: the bracketed portion of paragraph 126

should be changed to read as follows and the brackets removed: "The amount involved in the

disagreement that led to Daugerdas's departure from Arthur Anderson was $560,000.

Subsequent to his departure from Arthur Anderson, Daugerdas received an additional fee of

approximately $492,000 from Condisco for introducing an Arthur Anderson client before

Daugerdas left the firm. Arthur Anderson claims that Daugerdas owed it more than $1 million in

fees from this transaction."

¶ 132:  The maximum term of imprisonment for Count 17 should be changed to "30" years.

¶ 133:  The maximum range should be changed to "58 years (696 months)."

¶ 140:  The maximum fine for each count of conviction should be changed to "$250,000."

¶ 142 and pages 1-3:  The maximum fine should be changed to "$250,000."

¶ 144:  No change at this time, however, various changes will be made at sentencing.  The Government is directed to provide updated restitution amounts by June 23, 2014, reflecting:

| | | |
|---|---|---|
| 1. Guerin's Restitution Amount: | $ | 190,355,836 |
| 2. Additional Restitution for Parse:[2] | $ | 588,053 |
| 3. Additional Interest Accrued re: Parse:[3] | $ | 413,678 |
| 4. Restitution re: Arthur Frigo: | $ | 40,302,967 |
| 5. New Additional Interest Accrued[4] | | To be determined |
| 6. Final Additional Interest Accrued[5] | | To be determined |

---

[2] The additional restitution amount corrects the Government's omission of accrued interest between January 1, 2013 and March 1, 2013.  Because Guerin had already been sentenced by the time the Government discovered this error, only Parse was held responsible for this additional restitution amount.

[3] As described during Parse's sentencing, the additional interest accrued is the interest that accrued on the total restitution amount (Guerin restitution plus the Additional restitution) from Guerin's sentencing to Parse's sentencing.

[4] This amount will reflect any new judgments that include additional interest accrued after Parse's sentencing and before Daugerdas's.

[5] This amount will reflect interest accrued on categories 1 – 5 between the respective sentencing proceedings for which those amounts were imposed and Daugerdas's sentencing.

¶ 146:  Objection overruled, no change.

Dated: June 18, 2014
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record*

**SPA-7**

4

E6p0daus

```
 1                THE COURT:  All right.  Turning first to the
 2      guidelines calculation.
 3                On June 18th, this Court issued an order resolving
 4      Mr. Daugerdas's objections to the presentence investigation
 5      report, and providing certain directions to the probation
 6      department to amend the report.
 7                On June 20, the probation department issued a second
 8      amended PSR incorporating those changes.  Accordingly, this
 9      Court adopts the findings of fact in that second amended
10      presentence report as my own.
11                All seven counts of conviction in this case relate to
12      tax crimes.  And, accordingly, because the tax loss was greater
13      than $400 million, this Court applies a base offense level of
14      36.
15                Because I find that sophisticated means were used in
16      this scheme, I add a two-level enhancement.
17                Further, because Mr. Daugerdas encouraged others to
18      violate the Internal Revenue Service laws, a further two-level
19      enhancement is appropriate.
20                And, finally, because Mr. Daugerdas was the leader of
21      a conspiracy involving five or more individuals, an additional
22      four levels is appropriate.
23                So the total offense level is 44.
24                Mr. Daugerdas has no prior criminal convictions and,
25      accordingly, his criminal history category is a one.
```

**SPA-8**

5

E6p0daus

1       Under the guidelines, that would yield a guidelines
2   range of life in prison.  But that guideline range of life in
3   prison is statutorily capped at 696 months.
4       Now, I would like to turn the argument concerning
5   acquitted conduct.  It has been thoroughly briefed by the
6   parties.  And absent something else that counsel wishes to say
7   on that subject, I'm prepared to rule.
8       Anything from counsel?
9       MR. OKULA:  No, your Honor.
10      MR. MAZUREK:  No, your Honor.
11      THE COURT:  All right.
12      Mr. Daugerdas renews his argument that the jury
13  verdict should be read narrowly and Daugerdas should only be
14  sentenced for backdating.  Daugerdas contends that the jury's
15  verdict rejected the government's view that Daugerdas engaged
16  in the largest tax shelter fraud in the history of the United
17  States.  Daugerdas argues that the jury convicted him only of
18  the very limited conduct of fraudulently backdating
19  transactions.  By order dated May 7, 2014, this Court rejected
20  that argument in the context of Daugerdas's Rule 33 motion.
21  And, once again, now at sentencing, this Court rejects
22  Daugerdas's claim.  Speculation about why a jury reached a
23  particular verdict is not permitted because, quote, "It is
24  impossible to know exactly why a jury found a defendant not
25  guilty on a certain charge." United States v. Watts 519 US 148

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA-9**

6

E6p0daus
1  at 155 (1997).  In Watts, the Supreme Court held that, quote,
2  "An acquittal is not a finding of any fact.  An acquittal can
3  only be an acknowledgment that the government failed to prove
4  an essential element of the offense beyond a reasonable doubt.
5  Without specific jury findings, no one can logically or
6  realistically draw any factual finding inferences." Watts, 519
7  US at 155.
8          Now, in his sentencing submissions, Daugerdas attempts
9  to advance his argument about the limited scope of the jury
10 verdict with two post-verdict juror interviews.  Two jurors
11 informed Daugerdas's counsel that they, and the rest of the
12 jury, only convicted Daugerdas of backdating transactions, and
13 acquitted him of economic substance tax fraud.  If the jurors
14 purported to speak on behalf of the jury, then they disregarded
15 an express instruction of this Court that they may speak only
16 for themselves, and that they respect the sanctity of jury
17 deliberations.
18         Daugerdas's cabined view of the verdict would allow
19 post drop trial juror statements to trump the verdict itself.
20 By its verdict, the jury convicted Daugerdas of the count one
21 conspiracy, a decades long conspiracy to defraud the United
22 States and the IRS through the design and marketing of
23 fraudulent tax shelters, committing tax evasion and committing
24 wire fraud.  It also convicted Daugerdas of corruptly
25 endeavoring to object instruct and impair the lawful function

7

E6p0daus
1  of the IRS, and scheming to defraud the IRS through the use of
2  the mails.    The verdict demonstrates that Daugerdas was
3  convicted of the broad tax shelter conspiracy alleged in the
4  indictment.
5         In any event, even if the jury came to the cramped
6  conclusion Daugerdas now urges on this Court, he was not found
7  innocent of the government's theory of criminal conduct, only
8  not guilty.  The Supreme Court has long sanctioned the use of
9  acquitted conduct for sentencing purposes.  See, e.g. Williams
10 vs. New York, 337 US 241 (1941); United States v. Watts, 519 US
11 148 (1997).  As has the Second Circuit.  See United States v.
12 Sweig, 454 F.2d 181 (Second Circuit 1972), a preguidelines
13 decision.  United States v. Rodriguez Gonzalez, 899 F.2d 177
14 (1990), a post guidelines decision; United States v. Pica, 692
15 F.3d 79 at 88 (Second Circuit 2012); a post Booker and Apprendi
16 decision; and United States vs. Yannotti, 541 F.3d 112 at 129
17 (Second Circuit 2010).
18        Now, Daugerdas points in his submissions to an
19 anecdote from United States v. Canania, 532 F.3d 764, Eighth
20 Circuit 2008.  In that case, a trial juror, juror number six,
21 sent a letter to the judge who was considering sentencing the
22 defendant for acquitted conduct.  Juror number six expressed
23 his frustration that such a result undermines the role he
24 served as a juror.  The Sixth Circuit, sitting en banc,
25 squarely rebutted that notion, quote, "When a layperson such as
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

**SPA-11**

8

E6p0daus
1  juror number six expresses frustration that the Court system
2  does not seem to respect his contribution, the best response is
3  not to confirm the misunderstanding.  It is to explain that,
4  indeed, the juror's contribution is being faithfully acted
5  upon, that under our system, judges have the power within a
6  statutory range, to determine the punishment for the crime that
7  the juror did find, beyond a reasonable doubt, and that the
8  judge may take into account facts about the defendant that the
9  judge determines to be more probable than not, even though the
10 jurors could not find those facts beyond a reasonable doubt.
11 That difference is a cornerstone of criminal procedure and it
12 is the distinction that has been embedded in our common law
13 legal tradition for hundreds of years." United States v. White
14 551 F.3d 381 at 385 to 86 (Sixth Circuit 2008) (en banc).
15        Now, experienced counsel and jurists are well aware
16 that if Daugerdas's position were adopted, it would overturn
17 longstanding precedent that, quote, "Disputed facts relevant to
18 sentencing need be established only by a preponderance of the
19 evidence." United States v. Concepcion, 983 F.2d 369 at 388
20 (Second Circuit 1992).  And see United States v. Awan, 607 F.3d
21 306 at 312 (Second Circuit 2010).
22        In imposing an appropriate sentence, this Court may
23 receive and consider any information pertaining to Daugerdas's
24 background, character, and conduct without limitation.  18
25 U.S.C. Section 3661.  Quote, "Sentencing enhancements do not

9

E6p0daus

1 punish a defendant for crimes of which he was not convicted
2 but, rather, increase his sentence because of the manner in
3 which he committed the crime of conviction." Watts, 519 US at
4 at 154.  It is for this Court to view all relevant conduct and
5 fashion an appropriate sentence.
6          The Apprendi and Alleyne decisions do not support
7 Daugerdas's argument.  In Apprendi, the Supreme Court held that
8 the Sixth Amendment requires any act other than a prior
9 conviction that exposes a defendant to a sentence in excess of
10 the relevant statutory maximum, must be found by a jury and
11 established beyond a reasonable doubt.  That does not apply to
12 the circumstances here in which this Court makes certain
13 findings that affect Daugerdas's sentencing within the
14 statutory maximum.  In Alleyne vs. the United States, the
15 Supreme Court extended Apprendi to require juror fact-finding
16 for quote, "Any facts that increased either the statutory
17 maximum or minimum." 133 Supreme Court 2151 at 2161 n.2
18 (2013). But the Court was careful to draw a distinction between
19 finding facts affecting statutory maximum and minimum facts and
20 fact-finding used to guide judicial discretion in selecting
21 punishment within limits fixed by law. Alleyne 133 Supreme
22 Court at 2161 n.2 citing Williams vs. New York 337 US 241 at
23 246 (1949).  The former, implicates the Sixth Amendment.  The
24 latter does not.
25          In this Court's view, the government offered

10

E6p0daus
1  overwhelming evidence that Daugerdas led the design, marketing,
2  and execution of four fraudulent tax shelters, directed the
3  defense of those tax shelters through misleading and dishonest
4  opinion letters, assisted tax preparers in completing false and
5  fraudulent tax returns, prepared false documents for submission
6  to the IRS, and participated in fraudulent backdating of tax
7  shelter transactions.  That conduct was breathtaking.
8          Daugerdas' counsel asks, in a submission, quote, "If
9  the Court sentences Mr. Daugerdas on the massive economic
10 substance fraud and not the backdating, how will that
11 punishment further the goals of federal sentencing?  How will
12 that sentence square with the system of justice that has always
13 been based on a foundation of community judgment?" Those are
14 provocative questions, but Section 3553(a)answers them.  It
15 requires a Court to impose a sentence sufficient but not
16 greater than necessary, after giving due regard to factors
17 including the nature and circumstances of the offense, the
18 history and characteristics of the defendant, the need for the
19 sentence to reflect the seriousness of the offense, the need to
20 promote respect for law and provide just punishment, the need
21 to afford adequate deterrence and protect the public, the need
22 for rehabilitation, the need for restitution, and the need to
23 avoid unwarranted sentencing disparities.
24         Turning, next, to the issue of forfeiture.  The
25 government moves for a preliminary order of forfeiture pursuant
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E6p0daus
1   to Federal Rule of Criminal Procedure 32.2.  Rule 32.2 allows
2   the Court to enter an order of forfeiture, or a preliminary
3   order following a guilty plea or verdict.  For mail and wire
4   fraud convictions, forfeiture is permitted of "any property
5   constituting or derived from proceeds obtained directly or
6   indirectly as a result of such violation."  18 U.S.C.
7   Section 982.
8           Proceeds are quote, "Property that a person would not
9   have, but for the criminal offense." United States v. Grant,
10  2008 WL 437-6365 at *2, n.1. (SDNY September 25,2008).
11          Criminal forfeiture is designed to be punitive and its
12  scope is broad.  Thus, quote, "Co-conspirators are liable
13  jointly and severally to forfeit the reasonably foreseeable
14  proceeds of their criminal activity." United States v. Coleman
15  Commercial Carrier, Inc., 232 F.Supp.2nd 201 at 204
16  (SDNY 2002). A defendant convicted of an ongoing scheme is also
17  liable for the entire scheme's proceeds.  See United States v.
18  Capoccia 503 F 3rd 103 at 117 (Second Circuit 2007). Assets
19  that are otherwise legitimate or untainted may be seized if a
20  criminal defendant, "would not have acquired or maintained
21  them, but for his fraudulent scheme." United States v.
22  Porcelli, 865 F.2d 1352 at 1365 (Second Circuit 1989).
23          In deciding Daugerdas's Monsanto motion, this Court
24  held that, "The proof at the first trial established that all
25  of the tax shelter fee income was the product of the tax

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E6p0daus

1    shelter scheme and that the entirety of the tax shelter fees
2    obtained by the Chicago office of Jenkins and Gilchrist were
3    generated through the criminal acts of Daugerdas and his
4    co-conspirators.  As a result, none of the funds would have
5    been obtained, but for the fraudulent scheme, and they are
6    subject to seizure as proceeds of the fraudulent scheme.  Order
7    dated November 7, 2012, at page 5, ECF number 574.
8            The evidence at the second trial was substantially the
9    same as the first trial.  This Court concludes that the
10   government prove that the property the government seeks to
11   forfeit are proceeds of the fraudulent scheme for which
12   Daugerdas was convicted.  This Court orders the preliminary
13   forfeiture of funds as set forth in the government's
14   preliminary order of forfeiture in the amount of $164,737,500.
15           Turning to the issue of restitution.
16           The Mandatory Victim Restitution Act of 1996 requires
17   the imposition of restitution equal to the amount of actual
18   loss suffered by the victim, here, the Internal Revenue
19   Service, 18 U.S.C. Section 3663(a).  See United States v.
20   Carboni, 204 F.3d 39 at 47 (Second Circuit 2000). The amount of
21   loss is calculated as of the date of sentencing and includes
22   prejudgement interest.  See United States v. Qurashi 634 F.3d
23   699 at 703-04 (Second Circuit 2011).  Pursuant to 26 USC
24   Sections 6621 and 6622, the interest is compounded daily at a
25   quarterly determined rate equal to the federal short term rate

SPA-16

```
         E6p0daus
 1   plus 3 percent.
 2            Citing Apprendi, Daugerdas contends that restitution
 3   cannot be ordered, because the jury made no specific finding.
 4   But jury findings or admissions by the defendant establishing
 5   the maximum authorized punishment has no application to
 6   Mandatory Victim Restitution Act orders of restitution.  United
 7   States v. Reifler 446 F.3d 65 at 118 (Second Circuit 2006).
 8   Daugerdas argues that Southern Union Company vs. the United
 9   States, 132 Supreme Court 2344 (2012) undermines Reifler.  That
10   argument is misplaced.  Because Southern Union addressed the
11   application of Apprendi to fines, not restitution.  Reifler
12   remains the law in the Second Circuit, and this Court must
13   follow it.
14            The parties agree that the restitution calculations
15   submitted by the government is mathematically correct.  This
16   Court adopts those calculations as its own and, accordingly,
17   the total amount of restitution including prejudgement interest
18   is $371,006,397.  This Court will decide how much restitution
19   to apportion to Mr. Daugerdas after hearing the parties'
20   sentencing arguments.
21            Finally, turning to bail pending appeal.
22            Daugerdas moves for bail pending appeal claiming that
23   there are substantial questions of law that are likely to
24   result in reversal or a new trial, specifically Daugerdas
25   claims that:  One, the government's backdating theory
```

**SPA-17**

E6p0daus

1    constructively amended the indictment; and second, that this
2    Court's instructions on the annual accounting rule were
3    erroneous.
4              A Court must order bail pending appeal if it finds by
5    clear and convincing evidence that the defendant is not likely
6    to flee or pose a danger to himself or the community and the
7    appeal, "raises a substantial question of law or fact likely to
8    result in reversal or a new trial."  18 U.S.C. Section 3143(b).
9    A substantial question is a close question, or one that very
10   well could be decided the other way.  United States v Randell,
11   761 F.2d 122 at 125 (Second Circuit 1985).
12             Turning first to Daugerdas's argument that the
13   government constructively amended the indictment.  This Court
14   rejected that argument in its May 7, 2014 order denying a new
15   trial, because Daugerdas's argument would require speculation
16   about the juror's collective minds, which is prohibited by Rule
17   29, and because backdating was specifically identified in the
18   indictment as a means and method of the fraudulent tax
19   shelters.  In this Court's view, that is not a close question.
20             Second, Daugerdas raised no objection to this Court's
21   initial instruction on the annual accounting rule.  Indeed, he
22   conceded that the issue, "was something that the parties
23   litigated before the first trial" and argued against any
24   changes to it.  Daugerdas did, for the most part object to this
25   Court's wording in its supplemental jury instructions on this

E6p0daus

1  subject matter, but a defendant, "cannot dictate the precise
2  language of a charge." United States v. Han. 230 F.3d 560 at
3  565 (Second Circuit 2000).
4          Appellate review of "challenged jury instructions is
5  de novo," and reversal will be granted only if "all of the
6  instructions taken as a whole caused a defendant prejudice."
7  United States v. Bok, 156 F.3d 157 at 160 (Second Circuit
8  1998).  In this Court's view, its instructions to the jury
9  accurately stated the law about the annual accounting rule.
10  See, e.g. United States vs. Skelly Oil Co., 394 US 678 at 681
11  (1969).  While there are exceptions to the annual accounting
12  rule, none apply to this case.  Larding up the jury
13  instructions with irrelevant legal analysis would only confuse
14  the jury.  And this Court's role is to make the law
15  understandable to the jury.  It's instructions did precisely
16  that.
17          Because Daugerdas has not demonstrated by clear and
18  convincing evidence that a substantial question exists, this
19  Court denies his application for bail pending appeal.
20          Now, I believe that that addresses the legal issues,
21  and I am prepared at this time to hear counsel's arguments with
22  respect to sentencing.
23          Mr. Mazurek, do you wish --
24          MR. MAZUREK:  Before I -- again, just a couple of
25  clarifications.  I understand that, by your order of today with

**SPA-19**

16

E6p0daus
1  respect to acquitted conduct, that the Court is proceeding
2  under the authorities that you cited in your order, making
3  findings by a preponderance of the evidence in order to
4  determine the appropriate sentence under Section 3553(a).
5         THE COURT:  That is correct.
6         MR. MAZUREK:  Judge, I guess to begin, obviously, the
7  Court and defense counsel have --
8         THE COURT:  You know, just, if I can, in answering
9  your question, I am making findings about conduct based on a
10 preponderance of the evidence standard, but I am not making
11 determinations about specifically acquitted conduct.  But there
12 is much in the record that has been put before me, aside from
13 acquitted conduct.  So I don't want my answer to your question
14 to be viewed as a concession by the Court that it is acquitted
15 conduct.
16        MR. MAZUREK:  I understand.  Certainly you would
17 agree, that with respect to the nine counts of acquittal, that
18 that constitutes, at least for those counts of acquittal, that
19 constitutes --
20        THE COURT:  That constitutes acquitted conduct.
21        MR. MAZUREK:  Also, just for clarification.  I guess
22 my question really has to do with respect to issues relating to
23 the scope of conspiracy and relevant conduct under the
24 guidelines, the Court is making findings pursuant to a
25 preponderance of the evidence pursuant to existing Supreme

**SPA-20**

```
E6p0daus
```
1    Court and Second Circuit law.
2              THE COURT:  And the jury made a unanimous finding
3    about the multiple objects of the conspiracy.
4              MR. MAZUREK:  Understood.
5              And, your Honor, I was just going to begin by saying
6    that, clearly, defense counsel and the Court have disparate
7    views on what the jury's verdict actually means.
8              And with respect to sentencing under Section 3553(a),
9    which is the touchstone, now, that the Court must follow in
10   order to impose its sentence, the question that the Court must
11   answer in determining what is a reasonable sentence, pursuant
12   to the dictates of the Supreme Court decisions in Booker,
13   Blakeley, Rita, Gall, Kimbrough, and all of the progenies that
14   subsequently followed, that it has to be a reasonable sentence.
15   A sentence which, under the Parsimony clause of Section 3553(a)
16   as to be sufficient but not greater than necessary to achieve
17   the federal sentencing purposes specified in that statute.
18             And with respect to a substantive reasonableness
19   analysis, your Honor, there are two major prongs basically that
20   the Court must consider with subsequent factors that are also
21   included in 3553(a).  And those two prongs have to do with
22   offense conduct and history and characteristics of the
23   defendant.
24             Now, your Honor, with respect to the offense conduct,
25   we have our differences.  As indicated in our papers, we

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E6pgdaus2                    Sentence
1   address the Court before sentence is imposed?
2           MR. MAZUREK:  No, your Honor.
3           THE COURT:  We're going to take five minutes, a
4   five-minute recess, and then I will sentence the defendant.
5           (Recess)
6           THE COURT:  Please be seated.
7           This Court has reviewed the presentence report.  I
8   adopt the findings of fact as they were amended pursuant to the
9   order of this Court as my own.  I will cause the presentence
10  report to be docketed and filed under seal as part of the
11  record in this case.
12          Oliver Wendell Holmes famously wrote, "Taxes are the
13  price we pay for a civilized society."  This case reveals the
14  astonishing lengths that some super-wealthy Americans will go
15  to avoid their obligations as citizens.
16          Mr. Daugerdas comes before this Court having been
17  convicted of seven counts in the indictment after a nine-week
18  trial.  That retrial followed a 13-week trial in which
19  Mr. Daugerdas had been convicted on all counts, but this Court
20  vacated that earlier conviction because of the criminal
21  misconduct of a juror, Catherine Conrad, that came to light
22  three years ago next month.
23          Her conduct was outrageous and reported widely in the
24  media.  This Court does not place any responsibility on
25  Mr. Daugerdas for Conrad's misconduct, nor does this Court

**SPA-22**

```
     E6pgdaus2                    Sentence
1    fault Mr. Daugerdas for exercising his Constitutional right to
2    a jury trial.
3           Ironically, in the Fatico proceeding last month, the
4    government adduced testimony and offered evidence regarding
5    Daugerdas' perjury during a deposition in a civil case filed in
6    this district.
7           (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

67
E6p0dau3                      Sentence

1    While that conduct was egregious, this Court is left to wonder
2    what action, if any, prosecutors will take against Catherine
3    Conrad.Who lied in open court in the presence of the presiding
4    judge, the prosecution team, and the defendants.  The human
5    toll her deliberate lies inflicted on the parties, their
6    counsel, the witnesses, and the jurors who faithfully served is
7    in estimable.
8            While Daugerdas is the architect of the largest tax
9    shelter fraud in history, Conrad is certainly one of the most
10   brazen perjurers in any federal court.  She struck at the very
11   cornerstone of justice.
12           General deterrence is important.  The government
13   targets public figures like Martha Stewart and Barry Bonds for
14   obstruction of justice.  While Conrad might not garner a
15   national headline, she betrayed her sacred oath as a juror and
16   undermined the sound administration of justice.  But now three
17   years after Conrad's perjury was brought to light, the
18   government has taken no action to bring her to the bar of
19   justice.  This Court wonders why.
20           Now, Mr. Daugerdas was a well-respected lawyer and
21   certified public accountant who was at the apex of the tax bar
22   in the United States.  As far back as the early 1990s, he was
23   earning a salary in excess of $500,000 a year as an Arthur
24   Anderson partner.
25           But that wasn't enough.  When he was caught red-handed

**SPA-24**

E6p0dau3                              Sentence

1    diverting fees from his Arthur Anderson partners, he moved to
2    Altheimer & Gray for a more lucrative compensation arrangement.
3             That wasn't enough, either.  Then he moved to the
4    prestigious law firm of Jenkins & Gilchrist, and brought his
5    crew with him.  But partnership wasn't enough.  He was not
6    satisfied billing by the hour, or being compensated like other
7    partners.  He demanded and obtained a lucrative special
8    arrangement at Jenkins & Gilchrist that netted him a huge
9    percentage of the exorbitant fees he brought to the firm.
10            But even that wasn't enough.  At Jenkins, he set up
11   private side agreements to grab even more money and deceive his
12   law partners.
13            Mr. Daugerdas was a tax shelter racketeer who tapped
14   into the incredible greed of some of the super wealthy who
15   didn't want to contribute to the nation whose freedom made
16   their huge financial successes possible.  Daugerdas'
17   sophisticated tax shelter fraud scheme found willing customers
18   in a sordid crowd of real estate tycoons, tire magnates,
19   software developers, and many others.  None of them cared one
20   whit about lying to the government, and they were all brazen
21   tax cheats.  A number of them successful.  He evaded their tax
22   obligations causing the Treasury to lose more than a billion
23   dollars in revenue, and no one knows how much time and effort
24   was devoted to the investigation of these fraudulent shelters.
25            Mr. Daugerdas, as I have said, was charismatic, highly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E6p0dau3                        Sentence
 1   respected by his partners and associates, and sought out by
 2   some of the wealthiest Americans who didn't want to pay their
 3   taxes.  He was the biggest business generator at one of the
 4   largest law firms in the United States.  But he corrupted
 5   numerous professionals, including attorneys, accountants, and
 6   financial advisors.  His fraud involved some of the country's
 7   largest financial institutions and accounting firms, including
 8   Deutsche Bank and BDO Seidman.  The success of the scheme
 9   depended on the unethical and criminal behavior of highly
10   educated and highly compensated professionals.  Nearly
11   $8 billion in fraudulent tax benefits were claimed by the super
12   wealthy and Mr. Daugerdas, himself, received more than
13   $95 million in illicit proceeds in just a few years.
14            As I said, while Mr. Daugerdas was the architect of
15   the fraud, he found willing co-conspirators everywhere he
16   looked.  He had a Midas touch.  Just about everyone he came in
17   contact with, he managed to corrupt.  He even entangled his
18   college roommate, a successful insurance broker, into a money
19   laundering scheme to conceal fees he appropriated for himself
20   from Arthur Anderson.  He provided his partner Donna Guerin
21   with talking points to train fledgling lawyers at Jenkins &
22   Gilchrist to commit fraud.  Young associates took his talking
23   point about the hide the ball strategy as gospel, because he
24   was the senior partner and ringmaster of the firm.  And when
25   the tax shelter fraud came to light, a firm of 600 attorneys

E6p0dau3                      Sentence

1   with offices around the country collapsed under the weight of
2   his criminal acts.  There is a compelling need for general
3   deterrence.  Indeed, many of the professionals involved in this
4   tax shelter fraud scheme were not charged, nor were the super
5   wealthy tax cheats.  But that reality merely underscores the
6   importance of general deterrence for tax fraud schemes.
7           Daugerdas could have assisted the government in its
8   investigation, but he let his clients lie instead.  That
9   allowed the scheme to continue and facilitated the loss of more
10  and more tax revenue, and the expenditure of tens of millions
11  of government dollars in the investigation and prosecution of
12  this case.
13          After more than a decade of investigations and
14  criminal prosecution, Mr. Daugerdas comes before the Court for
15  sentencing.  By all accounts, he is a devoted father whose
16  experienced his share of adversity in life.  And many
17  individuals have written to this Court sharing personal
18  testimonials about Daugerdas' generosity and civic mindedness.
19          This Court has no doubt that Daugerdas has been
20  involved in various charitable activities.  But as the
21  government points out, his charitable contributions during the
22  height of his fraud, amount to less than five hundredths of
23  1 percent of his gross fee income.  One example makes the
24  point.  In the year 2000, when Daugerdas earned $50,297,507, he
25  made charitable contributions of a poultry $7,426.  So, by my

E6p0dau3                          Sentence

1    rough calculation, he was earning nearly a million dollars a
2    week.  And if he worked a five-day workweek, and he worked
3    hard, so I'll credit him with 10 hours a day, he earned $20,000
4    an hour during 2000.  So his charitable contribution was worth
5    about 22 minutes of his time.  And, in any event, as the
6    Court's noted in other circumstances, charitable contributions
7    with ill-gotten gains are really of no consequence at all.
8    Now, while this Court's obligated to ensure that there are not
9    unwarranted sentencing disparities, here such a factor holds
10   little weight.  Sentences that have been imposed for tax
11   shelter fraud fall on a wide spectrum and seem to be
12   irreconcilable.  Even if they were more instructive, Daugerdas
13   is in a class by himself.  He was at the apex of tax shelter
14   fraud racketeers.
15           Now, when analyzing all of the Section 3553(a) factors
16   as they apply to Daugerdas, this Court recognizes that he was
17   acquitted on a number of substantive tax evasion counts.  That
18   weighs in his favor.
19           While the government itself recognizes, as it should,
20   that a guidelines sentence of life imprisonment with a
21   statutory maximum of 58 years is more than is necessary to
22   affect justice, it argues that Daugerdas should receive a
23   sentence of more than 20 years.
24           In this Court's view, the government's recommendation
25   fails to account adequately for Daugerdas' age and his

E6p0dau3                          Sentence
 1    acquittal on a number of counts.
 2            There is a compelling need here for general deterrence
 3    and for respect for the rule of law, as have been reflected in
 4    so many different ways in this case, including just the last
 5    comments by counsel regarding the Fatico hearing where former
 6    Arthur Anderson partners parade into this Court and testify to
 7    how they believed in these fraudulent products.  That's
 8    precisely the kind of thinking and impulse that must be
 9    deterred.  And the government's resources are scarce.
10            So it is against this backdrop that I am prepared to
11    sentence you, Mr. Daugerdas.  And I would ask, sir, that you
12    stand.
13            Mr. Daugerdas, you began your career with great
14    promise.  You had the natural talents to be a success.  And for
15    a time, it appeared you were.  Unfortunately, it was all
16    undergirded by fraud.  And, sadly, your legacy is going to be
17    that of the architect of the greatest tax fraud in US history.
18            Now, this requires a significant term of imprisonment.
19    The guidelines, of course in this case, are far beyond anything
20    that is appropriate and reasonable, and no right-thinking
21    person would impose a guidelines sentence.  And as I have
22    already remarked, I think that the government's recommendation
23    does not properly account, sir, for certain factors.  In
24    particular, the acquittals that have been the subject of
25    considerable briefing before this Court.

73

E6p0dau3                    Sentence

1          And so, Mr. Daugerdas, it's my judgment, sir, that you
2    be sentenced to a total of 180 months of imprisonment.  I'm
3    imposing a sentence of 60 months on counts one, two, six,
4    seven, and 11; 36 months count 13; and 180 months on
5    count seventeen, all to run concurrently.
6          I am imposing three years of supervised release on
7    count one, five, six, seven, eleven, and seventeen.  And one
8    year of supervised release on count 13 all to the run
9    concurrently.  I am imposing all of the standard conditions of
10   supervised release, and the special condition that you submit
11   to testing for drugs or alcohol during the period of your
12   supervised release.
13         With respect to restitution, this Court may make each
14   defendant liable for payment of the full amount of restitution,
15   or may apportion liability among the defendants to reflect the
16   level of contribution.
17         You were the mastermind of the criminal scheme, and
18   executed it with many, many others.  Your ill-gotten gains
19   totaled more than $97 million.  Therefore, I will hold you
20   responsible for the full amount of restitution.
21         I apportion among other defendants, as follows:  You
22   will pay restitution in a total amount of $371,006,397, joint
23   and several, with your co-conspirators, Donna Guerin, David
24   Parse, Adrienne Dicker, Charlie Bee, and Robert Greisman.
25         In the amounts as follows: $190,355,836, joint and

E6p0dau3                    Sentence

1   several, with Donna Guerin and David Parse; $588,053, joint and
2   several, with David Parse; $413,678, joint and several, with
3   David Parse; $40,302,967, joint and several, with David Parse,
4   Charles Bee, Adrienne Dicker, and Robert Greisman; $26,976,111
5   joint and several, with Charles Bee, Adrienne Dicker, and
6   Robert Greisman.
7           And, finally, I'm going to enter the preliminary order
8   of forfeiture in the amount of $164,737,500. And I'm also
9   imposing restitution in the amount of $112,369,752 which will
10  be joint and several with any co-conspirator sentenced after
11  today.
12          Lastly I'm imposing the $700 mandatory special
13  assessment.
14          This, Mr. Daugerdas, constitutes the sentence of this
15  Court. I advise you that to the extent you have not previously
16  waived your right to appeal, that you have the right to appeal.
17  I advise you, further, that if counsel cannot be -- if you
18  cannot afford counsel, counsel will be provided to you free of
19  cost. You have been magnificently represented, not only here
20  by Mr. Mazurek and Mr. Linder, on the retrial but, also, in
21  your first trial. So I have every confidence that Mr. Mazurek
22  and Mr. Linder will advise you fully regarding your appellate
23  rights.
24          You may be seated, Mr. Daugerdas.
25          Are there any further applications?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x



:

UNITED STATES OF AMERICA          :    PRELIMINARY ORDER OF
                                       FORFEITURE AS TO SPECIFIC
             v.                   :    PROPERTY/MONEY JUDGMENT

PAUL M. DAUGERDAS,                :    S6 09 Cr. 581 (WHP)

             Defendant.           :

- - - - - - - - - - - - - - - - - x

   WHEREAS, on April 3, 2013, PAUL M. DAUGERDAS, (the "defendant"),

among others, was charged in a seventeen-count Superseding

Indictment, S6 09 Cr. 581 (WHP) (the "Indictment"), with violations

of Title 18, United States Code, Section 371 (Count One); client tax

evasion, in violation of Title 18, United States Code, Section 2,

and Title 26, United States Code, Section 7201 (Counts Two through

Eleven); corrupt endeavor to obstruct and impede the Internal Revenue

Laws, in violation of Title 26, United States Code, Section 7212(a)

(Count Thirteen); personal tax evasion, in violation of Title 26,

United States Code, Section 7201 (Counts Fourteen through Sixteen);

and mail fraud, in violation of Title 18, United States Code, Sections

1341 and 2 (Count Seventeen);

   WHEREAS, the Indictment included a forfeiture allegation

seeking, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A) and

28 U.S.C. § 2461, all property real and personal, that constitutes

or is derived from proceeds traceable to the commission of the offenses;

WHEREAS, on October 31, 2013, defendant Daugerdas was found guilty at trial of conspiracy to defraud the United States, commit tax evasion, and engage in a mail and wire fraud scheme, in violation of Title 18, United States Code, Section 371 (Count One); tax evasion, in violation of Title 18, United States Code, Section 2, and Title 26, United States Code, Section 7201 (Counts Five through Seven, and Eleven); a corrupt endeavor to obstruct the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a) (Count Thirteen); and mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2 (Count Seventeen);

WHEREAS, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and 2461, Title 21, United States Code, Section 853(p), and Federal Rule of Criminal Procedure 32.2(e)(1), in addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may seek a money judgment against the defendant to recover the amount of the defendant's crime proceeds, such money judgment being equal to the gross proceeds of the defendant's crime, without deducting expenses;

WHEREAS, the Government identified and established by a preponderance of the evidence at trial and in written submissions,

proceeds of $164,737,500 in United States Currency obtained from the mail and wire fraud offenses;

WHEREAS, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and 2461, Title 21, United States Code, Section 853(g), and Federal Rule of Criminal Procedure 32.2(c), the Government sought, pending any assertion of third-party claims, to reduce the following specific properties to its possession and to notify any and all potential purchasers and transferees thereof of its interest therein:

    a.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 619 Cedar Point Drive, Williams Bay, Wisconsin 53191, more particularly described as a single-family home owned by PAUL DAUGERDAS and/or family members, either directly or indirectly, with the legal description of "Lots 14 and 15 in Cedar Point Subdivision, in Sections 5 and 6, Township 1 North, Range 17 East, in the Village of Williams Bay, according to the recorded plot thereof recorded in the Office of the Registrar of Deeds for Walworth County, Wisconsin" ("Williams Bay Property");

    b.    Any and all United States currency, funds, or other monetary instruments on deposit at Goldman Sachs & Co., Account Number 020-317, held in the name of FOREST INVESTORS LLC;

    c.    Any and all United States currency, funds, or other monetary instruments on deposit at Goldman Sachs & Co., Account Number 020-50725-7, held in the name of MICHAEL PAUL DAUGERDAS;

    d.    Any and all United States currency, funds, or other monetary instruments on deposit at Fidelity, Account Number 03-375152, held in the name of PMD INVESTMENTS

LLC;

e.  Any and all United States currency, funds, or other monetary instruments on deposit at Fidelity, Account Number Z46-6223261, held in the name of ELEANOR SPINA DAUGERDAS TRUST U/A 05/23/85, formerly held in account number 03-315540 in the name of Eleanor Spina Daugerdas at Fidelity;

f.  Any and all United States currency, funds, or other monetary instruments on deposit at Putnam Investments, Account Number 3960-1400001511, held in the name of PAUL M. DAUGERDAS FBO NICOLE K. DAUGERDAS;

g.  Any and all United States currency, funds, or other monetary instruments on deposit at Putnam Investments, Account Number 3960-0488483198, held in the name of PAUL M. DAUGERDAS FBO DANIEL W. DAUGERDAS;

h.  Any and all United States currency, funds, or other monetary instruments on deposit at Putnam Investments, Account Number 3968-0357819711, held in the name of PAUL M. DAUGERDAS FBO MICHAEL P. DAUGERDAS;

i.  Any and all United States currency, funds, or other monetary instruments on deposit at Putnam Investments, Account Number 3873-0357661803, held in the name of PAUL M. DAUGERDAS FBO ALEXANDER P. JEFFREY;

j.  Any and all United States currency, funds, or other monetary instruments on deposit at Putnam Investments, Account Number 3975-0357804838, held in the name of PAUL M. DAUGERDAS FBO ELEANOR M. DAUGERDAS;

k.  Any and all United States currency, funds, or other monetary instruments on deposit at Putnam Investments, Account Number 3975-0357820510, held in the name of PAUL M. DAUGERDAS FBO COURTNEY M. DAUGERDAS;

l.  Any and all United States currency, funds, or other monetary instruments on deposit at Putnam

Investments, Account Number 3976-0357817116, held in the name of PAUL M. DAUGERDAS FBO MEGAN A. JEFFREY;

m.   Any and all United States currency, funds, or other monetary instruments on deposit at Smith Barney, Account Numbers 383-25091-15 and 383-47731-15[, held in the name of PMD Investments LLC;

n.   Any and all United States currency, funds, or other monetary instruments on deposit at Morgan Stanley, Account Number 06-78C3Z, held in the name of PMD Investments LLC;

o.   Any and all United States currency, funds, or other monetary instruments on deposit at Credit Suisse, Account Number 24N-018007, held in the name of PMD Investments LLC;

p.   Any and all interest in Credit Suisse Catalytic Investors LP Fund, held in the name of PAUL M. DAUGERDAS/TREASUREX FINANCIAL;

q.   All United States currency, funds, or other monetary instruments on deposit in account number 60-18009056 in the name of PAUL M. DAUGERDAS and Eleanor Daugerdas at John Hancock Securities; [this asset was in Indictment but not Affidavit should we include?]

r.   Any and all United States currency, funds, or other monetary instruments on deposit at Merrill Lynch, Account Numbers 661-62H25, 661-62H26, 661-62H44 and 661-62H45, held in the name of Paul M. Daugerdas and Eleanor Daugerdas JTWROS;

s.   Any and all United States currency, funds, or other monetary instruments on deposit at Goldman Sachs & Co., Account Number 4XDG, held in the name of Eleanor L. Daugerdas;

t.   Any and all United States currency, funds, or other monetary instruments on deposit at Deutsche Bank, Account Numbers 5XR-087746, 5XR-122063 and 5XR-104715, held in the name of PMD Investments LLC;

u.   Any and all United States currency, funds, or other

monetary instruments on deposit at TD Ameritrade, Account Number 766-9355530, held in the name of PAUL M. DAUGERDAS;

v.   Any and all United States currency, funds, or other monetary instruments on deposit at Fifth Third Bank, Account Number 7232735006, held in the name of Paul M. Daugerdas;

w.   Any and all United States currency, funds, or other monetary instruments on deposit at Fifth Third Bank, Account Number 7233463814, held in the name of Paul M. Daugerdas By Eleanor Spina Daugerdas;

x.   Any and all United States currency, funds, or other monetary instruments on deposit at Fifth Third Bank, Account Number 723463830, held in the name of Michael Paul Daugerdas IRREV Trust;

y.   Any and all United States currency, funds, or other monetary instruments on deposit at North Shore Community Bank & Trust Company, Account Number 0317008390, held in the name of Eleanor L. Daugerdas;

z.   Any and all United States currency, funds, or other monetary instruments on deposit at North Shore Community Bank & Trust Company, Account Numbers 0330008412 and 0300021917, held in the name of Eleanor L. Daugerdas;

(a. through z., collectively the "Specific Properties");

WHEREAS, the Specific Properties will be applied in partial satisfaction of the money judgment to be entered against the defendant;

WHEREAS, pursuant to Title 21, United States Code, Section 853(g), and Rules 32.2(b)(3), and 32.2(b)(6), of the Federal Rules of Criminal Procedure, the Government is now entitled, pending any

assertion of third-party claims, to reduce the Specific Properties to its possession and to notify any person who reasonably appears to be a potential claimant of its interest therein;

WHEREAS, on or about March 25, 2010, in order to resolve a Monsanto dispute regarding the payment of Daugerdas's legal fees with respect to a prior superseding indictment, the Government and the law firm of Jenner & Block, represented by Charles Sklarsky and Chris Gair, as prior counsel for Daugerdas, reached an agreement, as detailed below, with respect to the distribution of the proceeds from any sale of the Williams Bay property (identified above in sub-paragraph "a");

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.   As a result of the offenses alleged in Counts One and Seventeen of the Indictment of which the defendant was convicted at trial, a forfeiture money judgment in the amount of $164,737,500 in United States Currency ("Money Judgment") shall be entered against PAUL M. DAUGERDAS, the defendant.

2.   Pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment is final as to the defendant, PAUL M. DAUGERDAS, upon entry of this order, and shall be deemed part of

the sentence of the defendant, and shall be included in the judgment of conviction therewith.

3.   As a result of the offenses alleged in Counts One and Seven of the Indictment of which the defendant was convicted at trial, all of the defendant's right, title and interest in the Specific Properties are hereby forfeited to the United States for disposition in accordance with the law, subject to the provisions of 21 U.S.C. § 853(n), except that, with respect to the Williams Bay Property, any sales proceeds shall be distributed in accordance with the parties' prior agreement as follows: first, to the defendant's wife, Eleanor Daugerdas, in an amount equal to the hypothetical federal and state capital gains taxes pursuant to the formula set forth below; then $3,372,626 to the United States; then $1.6 million to the law firm of Jenner & Block; and then any remaining proceeds to the United States.   The formula for calculating capital gains taxes shall be: sales price minus 5% of sales price (to account for the real estate commission) minus $4,372,626 (a fixed amount to reflect an adjusted cost basis consisting of $3,372,626 of tracing and $1,000,000 of presumed improvement disbursements after purchase) times 20.425% (the combined state and federal capital gain tax rates).

4.   Upon entry of this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment, the United States Department of

Treasury (or its designee) is authorized to seize the Specific Properties and hold the Specific Properties in its secure, custody and control.

5.   Upon execution of this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment, and pursuant to 21 U.S.C. § 853, the United States Department of Treasury shall be authorized to deposit the payments on the Money Judgment in the Treasury Assets Forfeiture Fund ("TAFF"), and the United States shall have clear title to such forfeited property.

6.   Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, upon entry of this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas, pursuant to Rule 45 of the Federal Rules of Civil Procedure.

7.   Pursuant to 21 U.S.C. § 853(n)(1), Rule 32.2(b)(6) of the Federal Rules of Criminal Procedure, and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, the United States shall publish for at least thirty (30) consecutive days on the official government internet forfeiture site, www.forfeiture.gov, notice of

this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment. Any person, other than the defendant in this case, claiming an interest in the Specific Properties must file a petition within sixty (60) days from the first day of publication of the notice on this official government internet site, or no later than thirty-five (35) days from the mailing of actual notice, whichever is earlier.

8.    This notice shall state that the petition shall be for a hearing to adjudicate the validity of the petitioner's alleged interest in the Specific Properties, shall be signed by the petitioner under penalty of perjury, and shall set forth the nature and extent of the petitioner's right, title and interest in the Specific Properties and any additional facts supporting the petitioner's claim and the relief sought, pursuant to 21 U.S.C. § 853(n).

9.    Pursuant to Rule 32.2(b)(6)(A) of the Federal Rules of Criminal Procedure, the Government shall send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.

10.   Upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture with respect to the Specific Properties pursuant to 21 U.S.C. 853(n) and Rule 32.2(c)(2) of the

Federal Rules of Criminal Procedure, in which all third-party interests will be addressed. If finally forfeited to the United States, the Specific Properties shall be applied in partial satisfaction of the Money Judgment.

11.   All payments on the outstanding Money Judgment shall be made by postal money order, bank or certified check, made payable, in this instance, to the United States Department of Treasury, and delivered by mail to the United States Attorney's Office, Southern District of New York, New York 10007, and shall indicate the defendant's name and case number.

12.   Upon execution of this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment, and pursuant to Title 21, United States Code, Section 853, the United States Department of Treasury shall be authorized to deposit the payments on the Money Judgment in the Treasury Asset Forfeiture Fund, and the United States shall have clear title to such forfeited property.

13.   The Court shall retain jurisdiction to enforce this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment, and to amend it as necessary, pursuant to Rule 32.2(e) of the Federal Rules of Criminal Procedure.

14.   The Clerk of the Court shall forward three certified copies of this Order to Assistant United States Attorney Sharon Cohen Levin,

Chief of the Money Laundering & Asset Forfeiture Unit, One St. Andrew's

Plaza, New York, New York 10007.


SO ORDERED:


_____                    6/26/14
HONORABLE WILLIAM H. PAULEY, III             DATE
UNITED STATES DISTRICT JUDGE

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PAUL M. DAUGERDAS | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:  S6 09 Cr. 581 (WHP)<br><br>USM Number: None<br><br>Henry Mazurek, Esq.<br>Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)     Counts 1, 5, 6, 7, 11, 13, and 17
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 371 | Conspiracy to Defraud the IRS | 10/31/2005 | 1 |
| 26 USC 7201 | Tax Evasion | 10/31/2005 | 5 |
| 26 USC 7201 | Tax Evasion | 10/31/2005 | 6 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)     all remaining counts

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/27/14

6/25/2014
Date of Imposition of Judgment

_____
Signature of Judge

William H. Pauley III            U.S.D.J
Name of Judge                    Title of Judge

6/27/2014
Date

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
           Sheet 1A

DEFENDANT:  PAUL M. DAUGERDAS
CASE NUMBER:  S6 09 Cr. 581 (WHP)

Judgment—Page   2   of   7

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 26 USC 7201 | Tax Evasion | 10/31/2005 | 7 |
| 26 USC 7201 | Tax Evasion | 10/31/2005 | 11 |
| 26 USC 7212(a) | Corrupt Endeavor to Obstruct and Impede the Internal Revenue Laws | 10/31/2005 | 13 |
| 18 USC 1341 | Mail Fraud | 10/31/2005 | 17 |

AO 245B   (Rev. 09/08) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    3    of    7

DEFENDANT:  PAUL M. DAUGERDAS
CASE NUMBER:  S6 09 Cr. 581 (WHP)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

60 months each on Counts 1, 5, 6, 7, and 11; 36 months on Count 13; and 180 months on Count 17.  The sentences shall run concurrently for a total sentence of 180 months.

☑ The court makes the following recommendations to the Bureau of Prisons:

Please house at the satellite camp at FCI Oxford or in a facility with the appropriate security classification which is as close to Wilmette, Illinois as practicable.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

   ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☑ before 2 p.m. on   9/18/2014 _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 3 — Supervised Release

DEFENDANT:  PAUL M. DAUGERDAS                                    Judgment—Page ___4___ of ___7___
CASE NUMBER:  S6 09 Cr. 581 (WHP)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

3 years each on Counts 1, 5, 6, 7, 11, and 17; 1 year on Count 13.  These terms shall run concurrently.

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑   The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
           Sheet 3C — Supervised Release

DEFENDANT: PAUL M. DAUGERDAS                          Judgment—Page _____5_____ of _____7_____
CASE NUMBER: S6 09 Cr. 581 (WHP)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

The defendant shall participate in a substance abuse treatment program approved by the United States Probation Office, which may include testing to determine whether the defendant has reverted to use of drugs or alcohol. The Court authorizes the release of available substance abuse treatment evaluations and reports to the treatment provider, as approved by the probation officer. The defendant shall contribute to the costs of services rendered (co-payment) in an amount to be determined by the probation officer, based on ability to pay or availability of third party payment.

AO 245B    (Rev. 09/08) Case 1:09-cr-00581-WHP    Document 838    Filed 06/27/14    Page 6 of 7
    Sheet 5 — Criminal Monetary Penalties

DEFENDANT:  PAUL M. DAUGERDAS                                    Judgment — Page  6  of  7
CASE NUMBER:  S6 09 Cr. 581 (WHP)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS.** | $ 700.00 | $ | $ 371,006,397.00 |

☐   The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| United States Treasury | $371,006,397.00 | $371,006,397.00 | 100% |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $        371,006,397.00 | $      371,006,397.00 |  |

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☑   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐   the interest requirement is waived for the   ☐  fine   ☐  restitution.

    ☐   the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page ___7___ of ___7___

DEFENDANT: PAUL M. DAUGERDAS
CASE NUMBER: S6 09 Cr. 581 (WHP)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A    ☐    Lump sum payment of $ _____ due immediately, balance due

        ☐ not later than _____ , or
        ☐ in accordance   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B    ☐    Payment to begin immediately (may be combined with  ☐ C,   ☐ D, or   ☐ F below); or

C    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E    ☐    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☑    Special instructions regarding the payment of criminal monetary penalties:

      Daugerdas shall make restitution payments in monthly installments of 10 % of the his gross monthly income over a
      period of supervision to commence 30 days after the date of the judgment.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑    Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
      and corresponding payee, if appropriate.

      $190,355,836 (Donna Guerin/David Parse); $588,053 (Parse); $413,678 (Parse); $40,302, 967 (Parse, Charles Bee,
      Adrian Dicker and Robert Greisman); $26,976,111 (Bee, Dicker, and Greisman); remainder J&S with any sub. sent.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☑    The defendant shall forfeit the defendant's interest in the following property to the United States:

      As set forth in the order of forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

7758

```
 1              Before lunch you sent us a note which we marked as
 2     Court Exhibit 10, and it reads as follows:  Please provide
 3     further instruction or clarification to page 36 of the jury
 4     charge, lines 17 and 18.  Our question:  What is defined as "a
 5     prior year's tax return"?  Does this specifically mean a tax
 6     return that has already been filed?
 7              Members of the jury, in singling out lines 17 and 18
 8     with your question, you're focusing on the annual accounting
 9     rule.  The annual accounting rule prohibits, in connection with
10     the preparation of a tax return for a particular year,
11     consideration of transactions that occur in a subsequent year.
12     Therefore, the answer to that question is no.
13              Now, while I was working to frame the response to that
14     question, you sent me another question bearing on the same --
15     along the same lines on the same subject.  And we marked that
16     as Court Exhibit 12, and it reads as follows:
17              A follow-up question regarding page 36 in the jury
18     charge.  Can you legally claim an as-of dated transaction on
19     your tax return in a given year if that as-of transaction had a
20     settlement date in the following calendar year?
21              Members of the jury, I cannot answer that question yes
22     or no.  It all depends on when the transaction actually
23     occurred.  So this for now is the best that I can do with
24     respect to these questions that you've posed.  If you have
25     other questions on this or any other matter, or you want
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA-51**

7759

```
 1    additional exhibits, please let me know.
 2              You've sent us another note that we marked as Court
 3    Exhibit 11 requesting various exhibits.  Those exhibits are
 4    going to be forwarded to you in the jury room now when you
 5    return.
 6              So at this time I'm going to ask you to return to the
 7    jury room and resume your deliberations.
 8              Please recess the jury.
 9              (Jury retired to deliberate.  Time noted:  2:42 p.m.)
10              MR. MAZUREK:  Judge, can we just get a copy of Court
11    Exhibit 12.
12              THE COURT:  Yes.  As soon as I get some other note,
13    you'll be the first to know.
14              MR. MAZUREK:  You have another note?
15              THE COURT:  No.  I said as soon as I get one.
16              (Recess pending verdict)
17              THE COURT:  I received a note we'll mark as Court
18    Exhibit 13.  It reads as follows:
19              Judge Pauley, please provide us a copy of the passage
20    from the annual accounting rule that you read to us.  Signed by
21    the foreperson.
22              Show Court Exhibit 13 to counsel.
23              Customarily I send in to the jury room a typewritten
24    supplement to any charge that I give.  I neglected to mention
25    that to them.  So I prepared it, which we'll mark as Court
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

**SPA-52**

7760

```
 1    Exhibit 14 as a supplemental charge.  The annual accounting
 2    rule prohibits in connection with the preparation of a tax
 3    return for a particular year consideration of transactions that
 4    occur in a subsequent year.
 5            MR. MAZUREK:  Continuing objection for Mr. Daugerdas.
 6            THE COURT:  Understood.
 7            Show it to counsel, then I'm sending it in to the jury
 8    room.
 9            Oh.  And by the way, the parties were all in
10    agreement, right, that the exhibits called for in Court
11    Exhibit 11 were reviewed over the luncheon recess and could be
12    submitted to the jury room, right?
13            MR. MAZUREK:  Correct.
14            MR. OKULA:  Yes, your Honor.
15            MS. MCCARTHY:  Yes, your Honor.
16            MR. MAZUREK:  Judge, just in terms of putting in the
17    supplemental charge as Court Exhibit 14, in fairness, I think
18    you should do it together with reference to line 17 and 18 on
19    page 36 of the jury charge.  I don't want the jury to be
20    confused that this is now the annual accounting rule and what
21    you previously charged is not part of the annual accounting
22    rule.  I think that maybe there's a line that says together
23    with --
24            THE COURT:  I'll say supplemental charge to lines 16
25    and 17 of page 36.
```

7790

Davedaul
1   out to them.
2           MR. OKULA:  I'm handing up, your Honor, to the Court
3   the balance of the reviewed exhibits responsive to the most
4   recent note.  And I believe all counsel have reviewed them and
5   find them satisfactory.
6           THE COURT:  All right.  So are all the other exhibits
7   identified in Court Exhibit 19 acceptable now to be sent in to
8   the jury?
9           MR. OKULA:  Yes, your Honor.
10          MR. LINDER:  Yes, your Honor.
11          MS. MCCARTHY:  Yes, your Honor.
12          THE COURT:  Bring in the jury.
13          (In open court; jury present.  Time noted:
14  12:18 p.m.)
15          THE COURT:  Good afternoon, members of the jury.
16          Members of the jury, we know that you started your
17  work well ahead of 10:00 this morning.  We took note of that.
18          We've gotten some notes from you.  You asked us some
19  questions, and I've been grappling with those questions that
20  you posed in a note that we marked as Court Exhibit 17.  I'm
21  going to respond to those questions now.  And then I'm going to
22  provide you with the questions that you asked and the answers
23  that I'm giving to you here on the record, so that you'll have
24  that with you in the jury room.
25          And so just to read once again Court Exhibit 17, which
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**SPA-54**

7791

Davedaul

1 you sent us this morning, you write the following:  Regarding
2 the supplemental charge to lines 16 to 18, page 36 of the
3 charge, one, is the annual accounting rule cited a part of the
4 internal revenue laws?
5   Members of the jury, the answer to that question is
6 yes.
7   The second question that you ask in your note is:  Are
8 the internal revenue laws, in fact, laws or are they simply a
9 position taken by the IRS?
10   Members of the jury, the answer to that question is
11 the internal revenue laws are, in fact, laws.  The internal
12 revenue laws include the Internal Revenue Code, regulations
13 issued by the Department of Treasury implementing the Internal
14 Revenue Code and court decisions interpreting these various
15 statutes and regulations.
16   You have also heard testimony in this case about IRS
17 notices.  These are positions taken by the IRS that do not have
18 the effect of law.  IRS notices are not included in the
19 internal revenue laws.
20   Finally, you asked, question number three:  Is there a
21 law or rule within the internal revenue laws that can be
22 considered contradictory to the annual accounting rules cited
23 in the supplemental charge to page 36?
24   Members of the jury, the answer to that question is
25 that the law that I gave you concerning the annual accounting

**SPA-55**

7792

Davedau1

1    rule at page 36 and in my supplemental instruction is the law
2    that should govern your deliberations.  The application of this
3    rule depends on the particular facts of each case.
4             In some instances you have heard about as-of
5    reporting.  And it may be proper under the internal revenue
6    laws, if the transaction reported on the as-of date actually
7    occurred on that date.  On the other hand, it would violate the
8    internal revenue laws to report a transaction that occurred in
9    a subsequent year as occurring during the prior year.
10            You are to apply the facts of this case to the law as
11   I have provided it to you on page 36, lines 16 to 18, and as
12   added to in the supplemental charge.  Of course, you should not
13   consider any charge alone or give this charge undue weight, but
14   must consider my charge as a whole in your deliberations.
15            So that, members of the jury, constitutes my answers
16   to the questions that you posed.  If you have other questions,
17   just send them along to me.
18            We are going to send also in to you now the exhibits
19   that you requested in a two-page note that we marked as Court
20   Exhibit 19, but I want to draw your attention to the fact that
21   eight of the exhibits that you requested in your most recent
22   note to us were already provided to you.  Specifically -- and
23   I'll give you the details here -- Exhibits 59-4 and 59-10 were
24   provided to you in response to your the note that we marked as
25   Court Exhibit 16.

**SPA-56**

7793

Davedau1

```
 1              Exhibits 82-23 and 201-17 were provided to you in
 2    response to the note we marked yesterday as Court Exhibit 5.
 3              Exhibits 301-101A and 301-120 were --
 4              MS. DAVIS:  Sorry, your Honor.  It's 301-102A.
 5              THE COURT:  Thank you.  301-102A and 301-120 were
 6    provided to you yesterday in response to the note we marked as
 7    Court Exhibit 6.
 8              Exhibit 301-208 was provided to you yesterday in
 9    response to the note we marked as Court Exhibit 7.
10              And Exhibit 401-9 was provided to you yesterday in
11    response to your request that we marked as Court Exhibit 9.
12              MS. DAVIS:  Your Honor, 401-10 was in response to note
13    9.
14              THE COURT:  Okay.  401-10.  And so, members of the
15    jury, with the exception of those eight exhibits that we've
16    already sent in to you, we're sending the balance of the
17    exhibits that you requested into the jury room with you now on
18    your return.
19              So I'm going to ask you to resume your deliberations.
20    Please recess the jury.
21              (Jury retired to deliberate.  Time noted:  12:26 p.m.)
22              THE COURT:  And I will send a copy of the response to
23    Court Exhibit 17 in to the jury room.  We'll produce another
24    copy here and mark it as Court Exhibit 20.
25              Anything further at this time?
```

18 USCS § 981

# § 981. Civil forfeiture

- **(a)** (1) The following property, real or personal, is subject to forfeiture to the United States:
  - **(A)** Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title [18 USCS § 1956, 1957, or 1960], or any property traceable to such property.
  - **(B)** Any property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, if the offense--
    - **(i)** involves trafficking in nuclear, chemical, biological, or radiological weapons technology or material, or the manufacture, importation, sale, or distribution of a controlled substance (as that term is defined for purposes of the Controlled Substances Act), or any other conduct described in section 1956(c)(7)(B) [18 USCS § 1956(c)(7)(B)];
    - **(ii)** would be punishable within the jurisdiction of the foreign nation by death or imprisonment for a term exceeding 1 year; and
    - **(iii)** would be punishable under the laws of the United States by imprisonment for a term exceeding 1 year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.
  - **(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title [18 USCS § 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487,488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030,1032, or 1344] or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title [18 USCS § 1956(c)(7)]), or a conspiracy to commit such offense.
  - **(D)** Any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of--
    - **(i)** section 666(a)(1) [18 USCS § 666(a)(1)] (relating to Federal program fraud);
    - **(ii)** section 1001 [18 USCS § 1001] (relating to fraud and false statements);
    - **(iii)** section 1031 [18 USCS § 1031] (relating to major fraud against the United States);
    - **(iv)** section 1032 [18 USCS § 1032] (relating to concealment of assets from conservator or receiver of insured financial institution);
    - **(v)** section 1341 [18 USCS § 1341] (relating to mail fraud); or
    - **(vi)** section 1343 [18 USCS § 1343] (relating to wire fraud),
      if such violation relates to the sale of assets acquired or held by [the] the Federal Deposit Insurance Corporation, as conservator or receiver for a financial institution, or any other conservator for a financial institution appointed by the Office of the Comptroller of the Currency or the National Credit Union Administration, as conservator or liquidating agent for a financial institution.
  - **(E)** With respect to an offense listed in subsection (a)(1)(D) committed for the purpose of executing or attempting to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent statements, pretenses, representations or promises, the gross receipts of such an offense shall include all property, real or personal, tangible or intangible, which thereby is obtained, directly or indirectly.
  - **(F)** Any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, from a violation of--
    - **(i)** section 511 [18 USCS § 511] (altering or removing motor vehicle identification numbers);
    - **(ii)** section 553 [18 USCS § 553] (importing or exporting stolen motor vehicles);
    - **(iii)** section 2119 [18 USCS § 2119] (armed robbery of automobiles);
    - **(iv)** section 2312 [18 USCS § 2312] (transporting stolen motor vehicles in interstate commerce); or
    - **(v)** section 2313 [18 USCS § 2313] (possessing or selling a stolen motor vehicle that has moved in interstate commerce).
  - **(G)** All assets, foreign or domestic--
    - **(i)** of any individual, entity, or organization engaged in planning or perpetrating any [any] Federal crime of terrorism (as defined in section 2332b(g)(5) [18 USCS § 2332b(g)(5)]) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization;
    - **(ii)** acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in section 2332b(g)(5) [18 USCS § 2332b(g)(5)][)] against the United States, citizens or residents of the United States, or their property;
    - **(iii)** derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in section 2332b(g)(5) [18 USCS § 2332b(g)(5)]) against the United States, citizens or residents of the United States, or their property; or
    - **(iv)** of any individual, entity, or organization engaged in planning or perpetrating any act of international terrorism (as defined in section 2331 [18 USCS § 2331]) against any international organization (as defined in section 209 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 4309(b)) or against any foreign Government [government]. Where

the property sought for forfeiture is located beyond the territorial boundaries of the United States, an act in furtherance of such planning or perpetration must have occurred within the jurisdiction of the United States.

- **(H)** Any property, real or personal, involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a violation, of section 2339C of this title [18 USCS § 2339C].

  - **(2)** For purposes of paragraph (1), the term "proceeds" is defined as follows:

    - **(A)** In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

    - **(B)** In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

    - **(C)** In cases involving fraud in the process of obtaining a loan or extension of credit, the court shall allow the claimant a deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim.

- **(b)**

  - **(1)** Except as provided in section 985 [18 USCS § 985], any property subject to forfeiture to the United States under subsection (a) may be seized by the Attorney General and, in the case of property involved in a violation investigated by the Secretary of the Treasury or the United States Postal Service, the property may also be seized by the Secretary of the Treasury or the Postal Service, respectively.

  - **(2)** Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant if--

    - **(A)** a complaint for forfeiture has been filed in the United States district court and the court issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims;

    - **(B)** there is probable cause to believe that the property is subject to forfeiture and--

      - **(i)** the seizure is made pursuant to a lawful arrest or search; or

      - **(ii)** another exception to the Fourth Amendment warrant requirement would apply; or

    - **(C)** the property was lawfully seized by a State or local law enforcement agency and transferred to a Federal agency.

  - **(3)** Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement. Any motion for the return of property seized under this section shall be filed in the district court in which the seizure warrant was issued or in the district court for the district in which the property was seized.

  - **(4)** (A) If any person is arrested or charged in a foreign country in connection with an offense that would give rise to the forfeiture of property in the United States under this section or under the Controlled Substances Act, the Attorney General may apply to any Federal judge or magistrate judge in the district in which the property is located for an ex parte order restraining the property subject to forfeiture for not more than 30 days, except that the time may be extended for good cause shown at a hearing conducted in the manner provided in rule 43(e) of the Federal Rules of Civil Procedure.

    - **(B)** The application for the restraining order shall set forth the nature and circumstances of the foreign charges and the basis for belief that the person arrested or charged has property in the United States that would be subject to forfeiture, and shall contain a statement that the restraining order is needed to preserve the availability of property for such time as is necessary to receive evidence from the foreign country or elsewhere in support of probable cause for the seizure of the property under this subsection.

- **(c)** Property taken or detained under this section shall not be repleviable, but shall be deemed to be in the custody of the Attorney General or the Secretary of the Treasury, as the case may be, subject only to the orders and decrees of the court or the official having jurisdiction thereof. Whenever property is seized under this subsection, the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be, may--

  - **(1)** place the property under seal;

  - **(2)** remove the property to a place designated by him; or

  - **(3)** require that the General Services Administration take custody of the property and remove it, if practicable, to an appropriate location for disposition in accordance with law.

- **(d)** For purposes of this section, the provisions of the customs laws relating to the seizure, summary and judicial forfeiture, condemnation of property for violation of the customs laws, the disposition of such property or the proceeds from the sale of such property under this section, the remission or mitigation of such forfeitures, and the compromise of claims (19 U.S.C. 1602 et seq.), insofar as they are applicable and not inconsistent with the provisions of this section, shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under this section, except that such duties as are imposed upon the customs officer or any other person with respect to the seizure and forfeiture of property under the customs laws shall be performed with respect to seizures and forfeitures of property under this section by such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be. The Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding.

- **(e)** Notwithstanding any other provision of the law, except section 3 of the Anti Drug Abuse Act of 1986 [21 USCS § 801 note], the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be, is authorized to retain property forfeited pursuant to this section, or to transfer such property on such terms and conditions as he may determine--
    - o **(1)** to any other Federal agency;
    - o **(2)** to any State or local law enforcement agency which participated directly in any of the acts which led to the seizure or forfeiture of the property;
    - o **(3)** in the case of property referred to in subsection (a)(1)(C), to any Federal financial institution regulatory agency--
        - ▪ **(A)** to reimburse the agency for payments to claimants or creditors of the institution; and
        - ▪ **(B)** to reimburse the insurance fund of the agency for losses suffered by the fund as a result of the receivership or liquidation;
    - o **(4)** in the case of property referred to in subsection (a)(1)(C), upon the order of the appropriate Federal financial institution regulatory agency, to the financial institution as restitution, with the value of the property so transferred to be set off against any amount later recovered by the financial institution as compensatory damages in any State or Federal proceeding;
    - o **(5)** in the case of property referred to in subsection (a)(1)(C), to any Federal financial institution regulatory agency, to the extent of the agency's contribution of resources to, or expenses involved in, the seizure and forfeiture, and the investigation leading directly to the seizure and forfeiture, of such property;
    - o **(6)** as restoration to any victim of the offense giving rise to the forfeiture, including, in the case of a money laundering offense, any offense constituting the underlying specified unlawful activity; or
    - o **(7)** In [in] the case of property referred to in subsection (a)(1)(D), to the Resolution Trust Corporation, the Federal Deposit Insurance Corporation, or any other Federal financial institution regulatory agency (as defined in section 8(e)(7)(D) of the Federal Deposit Insurance Act [12 USCS § 1818(e)(7)(D)]).

      The Attorney General or the Secretary of the Treasury, as the case may be, shall ensure the equitable transfer pursuant to paragraph (2) of any forfeited property to the appropriate State or local law enforcement agency so as to reflect generally the contribution of any such agency participating directly in any of the acts which led to the seizure or forfeiture of such property. A decision by the Attorney General or the Secretary of the Treasury pursuant to paragraph (2) shall not be subject to review. The United States shall not be liable in any action arising out of the use of any property the custody of which was transferred pursuant to this section to any non-Federal agency. The Attorney General or the Secretary of the Treasury may order the discontinuance of any forfeiture proceedings under this section in favor of the institution of forfeiture proceedings by State or local authorities under an appropriate State or local statute. After the filing of a complaint for forfeiture under this section, the Attorney General may seek dismissal of the complaint in favor of forfeiture proceedings under State or local law. Whenever forfeiture proceedings are discontinued by the United States in favor of State or local proceedings, the United States may transfer custody and possession of the seized property to the appropriate State or local official immediately upon the initiation of the proper actions by such officials. Whenever forfeiture proceedings are discontinued by the United States in favor of State or local proceedings, notice shall be sent to all known interested parties advising them of the discontinuance or dismissal. The United States shall not be liable in any action arising out of the seizure, detention, and transfer of seized property to State or local officials. The United States shall not be liable in any action arising out of a transfer under paragraph (3), (4), or (5) of this subsection.
- **(f)** All right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section.
- **(g)**
    - o **(1)** Upon the motion of the United States, the court shall stay the civil forfeiture proceeding if the court determines that civil discovery will adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case.
    - o **(2)** Upon the motion of a claimant, the court shall stay the civil forfeiture proceeding with respect to that claimant if the court determines that--
        - ▪ **(A)** the claimant is the subject of a related criminal investigation or case;
        - ▪ **(B)** the claimant has standing to assert a claim in the civil forfeiture proceeding; and
        - ▪ **(C)** continuation of the forfeiture proceeding will burden the right of the claimant against self-incrimination in the related investigation or case.
    - o **(3)** With respect to the impact of civil discovery described in paragraphs (1) and (2), the court may determine that a stay is unnecessary if a protective order limiting discovery would protect the interest of one party without unfairly limiting the ability of the opposing party to pursue the civil case. In no case, however, shall the court impose a protective order as an alternative to a stay if the effect of such protective order would be to allow one party to pursue discovery while the other party is substantially unable to do so.
    - o **(4)** In this subsection, the terms "related criminal case" and "related criminal investigation" mean an actual prosecution or investigation in progress at the time at which the request for the stay, or any subsequent motion to lift the stay is made. In determining whether a criminal case or investigation is "related" to a civil forfeiture proceeding, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors.
    - o **(5)** In requesting a stay under paragraph (1), the Government may, in appropriate cases, submit evidence ex parte in order to avoid disclosing any matter that may adversely affect an ongoing criminal investigation or pending criminal trial.
    - o **(6)** Whenever a civil forfeiture proceeding is stayed pursuant to this subsection, the court shall enter any order necessary to preserve the value of the property or to protect the rights of lienholders or other persons with an interest in the property while the stay is in effect.

- ○ **(7)** A determination by the court that the claimant has standing to request a stay pursuant to paragraph (2) shall apply only to this subsection and shall not preclude the Government from objecting to the standing of the claimant by dispositive motion or at the time of trial.
- **(h)** In addition to the venue provided for in section 1395 of title 28 or any other provision of law, in the case of property of a defendant charged with a violation that is the basis for forfeiture of the property under this section, a proceeding for forfeiture under this section may be brought in the judicial district in which the defendant owning such property is found or in the judicial district in which the criminal prosecution is brought.
- **(i)** (1) Whenever property is civilly or criminally forfeited under this chapter [18 USCS §§ 981 et seq.], the Attorney General or the Secretary of the Treasury, as the case may be, may transfer the forfeited personal property or the proceeds of the sale of any forfeited personal or real property to any foreign country which participated directly or indirectly in the seizure or forfeiture of the property, if such a transfer--
  - ○ **(A)** has been agreed to by the Secretary of State;
  - ○ **(B)** is authorized in an international agreement between the United States and the foreign country; and
  - ○ **(C)** is made to a country which, if applicable, has been certified under section 490(a)(1) of the Foreign Assistance Act of 1961 [22 USCS § 2291j(a)(1)].

    A decision by the Attorney General or the Secretary of the Treasury pursuant to this paragraph shall not be subject to review. The foreign country shall, in the event of a transfer of property or proceeds of sale of property under this subsection, bear all expenses incurred by the United States in the seizure, maintenance, inventory, storage, forfeiture, and disposition of the property, and all transfer costs. The payment of all such expenses, and the transfer of assets pursuant to this paragraph, shall be upon such terms and conditions as the Attorney General or the Secretary of the Treasury may, in his discretion, set.
    - ▪ **(2)** The provisions of this section shall not be construed as limiting or superseding any other authority of the United States to provide assistance to a foreign country in obtaining property related to a crime committed in the foreign country, including property which is sought as evidence of a crime committed in the foreign country.
    - ▪ **(3)** A certified order or judgment of forfeiture by a court of competent jurisdiction of a foreign country concerning property which is the subject of forfeiture under this section and was determined by such court to be the type of property described in subsection (a)(1)(B) of this section, and any certified recordings or transcripts of testimony taken in a foreign judicial proceeding concerning such order or judgment of forfeiture, shall be admissible in evidence in a proceeding brought pursuant to this section. Such certified order or judgment of forfeiture, when admitted into evidence, shall constitute probable cause that the property forfeited by such order or judgment of forfeiture is subject to forfeiture under this section and creates a rebuttable presumption of the forfeitability of such property under this section.
    - ▪ **(4)** A certified order or judgment of conviction by a court of competent jurisdiction of a foreign country concerning an unlawful drug activity which gives rise to forfeiture under this section and any certified recordings or transcripts of testimony taken in a foreign judicial proceeding concerning such order or judgment of conviction shall be admissible in evidence in a proceeding brought pursuant to this section. Such certified order or judgment of conviction, when admitted into evidence, creates a rebuttable presumption that the unlawful drug activity giving rise to forfeiture under this section has occurred.
    - ▪ **(5)** The provisions of paragraphs (3) and (4) of this subsection shall not be construed as limiting the admissibility of any evidence otherwise admissible, nor shall they limit the ability of the United States to establish probable cause that property is subject to forfeiture by any evidence otherwise admissible.
- **(j)** For purposes of this section--
  - ○ **(1)** the term "Attorney General" means the Attorney General or his delegate; and
  - ○ **(2)** the term "Secretary of the Treasury" means the Secretary of the Treasury or his delegate.
- **(k)** Interbank Accounts.
  - ○ **(1)** In general.
    - ▪ **(A)** In general. For the purpose of a forfeiture under this section or under the Controlled Substances Act (21 U.S.C. 801 et seq.), if funds are deposited into an account at a foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]), and that foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) has an interbank account in the United States with a covered financial institution (as defined in section 5318(j)(1) of title 31), the funds shall be deemed to have been deposited into the interbank account in the United States, and any restraining order, seizure warrant, or arrest warrant in rem regarding the funds may be served on the covered financial institution, and funds in the interbank account, up to the value of the funds deposited into the account at the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]), may be restrained, seized, or arrested.
    - ▪ **(B)** Authority to suspend. The Attorney General, in consultation with the Secretary of the Treasury, may suspend or terminate a forfeiture under this section if the Attorney General determines that a conflict of law exists between the laws of the jurisdiction in which the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) is located and the laws of the United States with respect to liabilities arising from the restraint, seizure, or arrest of such funds, and that such suspension or termination would be in the interest of justice and would not harm the national interests of the United States.
  - ○ **(2)** No requirement for Government to trace funds. If a forfeiture action is brought against funds that are restrained, seized, or arrested under paragraph (1), it shall not be necessary for the Government to establish that the funds are directly traceable to the funds that were deposited into the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]), nor shall it be necessary for the Government to rely on the application of section 984 [18 USCS § 984].

- ○ **(3)** Claims brought by owner of the funds. If a forfeiture action is instituted against funds restrained, seized, or arrested under paragraph (1), the owner of the funds deposited into the account at the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) may contest the forfeiture by filing a claim under section 983 [18 USCS § 983].
- ○ **(4)** Definitions. For purposes of this subsection, the following definitions shall apply:
  - ▪ **(A)** Interbank account. The term "interbank account" has the same meaning as in section 984(c)(2)(B) [18 USCS § 984(c)(2)(B)].
  - ▪ **(B)** Owner.
    - ▪ **(i)** In general. Except as provided in clause (ii), the term "owner"--
      - ▪ **(I)** means the person who was the owner, as that term is defined in section 983(d)(6) [18 USCS § 983(d)(6)], of the funds that were deposited into the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) at the time such funds were deposited; and
      - ▪ **(II)** does not include either the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) or any financial institution acting as an intermediary in the transfer of the funds into the interbank account.
    - ▪ **(ii)** Exception. The foreign financial institution (as defined in section 984(c)(2)(A) of thistitle [18 USCS § 984(c)(2)(A)]) may be considered the "owner" of the funds (and no other person shall qualify as the owner of such funds) only if--
      - ▪ **(I)** the basis for the forfeiture action is wrongdoing committed by the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]); or
      - ▪ **(II)** the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) establishes, by a preponderance of the evidence, that prior to the restraint, seizure, or arrest of the funds, the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) had discharged all or part of its obligation to the prior owner of the funds, in which case the foreign financial institution (as defined in section 984(c)(2)(A) of this title [18 USCS § 984(c)(2)(A)]) shall be deemed the owner of the funds to the extent of such discharged obligation.

**SPA-62**

18 USCS § 982

# § 982. Criminal forfeiture

- **(a)**
  - **(1)** The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title [18 USCS 1956, 1957, or 1960], shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.
  - **(2)** The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate--
    - **(A)** section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344 of this title [18 USCS § 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344], affecting a financial institution, or
    - **(B)** section 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 555, 842, 844, 1028, 1029, or 1030 of this title [18 USCS § 471, 472, 473, 474,476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 555, 842, 844,1028, 1029, or 1030],
      shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.
  - **(3)** The court, in imposing a sentence on a person convicted of an offense under--
    - **(A)** section 666(a)(1) [18 USCS § 666(a)(1)] (relating to Federal program fraud);
    - **(B)** section 1001 [18 USCS § 1001] (relating to fraud and false statements);
    - **(C)** section 1031 [18 USCS § 1031] (relating to major fraud against the United States);
    - **(D)** section 1032 [18 USCS § 1032] (relating to concealment of assets from conservator, receiver or liquidating agent of insured financial institution);
    - **(E)** section 1341 [18 USCS § 1341] (relating to mail fraud); or
    - **(F)** section 1343 [18 USCS § 1343] (relating to wire fraud),
      involving the sale of assets acquired or held by [the] the Federal Deposit Insurance Corporation, as conservator or receiver for a financial institution or any other conservator for a financial institution appointed by the Office of the Comptroller of the Currency or the National Credit Union Administration, as conservator or liquidating agent for a financial institution, shall order that the person forfeit to the United States any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such violation.
  - **(4)** With respect to an offense listed in subsection (a)(3) committed for the purpose of executing or attempting to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent statements, pretenses, representations, or promises, the gross receipts of such an offense shall include any property, real or personal, tangible or intangible, which is obtained, directly or indirectly, as a result of such offense.
  - **(5)** The court, in imposing sentence on a person convicted of a violation or conspiracy to violate--
    - **(A)** section 511 [18 USCS § 511] (altering or removing motor vehicle identification numbers);
    - **(B)** section 553 [18 USCS § 553] (importing or exporting stolen motor vehicles);
    - **(C)** section 2119 [18 USCS § 2119] (armed robbery of automobiles);
    - **(D)** section 2312 [18 USCS § 2312] (transporting stolen motor vehicles in interstate commerce); or
    - **(E)** section 2313 [18 USCS § 2313] (possessing or selling a stolen motor vehicle that has moved in interstate commerce);
      shall order that the person forfeit to the United States any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, as a result of such violation.
  - **(6)** (A) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 274(a), 274A(a)(1), or 274A(a)(2) of the Immigration and Nationality Act [8 USCS §§ 1324(a), 1324a(a)(1), or 1324a(a)(2)] or section 555, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title [18 USCS § 555, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546], or a violation of, or conspiracy to violate, section 1028 of this title [18 USCS § 1028] if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States, regardless of any provision of State law--
    - **(i)** any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the person is convicted; and
    - **(ii)** any property real or personal--
      - **(I)** that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or
      - **(II)** that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted.
        - **(B)** The court, in imposing sentence on a person described in subparagraph (A), shall order that the person forfeit to the United States all property described in that subparagraph.
  - **(7)** The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.
  - **(8)** The court, in sentencing a defendant convicted of an offense under section 1028, 1029, 1341, 1342, 1343, or 1344 [18 USCS § 1028, 1029, 1341, 1342, 1343, or 1344], or of a conspiracy to commit such an offense, if the offense involves telemarketing (as

# SPA-63

that term is defined in section 2325 [18 USCS § 2325]), shall order that the defendant forfeit to the United States any real or personal property--

- **(A)** used or intended to be used to commit, to facilitate, or to promote the commission of such offense; and
- **(B)** constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of the offense.

- **(b)**
  - **(1)** The forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853).
  - **(2)** The substitution of assets provisions of subsection 413(p) [21 USCS § 853(p)] shall not be used to order a defendant to forfeit assets in place of the actual property laundered where such defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $ 100,000 or more in any twelve month period.

**SPA-64**

## § 1341. Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.

# § 3553. Imposition of a sentence

- **(a)** Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
  - o **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
  - o **(2)** the need for the sentence imposed--
    - **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    - **(B)** to afford adequate deterrence to criminal conduct;
    - **(C)** to protect the public from further crimes of the defendant; and
    - **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
  - o **(3)** the kinds of sentences available;
  - o **(4)** the kinds of sentence and the sentencing range established for--
    - **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
      - **(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
      - **(ii)** that, except as provided in section 3742(g) [18 USCS § 3742(g)], are in effect on the date the defendant is sentenced; or
    - **(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
  - o **(5)** any pertinent policy statement--
    - **(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
    - **(B)** that, except as provided in section 3742(g) [18 USCS § 3742(g)], is in effect on the date the defendant is sentenced.[;]
  - o **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
  - o **(7)** the need to provide restitution to any victims of the offense.
- **(b)** Application of guidelines in imposing a sentence.
  - o **(1)** In general **[Caution: In United States v. Booker (2005) 543 US 220, 160 L Ed 2d 621, 125 S Ct 738, the Supreme Court held that 18 USCS § 3553(b)(1), which makes the Federal Sentencing Guidelines mandatory, is incompatible with the requirements of the Sixth Amendment and therefore must be severed and excised from the Sentencing Reform Act of 1984.].** Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.
  - o **(2)** Child crimes and sexual offenses.

    **[A]** Sentencing. In sentencing a defendant convicted of an offense under section 1201 [18 USCS § 1201] involving a minor victim, an offense under section 1591 [18 USCS § 1591], or an offense under chapter 71, 109A, 110, or 117 [18 USCS §§ 1460 et seq., 2241 et seq., 2251 et seq., or 2421 et seq.], the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless---
    - **(i)** the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described;
    - **(ii)** the court finds that there exists a mitigating circumstance of a kind or to a degree, that--
      - **(I)** has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;
      - **(II)** has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and
      - **(III)** should result in a sentence different from that described; or
    - **(iii)** the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.

SPA-66

## § 3661. Use of information for sentencing

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

# SPA-67

In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission, together with any amendments thereto by act of Congress. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission, together with any amendments to such guidelines or policy statements by act of Congress.

- **(c)** Statement of reasons for imposing a sentence. The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence--
  - o **(1)** is of the kind, and within the range, described in subsection (a)(4), and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or
  - o **(2)** is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form issued under section 994(w)(1)(B) of title 28 [28 USCS § 994(w)(1)(B)], except to the extent that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32. In the event that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32 the court shall state that such statements were so received and that it relied upon the content of such statements.

    If the court does not order restitution, or orders only partial restitution, the court shall include in the statement the reason therefor. The court shall provide a transcription or other appropriate public record of the court's statement of reasons, together with the order of judgment and commitment, to the Probation System and to the Sentencing Commission,[,] and, if the sentence includes a term of imprisonment, to the Bureau of Prisons.

- **(d)** Presentence procedure for an order of notice. Prior to imposing an order of notice pursuant to section 3555 [18 USCS § 3555], the court shall give notice to the defendant and the Government that it is considering imposing such an order. Upon motion of the defendant or the Government, or on its own motion, the court shall--
  - o **(1)** permit the defendant and the Government to submit affidavits and written memoranda addressing matters relevant to the imposition of such an order;
  - o **(2)** afford counsel an opportunity in open court to address orally the appropriateness of the imposition of such an order; and
  - o **(3)** include in its statement of reasons pursuant to subsection (c) specific reasons underlying its determinations regarding the nature of such an order.

    Upon motion of the defendant or the Government, or on its own motion, the court may in its discretion employ any additional procedures that it concludes will not unduly complicate or prolong the sentencing process.

- **(e)** Limited authority to impose a sentence below a statutory minimum. Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

- **(f)** Limitation on applicability of statutory minimums in certain cases. Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that--
  - o **(1)** the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
  - o **(2)** the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
  - o **(3)** the offense did not result in death or serious bodily injury to any person;
  - o **(4)** the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act [21 USCS § 848]; and
  - o **(5)** not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

- - **(4)** Voting power determined. For purposes of this subsection, voting power shall be determined on the basis of total combined voting power of all classes of stock of the corporation entitled to vote.
- **(i)** Taxable year of personal service corporations.
  - **(1)** In general. For purposes of this subtitle [26 USCS §§ 1 et seq.], the taxable year of any personal service corporation shall be the calendar year unless the corporation establishes, to the satisfaction of the Secretary, a business purpose for having a different period for its taxable year. For purposes of this paragraph, any deferral of income to shareholders shall not be treated as a business purpose.
  - **(2)** Personal service corporation. For purposes of this subsection, the term "personal service corporation" has the meaning given such term by section 269A(b)(1) [26 USCS § 269A(b)(1)], except that section 269A(b)(2) [26 USCS § 269A(b)(2)] shall be applied--
    - **(A)** by substituting "any" for "more than 10 percent", and
    - **(B)** by substituting "any" for "50 percent or more in value" in section 318(a)(2)(C) [26 USCS § 318(a)(2)(C)]. A corporation shall not be treated as a personal service corporation unless more than 10 percent of the stock (by value) in such corporation is held by employee-owners (within the meaning of section 269A(b)(2) [26 USCS § 269A(b)(2)], as modified by the preceding sentence). If a corporation is a member of an affiliated group filing a consolidated return, all members of such group shall be taken into account in determining whether such corporation is a personal service corporation.

# SPA-69

- **(B)** Content of the notice. The notice must describe the forfeited property, state the times under the applicable statute when a petition contesting the forfeiture must be filed, and state the name and contact information for the government attorney to be served with the petition.
- **(C)** Means of publication; Exceptions to Publication Requirement. Publication must take place as described in Supplemental **Rule** G(4)(a)(iii) of the Federal **Rules** of Civil Procedure, and may be by any means described in Supplemental **Rule** G(4)(a)(iv). Publication is unnecessary if any exception in Supplemental **Rule** G(4)(a)(i) applies.
- **(D)** Means of sending the notice. The notice may be sent in accordance with Supplemental **Rules** G(4)(b)(iii)-(v) of the Federal **Rules** of Civil Procedure.

- o **(7) *Interlocutory sale.*** At any time before entry of a final forfeiture order, the court, in accordance with Supplemental **Rule** G(7) of the Federal **Rules** of Civil Procedure, may order the interlocutory sale of property alleged to be forfeitable.

- **(c)** Ancillary Proceeding; Entering a Final Order of Forfeiture.
  - o **(1)** *In General.* If, as prescribed by statute, a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding, but no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment.
    - **(A)** In the ancillary proceeding, the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason. For purposes of the motion, the facts set forth in the petition are assumed to be true.
    - **(B)** After disposing of any motion filed under **Rule 32**.2(c)(1)(A) and before conducting a hearing on the petition, the court may permit the parties to conduct discovery in accordance with the Federal **Rules** of Civil Procedure if the court determines that discovery is necessary or desirable to resolve factual issues. When discovery ends, a party may move for summary judgment under Federal **Rule** of Civil Procedure 56.
  - o **(2)** *Entering a Final Order.* When the ancillary proceeding ends, the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights. If no third party files a timely petition, the preliminary order becomes the final order of forfeiture if the court finds that the defendant (or any combination of defendants convicted in the case) had an interest in the property that is forfeitable under the applicable statute. The defendant may not object to the entry of the final order on the ground that the property belongs, in whole or in part, to a codefendant or third party; nor may a third party object to the final order on the ground that the third party had an interest in the property.
  - o **(3)** *Multiple Petitions.* If multiple third-party petitions are filed in the same case, an order dismissing or granting one petition is not appealable until rulings are made on all the petitions, unless the court determines that there is no just reason for delay.
  - o **(4)** *Ancillary Proceeding Not Part of Sentencing.* An ancillary proceeding is not part of sentencing.

- **(d)** Stay Pending Appeal. If a defendant appeals from a conviction or an order of forfeiture, the court may stay the order of forfeiture on terms appropriate to ensure that the property remains available pending appellate review. A stay does not delay the ancillary proceeding or the determination of a third party's rights or interests. If the court **rules** in favor of any third party while an appeal is pending, the court may amend the order of forfeiture but must not transfer any property interest to a third party until the decision on appeal becomes final, unless the defendant consents in writing or on the record.

- **(e)** Subsequently Located Property; Substitute Property.
  - o **(1)** *In General.* On the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that:
    - **(A)** is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered; or
    - **(B)** is substitute property that qualifies for forfeiture under an applicable statute.
  - o **(2)** *Procedure.* If the government shows that the property is subject to forfeiture under **Rule 32**.2(e)(1), the court must:
    - **(A)** enter an order forfeiting that property, or amend an existing preliminary or final order to include it; and
    - **(B)** if a third party files a petition claiming an interest in the property, conduct an ancillary proceeding under **Rule 32**.2(c).
  - o **(3)** *Jury Trial Limited.* There is no right to a jury trial under **Rule 32**.2(e).

21 USCS § 853

# § 853. Criminal forfeitures

- **(a)** Property subject to criminal forfeiture. Any person convicted of a violation of this title or title III punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law--
    - **(1)** any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;
    - **(2)** any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and
    - **(3)** in the case of a person convicted of engaging in a continuing criminal enterprise in violation of section 408 of this title (21 U.S.C. 848), the person shall forfeit, in addition to any property described in paragraph (1) or (2), any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise.
      The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this title or title III, that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this part [21 USCS §§ 841 et seq.], a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.
- **(b)** Meaning of term "property". Property subject to criminal forfeiture under this section includes--
    - **(1)** real property, including things growing on, affixed to, and found in land; and
    - **(2)** tangible and intangible personal property, including rights, privileges, interests, claims, and securities.
- **(c)** Third party transfers. All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.
- **(d)** Rebuttable presumption. There is a rebuttable presumption at trial that any property of a person convicted of a felony under this title or title III is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that--
    - **(1)** such property was acquired by such person during the period of the violation of this title or title III or within a reasonable time after such period; and
    - **(2)** there was no likely source for such property other than the violation of this title or title III.
- **(e)** Protective orders.
    - **(1)** Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) for forfeiture under this section--
        - **(A)** upon the filing of an indictment or information charging a violation of this title or title III for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section; or
        - **(B)** prior to the filing of such an indictment or information, if, after notice to persons appearing to have an interest in the property and opportunity for a hearing, the court determines that--
            - **(i)** there is a substantial probability that the United States will prevail on the issue of forfeiture and that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and
            - **(ii)** the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered:
              *Provided, however,* That an order entered pursuant to subparagraph (B) shall be effective for not more than ninety days, unless extended by the court for good cause shown or unless an indictment or information described in subparagraph (A) has been filed.
    - **(2)** A temporary restraining order under this subsection may be entered upon application of the United States without notice or opportunity for a hearing when an information or indictment has not yet been filed with respect to the property, if the United States demonstrates that there is probable cause to believe that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section and that provision of notice will jeopardize the availability of the property for forfeiture. Such a temporary order shall expire not more than fourteen days after the date on which it is entered, unless extended for good cause shown or unless the party against whom it is entered consents to an extension for a longer period. A hearing requested concerning an order entered under this paragraph shall be held at the earliest possible time and prior to the expiration of the temporary order.
    - **(3)** The court may receive and consider, at a hearing held pursuant to this subsection, evidence and information that would be inadmissible under the Federal Rules of Evidence.
    - **(4)** Order to repatriate and deposit.
        - **(A)** In general. Pursuant to its authority to enter a pretrial restraining order under this section, the court may order a defendant to repatriate any property that may be seized and forfeited, and to deposit that property pending trial in the registry of the court, or with the United States Marshals Service or the Secretary of the Treasury, in an interest-bearing account, if appropriate.

- **(B)** Failure to comply. Failure to comply with an order under this subsection, or an order to repatriate property under subsection (p), shall be punishable as a civil or criminal contempt of court, and may also result in an enhancement of the sentence of the defendant under the obstruction of justice provision of the Federal Sentencing Guidelines.

- **(f)** Warrant of seizure. The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

- **(g)** Execution. Upon entry of an order of forfeiture under this section, the court shall authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper. Following entry of an order declaring the property forfeited, the court may, upon application of the United States, enter such appropriate restraining orders or injunctions, require the execution of satisfactory performance bonds, appoint receivers, conservators, appraisers, accountants, or trustees, or take any other action to protect the interest of the United States in the property ordered forfeited. Any income accruing to or derived from property ordered forfeited under this section may be used to offset ordinary and necessary expenses to the property which are required by law, or which are necessary to protect the interests of the United States or third parties.

- **(h)** Disposition of property. Following the seizure of property ordered forfeited under this section, the Attorney General shall direct the disposition of the property by sale or any other commercially feasible means, making due provision for the rights of any innocent persons. Any property right or interest not exercisable by, or transferable for value to, the United States shall expire and shall not revert to the defendant, nor shall the defendant or any person acting in concert with him or on his behalf be eligible to purchase forfeited property at any sale held by the United States. Upon application of a person, other than the defendant or a person acting in concert with him or on his behalf, the court may restrain or stay the sale or disposition of the property pending the conclusion of any appeal of the criminal case giving rise to the forfeiture, if the applicant demonstrates that proceeding with the sale or disposition of the property will result in irreparable injury, harm, or loss to him.

- **(i)** Authority of the Attorney General. With respect to property ordered forfeited under this section, the Attorney General is authorized to--
  - **(1)** grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this title, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section;
  - **(2)** compromise claims arising under this section;
  - **(3)** award compensation to persons providing information resulting in a forfeiture under this section;
  - **(4)** direct the disposition by the United States, in accordance with the provisions of section 511(e) of this title (21 U.S.C. 881(e)), of all property ordered forfeited under this section by public sale or any other commercially feasible means, making due provision for the rights of innocent persons; and
  - **(5)** take appropriate measures necessary to safeguard and maintain property ordered forfeited under this section pending its disposition.

- **(j)** Applicability of civil forfeiture provisions. Except to the extent that they are inconsistent with the provisions of this section, the provisions of section 511(d) of this title (21 U.S.C. 881(d)) shall apply to a criminal forfeiture under this section.

- **(k)** Bar on intervention. Except as provided in subsection (n), no party claiming an interest in property subject to forfeiture under this section may--
  - **(1)** intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this section; or
  - **(2)** commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

- **(l)** Jurisdiction to enter orders. The district courts of the United States shall have jurisdiction to enter orders as provided in this section without regard to the location of any property which may be subject to forfeiture under this section or which has been ordered forfeited under this section.

- **(m)** Depositions. In order to facilitate the identification and location of property declared forfeited and to facilitate the disposition of petitions for remission or mitigation of forfeiture, after the entry of an order declaring property forfeited to the United States, the court may, upon application of the United States, order that the testimony of any witness relating to the property forfeited be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place, in the same manner as provided for the taking of depositions under Rule 15 of the Federal Rules of Criminal Procedure.

- **(n)** Third party interests.
  - **(1)** Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.
  - **(2)** Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.
  - **(3)** The petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

- o **(4)** The hearing on the petition shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition. The court may consolidate the hearing on the petition with a hearing on any other petition filed by a person other than the defendant under this subsection.
- o **(5)** At the hearing, the petitioner may testify and present evidence and witnesses on his own behalf, and cross-examine witnesses who appear at the hearing. The United States may present evidence and witnesses in rebuttal and in defense of its claim to the property and cross-examine witnesses who appear at the hearing. In addition to testimony and evidence presented at the hearing, the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture.
- o **(6)** If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that--
  - ▪ **(A)** the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
  - ▪ **(B)** the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonable without cause to believe that the property was subject to forfeiture under this section;
       the court shall amend the order of forfeiture in accordance with its determination.
- o **(7)** Following the court's disposition of all petitions filed under this subsection, or if no such petitions are filed following the expiration of the period provided in paragraph (2) for the filing of such petitions, the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee.
- **(o)** Construction. The provisions of this section shall be liberally construed to effectuate its remedial purposes.
- **(p)** Forfeiture of substitute property.
  - o **(1)** In general. Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant--
    - ▪ **(A)** cannot be located upon the exercise of due diligence;
    - ▪ **(B)** has been transferred or sold to, or deposited with, a third party;
    - ▪ **(C)** has been placed beyond the jurisdiction of the court;
    - ▪ **(D)** has been substantially diminished in value; or
    - ▪ **(E)** has been commingled with other property which cannot be divided without difficulty.
  - o **(2)** Substitute property. In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.
  - o **(3)** Return of property to jurisdiction. In the case of property described in paragraph (1)(C), the court may, in addition to any other action authorized by this subsection, order the defendant to return the property to the jurisdiction of the court so that the property may be seized and forfeited.
- **(q)** Restitution for cleanup of clandestine laboratory sites. The court, when sentencing a defendant convicted of an offense under this title or title III involving the manufacture, the possession, or the possession with intent to distribute, of amphetamine or methamphetamine, shall--
  - o **(1)** order restitution as provided in sections 3612 and 3664 of title 18, United States Code [18 USCS §§ 3612 and 3664];
  - o **(2)** order the defendant to reimburse the United States, the State or local government concerned, or both the United States and the State or local government concerned for the costs incurred by the United States or the State or local government concerned, as the case may be, for the cleanup associated with the manufacture of amphetamine or methamphetamine by the defendant, or on premises or in property that the defendant owns, resides, or does business in; and
  - o **(3)** order restitution to any person injured as a result of the offense as provided in section 3663A of title 18, United States Code [18 USCS § 3663A].

**SPA-73**

26 USCS § 441

# § 441. Period for computation of taxable income.

- **(a)** Computation of taxable income. Taxable income shall be computed on the basis of the taxpayer's taxable year.
- **(b)** Taxable year. For purposes of this subtitle [26 USCS §§ 1 et seq.], the term "taxable year" means--
  - ○ **(1)** the taxpayer's annual accounting period, if it is a calendar year or a fiscal year;
  - ○ **(2)** the calendar year, if subsection (g) applies;
  - ○ **(3)** the period for which the return is made, if a return is made for a period of less than 12 months; or
  - ○ **(4)** in the case of a DISC filing a return for a period of at least 12 months, the period determined under subsection (h).
- **(c)** Annual accounting period. For purposes of this subtitle [26 USCS §§ 1 et seq.], the term "annual accounting period" means the annual period on the basis of which the taxpayer regularly computes his income in keeping his books.
- **(d)** Calendar year. For purposes of this subtitle [26 USCS §§ 1 et seq.], the term "calendar year" means a period of 12 months ending on December 31.
- **(e)** Fiscal year. For purposes of this subtitle [26 USCS §§ 1 et seq.], the term "fiscal year" means a period of 12 months ending on the last day of any month other than December. In the case of any taxpayer who has made the election provided by subsection (f), the term means the annual period (varying from 52 to 53 weeks) so elected.
- **(f)** Election of year consisting of 52-53 weeks.
  - ○ **(1)** General rule. A taxpayer who, in keeping his books, regularly computes his income on the basis of an annual period which varies from 52 to 53 weeks and ends always on the same day of the week and ends always--
    - ▪ **(A)** on whatever date such same day of the week last occurs in a calendar month, or
    - ▪ **(B)** on whatever date such same day of the week falls which is nearest to the last day of a calendar month, may (in accordance with the regulations prescribed under paragraph (3)) elect to compute his taxable income for purposes of this subtitle [26 USCS §§ 1 et seq.] on the basis of such annual period. This paragraph shall apply to taxable years ending after the date of the enactment of this title.
  - ○ **(2)** Special rules for 52-53-week year.
    - ▪ **(A)** Effective dates. In any case in which the effective date or the applicability of any provision of this title is expressed in terms of taxable years beginning, including, or ending with reference to a specified date which is the first or last day of a month, a taxable year described in paragraph (1) shall (except for purposes of the computation under section 15) be treated--
      - ▪ **(i)** as beginning with the first day of the calendar month beginning nearest to the first day of such taxable year, or
      - ▪ **(ii)** as ending with the last day of the calendar month ending nearest to the last day of such taxable year, as the case may be.
    - ▪ **(B)** Change in accounting period. In the case of a change from or to a taxable year described in paragraph (1)--
      - ▪ **(i)** if such change results in a short period (within the meaning of section 443 [26 USCS § 443]) of 359 days or more, or of less than 7 days, section 443(b) (relating to alternative tax computation) shall not apply;
      - ▪ **(ii)** if such change results in a short period of less than 7 days, such short period shall, for purposes of this subtitle [26 USCS §§ 1 et seq.], be added to and deemed a part of the following taxable year; and
      - ▪ **(iii)** if such change results in a short period to which subsection (b) of section 443 [26 USCS § 443] applies, the taxable income for such short period shall be placed on an annual basis for purposes of such subsection by multiplying the gross income for such short period (minus the deductions allowed by this chapter [26 USCS § 1 et seq.] for the short period, but only the adjusted amount of the deductions for personal exemptions as described in section 443(c) [26 USCS § 443(c)]) by 365, by dividing the result by the number of days in the short period, and the tax shall be the same part of the tax computed on the annual basis as the number of days in the short period is of 365 days.
  - ○ **(3)** Special rule for partnerships, S corporations, and personal service corporations. The Secretary may by regulation provide terms and conditions for the application of this subsection to a partnership, S corporation, or personal service corporation (within the meaning of section 441(i)(2) [26 USCS § 441(i)(2)]).
  - ○ **(4)** Regulations. The Secretary shall prescribe such regulations as he deems necessary for the application of this subsection.
- **(g)** No books kept; no accounting period. Except as provided in section 443 [26 USCS § 443] (relating to returns for periods of less than 12 months), the taxpayer's taxable year shall be the calendar year if--
  - ○ **(1)** the taxpayer keeps no books;
  - ○ **(2)** the taxpayer does not have an annual accounting period; or
  - ○ **(3)** the taxpayer has an annual accounting period, but such period does not qualify as a fiscal year.
- **(h)** Taxable year of DISC's.
  - ○ **(1)** In general. For purposes of this subtitle [26 USCS §§ 1 et seq.], the taxable year of any DISC shall be the taxable year of that shareholder (or group of shareholders with the same 12-month taxable year) who has the highest percentage of voting power.
  - ○ **(2)** Special rule where more than one shareholder (or group) has highest percentage. If 2 or more shareholders (or groups) have the highest percentage of voting power under paragraph (1), the taxable year of the DISC shall be the same 12-month period as that of any such shareholder (or group).
  - ○ **(3)** Subsequent changes of ownership. The Secretary shall prescribe regulations under which paragraphs (1) and (2) shall apply to a change of ownership of a corporation after the taxable year of the corporation has been determined under paragraph (1) or (2) only if such change is a substantial change of ownership.

**SPA-74**

USCS Fed Rules Crim Proc R 32.2

# Rule 32.2. Criminal Forfeiture

- **(a)** Notice to the defendant. A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute. The notice should not be designated as a count of the indictment or information. The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks.

- **(b)** Entering a Preliminary Order of Forfeiture.
  - **(1)** *Forfeiture phase of the trial.*
    - **(A)** Forfeiture determinations. As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.
    - **(B)** Evidence and hearing. The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.
  - **(2)** *Preliminary order.*
    - **(A)** Contents of a specific order. If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria. The court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).
    - **(B)** Timing. Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4).
    - **(C)** General order. If, before sentencing, the court cannot identify all the specific property subject to forfeiture or calculate the total amount of the money judgment, the court may enter a forfeiture order that:
      - **(i)** lists any identified property;
      - **(ii)** describes other property in general terms; and
      - **(iii)** states that the order will be amended under Rule 32.2(e)(1) when additional specific property is identified or the amount of the money judgment has been calculated.
  - **(3)** *Seizing property.* The entry of a preliminary order of forfeiture authorizes the Attorney General (or a designee) to seize the specific property subject to forfeiture; to conduct any discovery the court considers proper in identifying, locating, or disposing of the property; and to commence proceedings that comply with any statutes governing third-party rights. The court may include in the order of forfeiture conditions reasonably necessary to preserve the property's value pending any appeal.
  - **(4)** *Sentence and judgment.*
    - **(A)** When final. At sentencing--or at any time before sentencing if the defendant consents--the preliminary forfeiture order becomes final as to the defendant. If the order directs the forfeiture of specific property, it remains preliminary as to third parties until the ancillary proceeding is concluded under Rule 32.2(c).
    - **(B)** Notice and inclusion in the judgment. The court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing. The court must also include the forfeiture order, directly or by reference, in the judgment, but the court's failure to do so may be corrected at any time under Rule 36.
    - **(C)** Time to appeal. The time for the defendant or the government to file an appeal from the forfeiture order, or from the court's failure to enter an order, begins to run when judgment is entered. If the court later amends or declines to amend a forfeiture order to include additional property under Rule 32.2(e), the defendant or the government may file an appeal regarding that property under Federal Rule of Appellate Procedure 4(b). The time for that appeal runs from the date when the order granting or denying the amendment becomes final.
  - **(5)** *Jury determination.*
    - **(A)** Retaining the jury. In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict.
    - **(B)** Special verdict form. If a party timely requests to have the jury determine forfeiture, the government must submit a proposed Special Verdict Form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant.
  - **(6)** *Notice of the forfeiture order.*
    - **(A)** Publishing and sending notice. If the court orders the forfeiture of specific property, the government must publish notice of the order and send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.